**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISON
No. 5:20-CT-03333-M**

| | | |
|---|---|---|
| CHARLES HALLINAN, JOSEAN KINARD, GEORGE RIDDICK, JORGE L. MALDONADO, WILLIAM BROWN, TERRANCE FREEMAN, ANTHONY BUTLER, DARYL WILLIAMS, QUAMAIN JACKSON, AND LASALLE WALDRIP, on behalf of themselves and similarly situated individuals, | ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs/Petitioners,* | ) ) | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY CLASS UNDER RULE 23(b)(2)** |
| v. | ) ) | |
| THOMAS SCARANTINO, Complex Warden, Federal Correctional Complex Butner; MICHAEL CARVAJAL, Federal Bureau of Prisons Director; and JEFFERY ALLEN, Federal Bureau of Prisons Medical Director, in their official capacities, and the FEDERAL BUREAU OF PRISONS, | ) ) ) ) ) ) ) | |
| *Defendants/Respondents.* | | |

## INTRODUCTION

COVID-19 is devastating Federal Correctional Complex Butner ("Butner"). The virus has infected a quarter of the population and killed 26 incarcerated men and a staff member. Butner houses just three percent of the population of the Federal Bureau of Prisons ("BOP") but is responsible for six percent of its COVID-19 cases and 20 percent of its COVID-19 deaths. More than twice as many incarcerated men have died from COVID-19 at Butner as at any other BOP facility. Every one of them had an underlying disability[1] putting him at increased risk of dying from the virus. And signs indicate infections are rising.

The risks at Butner have long been obvious. It is a crowded facility with a vulnerable population. It houses some of the sickest people in the entire BOP. People sleep within a few feet of each other and share bathrooms, phones, computers, and common spaces.

Respondents/Defendants ("Defendants") know the extraordinary danger COVID-19 poses at Butner. Yet they have failed to mitigate the risks in any meaningful way for the proposed class members. They could have reduced the risk but have failed to do so in violation of the Rehabilitation Act and the Eighth Amendment.

The issues concerning Defendants' obligation can and should be resolved in a single trial, with a single injunction. Plaintiffs/Petitioners ("Plaintiffs") seek to represent the men in custody at Butner who remain at an extreme risk of serious harm due to Defendants' failure to take appropriate steps to protect their health and safety. A single trial will most efficiently allow Plaintiffs to seek justice, warranting class certification.

## PROPOSED CLASS AND SUBCLASS

Plaintiffs seek to certify a class defined as:

> All persons currently or in the future incarcerated at FCC Butner while

---

[1] For purposes of this brief, "disabilities" are those listed in the definition of the Disability Subclass.

1

anyone on the premises is infected with COVID-19.

Doc. 1, Complaint, at ¶ 324 (the "Class"). Each named Plaintiff seeks to represent the Class.

Reflecting the heightened risk COVID-19 poses for the high number of people at Butner with disabilities, Plaintiffs Hallinan, Riddick, Maldonado, Butler, Brown, Freeman, Williams, and Waldrip additionally seek to represent a subclass of:

> All class members who are medically vulnerable and at high risk of severe illness or death from COVID-19 due to disabilities protected under Section 504 of the Rehabilitation Act, including those with the following conditions: cancer; chronic kidney disease; chronic obstructive pulmonary disease ("COPD") or moderate to severe asthma; immunocompromised state from solid organ transplant, blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids or other immune weakening medicines; serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; diabetes; cerebrovascular disease; cystic fibrosis; hypertension; neurologic conditions such as dementia; liver disease; pulmonary fibrosis; and thalassemia ("Subclass").

*Id*. ¶ 325.

## FACTUAL BACKGROUND

### I.      COVID-19 Is a Deadly, Contagious Disease that Poses a Substantial Risk to All Putative Class and Subclass Members

The virus that causes COVID-19 is highly contagious, with no vaccine and no known cure. Doc. 1-30, Declaration of Expert Chris Beyrer ("Beyrer Decl."), at 3. It spreads mainly through respiratory droplets, airborne transmission, and contact with contaminated objects. Doc. 1-7, How Coronavirus Spreads; Beyrer Decl. at 6-7. Asymptomatic people can transmit the virus, making prevention particularly difficult. Doc. 1-7, How Coronavirus Spreads; Beyrer Decl. at 6. COVID-19 is deadly, with an overall mortality rate of 2.9 percent in the United States. Beyrer Decl. at 3 and n.5. It can cause pneumonia, acute respiratory distress syndrome, respiratory failure, heart failure, and sepsis.[2] Those who survive COVID-19 can suffer severe and permanent damage to the

---

[2]      Fei Zhou, et al., *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China: A Retrospective Cohort Study*, 395 The Lancet 1054 (Mar. 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext; Jordan Cates, et al., *Risk*

2

lungs and other vital organs. Beyrer Decl. at 4.

All people risk serious illness and death from COVID-19. Beyrer Decl. at 4. People with certain underlying medical conditions—including those the Subclass members have—face higher risk of hospitalization and death. *Id.* at 9-10 and n.31. Hospitalization is at least three times more likely in patients with medical conditions such as diabetes, cardiovascular disease, and chronic kidney disease as compared to patients without these conditions, and death due to COVID-19 is 12 times more likely in patients with underlying health conditions such as diabetes, cardiovascular disease, and chronic lung disease. *Id.* at 9-10 and n.33. Only three measures are known to reduce the spread of this fatal virus: (i) social distancing of at least six feet of space between people (Doc. 1-14, How to Protect Yourself & Others, Beyrer Decl. at 6-7), (ii) mask usage (Doc. 1-14, How to Protect Yourself & Others, Beyrer Decl. at 15-16), and (iii) vigilant hygiene practices (Doc. 1-14, How to Protect Yourself & Others, Beyrer Decl. at 17-18). The most important is distancing, without which even vigilant hygiene efforts will not slow the virus. Beyrer Decl. at 6-7. Six feet should be considered a minimum, and there is evidence that droplets carrying the virus can travel more than 20 feet. *Id.* Exposure time, ventilation of enclosed environments, and force of escalation are all important factors in transmission. *Id.* at 7 and n.21. Because asymptomatic people can transmit the virus, everyone—not just those with symptoms—must practice distancing and other preventative measures. *Id.* at 6.

## II. COVID-19 Poses an Extraordinary Risk at Butner

All prisons are at increased risk for rapid spread of COVID-19. *Id.* at 7-8; Doc. 1-16, July 22, 2020 Edition of Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19)

---

*for In-Hospital Complications Associated with COVID-19 and Influenza – Veterans Health Administration, United States, October 1, 2018-May 21, 2020*, CDC MMWR, October 23, 2020, https://www.cdc.gov/ mmwr/volumes/69/wr/mm6942e3.htm?s_cid=mm6942e3_w.

3

in Correctional and Detention Facilities. But the conditions at Butner, and Defendants' failure to sufficiently address the risks there, place the members of the Class and Subclass at a significantly heightened risk, even as compared to people in most prisons.

###    A.    Butner houses many people at high risk from COVID-19 due to medical vulnerabilities

Butner houses 3,877 men,[3] including some of the most medically vulnerable in BOP custody. The complex[4] includes a hospital, FMC Butner, serving people at BOP's highest health care classification level, Care Level 4.[5] In FMC Butner alone, there is a floor of roughly 240 people who are seriously immunocompromised from cancer treatment.[6]

Butner also houses hundreds of men with health care needs classified as Care Level 3.[7] They suffer from ailments such as cancer,[8] hypertension, heart disease,[9] compromised immune systems,[10] and diabetes[11]—conditions that make people particularly vulnerable to severe illness or

---

[3]    *Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp#bop_pop_table (last visited Nov. 9, 2020).

[4]    Butner is made up of four sections: FMC Butner; LSCI Butner (or "Butner Low"); FCI Butner I, which comprises "the Camp" and "Medium I"; and FCI Butner II (or "Medium II").

[5]    BOP has a classification system for medical care. Each incarcerated person and each institution are assigned a care level from 1 to 4, with 4 being the highest level of care. *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Federal Bureau of Prisons, https://www.bop.gov/resources/pdfs /care_level_classification_guide.pdf, at 3-5. Conditions that result in Care Level 4 include "cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, [and] major surgical treatment." *Id.*

[6]    *Hallinan v. Scarantino*, No. 5:20-hc-02088-FL (E.D.N.C., Flanagan, J.) (hereinafter "*Hallinan I*"), Doc. 26-14, Declaration of Randy Ortiz ("Ortiz Decl."), at 2; *see also Hallinan I*, Doc. 26-6, Declaration of Michael Harrington ("Harrington Decl."), at 2.

[7]    Ex. 1, Declaration of Terrance Freeman ("Freeman Decl.") at 3; Ex. 2, Declaration of George B. Riddick ("Riddick Decl."), at 2; Ex. 4, Declaration of Daryl Williams ("Williams Decl."), at 2; Ex. 5, Declaration of Antonio Ross ("Ross Decl."), at 2. All exhibit references herein are exhibits to the Declaration of Jeffrey Wilkerson. *See also Hallinan I*, Doc. 26-8, Declaration of Arnold J. Hill ("Hill Decl."), at 2; *Hallinan I*, Doc. 26-13, Declaration of Benjamin D. McRae ("McRae Decl."), at 2.

[8]    *See, e.g.*, Ex. 6, Declaration of Charles Hallinan ("Hallinan Decl."), at 2; Ex. 2, Riddick Decl. at 2; Ex. 4, Williams Decl. at 2; *Hallinan I*, Doc. 26-14, Ortiz Decl., at 1; Doc. 26-3, Declaration of John Dailey ("Dailey Decl."), at 2.

[9]    *See, e.g.*, Ex. 6, Hallinan Decl. at 2; Ex. 1, Freeman Decl. at 3; Ex. 3, Declaration of Lasalle Waldrip ("Waldrip Decl.") at 2; Doc. 1-7, Declaration of Antwan Harris ("Harris Decl."), at 1; *Hallinan I*, Doc. 26-8, Hill Decl. at 2; Doc. 26-13, McRae Decl. at 2; Doc. 26-16, Declaration of Troy Aurelius Titus ("Titus Decl.") at 6.

[10]    *See, e.g.*, Ex. 7, Declaration of Lee M. Ayers ("Ayers Decl."), at 3; Ex. 5, Ross Decl. at 2; *Hallinan I*, Doc. 26-12, Declaration of Jorge Maldonado ("Maldonado Decl."), at 2, 4; Doc. 26-14, Ortiz Decl. at 2; Doc. 26-3, Dailey Decl. at 3; Doc. 26-16, Titus Decl. at 6.

[11]    *See, e.g.*, Ex. 3, Waldrip Decl. at 2; Ex. 4, Williams Decl. at 2; *Hallinan I*, Doc. 26-8, Hill Decl. at 2; Doc. 26-14, Ortiz Decl. at 2; Doc. 26-16, Titus Decl. at 6.

4

death from COVID-19. Plaintiff Hallinan estimates half the people in his housing unit are elderly or have serious medical conditions.[12]

## B. The physical layout of Butner exacerbates the risk to the Class and Subclass

The layout of Butner intensifies the inherent dangers of an infectious disease outbreak in a prison populated largely with sick and elderly people. Beyrer Decl. at 14. In much of the facility, people live in large open rooms housing as many as 160 people.[13] The rooms have cubicles set up with partition dividers, but they provide no protection from an airborne illness.[14] As many as three people are housed in each cubicle, each sleeping within a few feet of one another.[15] In some areas, men are housed in celled units with up to 160 people.[16] Like the cubicles, the cells hold between one and four people.[17] Whether housed in cubicles or cells, the men cannot maintain a six-foot distance.[18]

The men at Butner share common areas to meet their most basic needs. Men in cubicles must share bathrooms with everyone in their unit.[19] In most celled units, men share toilets and sinks with cellmates and share showers with everyone in the unit.[20] Bathrooms and showers used

---

[12] Ex. 6, Hallinan Decl. at 5; *see also Hallinan I*, Doc. 26-16, Titus Decl. at 5-6 (estimating that 70% of his housing unit was at an elevated risk of death from COVID-19).

[13] *See* Ex. 6, Hallinan Decl. at 3; Ex. 3, Waldrip Decl. at 2; Ex. 8, Declaration of Josean Kinard ("Kinard Decl.") at 2, 8, 9; *Hallinan I*, Doc. 26-13, McRae Decl. at 2; Doc. 26-7, Harris Decl. at 2; Doc. 26-8, Hill Decl. at 3; Doc. 26-3, Dailey Decl. at 3; Doc. 26-12, Maldonado Decl. at 5.

[14] Ex. 6, Hallinan Decl. at 3; Ex. 3, Waldrip Decl. at 2; Ex. 8, Kinard Decl. at 2, 8; *Hallinan I*, Doc. 26-11, Declaration of John Krokos ("Krokos Decl.") at 3; Doc. 26-13, McRae Decl. at 3; Doc. 26-8, Hill Decl. at 3.

[15] *See* Ex. 6, Hallinan Decl. at 3; Ex. 3, Waldrip Decl. at 2; Ex. 8, Kinard Decl. at 2, 8; *Hallinan I*, Doc. 26-8, Hill Decl. at 3; Doc. 26-13, McRae Decl. at 3; Doc. 26-3, Dailey Decl. at 3-4; Doc. 26-11, Krokos Decl. at 3.

[16] *See* Ex. 5, Ross Decl. at 4; Ex. 4, Williams Decl. at 5; Ex. 2, Riddick Decl. at 6; Ex. 7, Ayers Decl. at 3-4.

[17] *See* Ex. 2, Riddick Decl. at 4; Ex. 7, Ayers Decl. at 3-4; *see also* Ross Decl. at 4; Williams Decl. at 2.

[18] *See* Ex. 6, Hallinan Decl. at 3; Ex. 4, Williams Decl. at 2; Ex. 2, Riddick Decl. at 4-5; Ex. 7, Ayers Decl. at 3-4; Ex. 3, Waldrip Decl. at 2; Ex. 8, Kinard Decl. at 2; *Hallinan I*, Doc. 26-3, Dailey Decl. at 3-4; Doc. 26-11, Krokos Decl. at 3; Doc. 26-12, Maldonado Decl. at 7; Doc. 1-7, Harris Decl. at 2-3; *see also* Doc. 26-8, Hill Decl. at 3 (sleeps within about six feet of 11 men); *see also* Beyrer Decl. at 7 (six feet "should be considered a *minimum guide*"; "ventilation of enclosed environments, and exposure time" are also important factors in transmission).

[19] *See* Ex. 6, Hallinan Decl. at 3; Ex. 8, Kinard Decl. at 2, 8; *Hallinan I*, Doc. 26-3, Dailey Decl. at 4; Doc. 26-8, Hill Decl. at 3-4; Doc. 26-11, Krokos Decl. at 5; Doc. 26-13, McRae Decl. at 3; Doc. 26-7, Harris Decl. at 3; Doc. 26-17, Whyte Decl. at 4.

[20] Ex. 2, Riddick Decl. at 4-5; Ex. 7, Ayers Decl. at 4. Only in the FMC do the cells contain a toilet, sink, and shower, shared only by the cellmates. *See* Riddick Decl. at 4-5; *Hallinan I*, Doc. 26-14, Ortiz Decl. at 2.

5

by scores of men are cleaned just once or twice a day.[21] Men are generally shoulder to shoulder as they use shared phones and computers and wait their turn.[22] Like bathrooms, most phones and computers are cleaned once or twice daily.[23] They are not disinfected between near-constant use.[24] Men line up multiple times per day for meals and medications, coming into close contact with other men from their unit and people from outside their unit who dispense meals and medicine.[25]

### C.    COVID-19 is causing enormous harm at Butner

COVID-19 was first confirmed at Butner in late March 2020.[26]  As of March 30, two incarcerated people and a staff member were diagnosed. Doc. 1-17 at 3, March 30, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website.  A month later, there were more than 200 confirmed cases. Doc. 1-20, May 1, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website. To date, more than 1,000 at Butner—including more than 80 staff—have tested positive.[27] Twenty-six incarcerated people and one staff person at Butner have died from COVID-19. *Id*.; Doc. 1-6, Federal Bureau of Prisons Press Releases on Inmate Deaths at FCC

---

[21]  Ex. 4, Williams Decl. at 5; Ex. 6, Hallinan Decl. at 3; *Hallinan I*, Doc. 26-3, Dailey Decl. at 4; Doc. 26-8, Hill Decl. at 3-4; Doc. 26-11, Krokos Decl. at 5; Doc. 26-17, Whyte Decl. at 4; *see also* Doc. 1-30 at 17 ("cleaning every 24 hours will leave incarcerated people at risk throughout the entire day").

[22]  Ex. 2, Riddick Decl. at 6-7; Ex. 7, Ayers Decl. at 5; Ex. 9, Jackson Decl. at 4, 7; Ex. 4, Williams Decl. at 5; Ex. 5, Ross Decl. at 5-6; Ex. 8, Kinard Decl. at 3; Ex. 6, Hallinan Decl. at 4-5; *see also Hallinan I*, Doc. 26-11, Krokos Decl. at 5; 26-12, Maldonado Decl. at 5-6; Doc. 26-13, McRae Decl. at 3-4; Doc. 26-17, Whyte Decl. at 4-5.

[23]  Ex. 2, Riddick Decl. at 6-7; Ex. 8, Kinard Decl. at 3; Ex. 7, Ayers Decl. at 5; Ex. 9, Jackson Decl. at 4; Ex. 4, Williams Decl. at 5; Ex. 5, Ross Decl. at 5-6; Ex. 6, Hallinan Decl. at 4-5; *Hallinan I*, Doc. 26-11, Krokos Decl. at 5; Doc. 26-7, Harris Decl. at 4; Doc. 26-17, Whyte Decl. at 4-5; *see also* Doc. 1-30 at 17.

[24]  *See, e.g.,* Ex. 2, Riddick Decl. at 6-7; Ex. 8, Kinard Decl. at 3; Ex. 7, Ayers Decl. at 5; Ex. 4, Williams Decl. at 5; Ex. 5, Ross Decl. at 5-6; Ex. 6, Hallinan Decl. at 4-5; *Hallinan I*, Doc. Doc. 26-8, Hill Decl. at 4; Doc. 26-7, Harris Decl. at 4; Doc. 26-11, Krokos Decl. at 5; Doc. 26-12, Maldonado Decl. at 5; Doc. 26-13, McRae Decl. at 3-4; Doc. 26-17, Whyte Decl. at 4-5.

[25]  Ex. 5, Ross Decl. at 5; Ex. 6, Hallinan Decl. at 4; Ex. 3, Waldrip Decl. at 3, 7; Ex. 8, Kinard Decl. at 3; Ex. 4, Williams Decl. at 3-4; Ex. 9, Jackson Decl. at 6; *Hallinan I*, Doc. 26-3, Dailey Decl. at 4; Doc. 26-7, Harris Decl. at 3; Doc. 26-8, Hill Decl. at 4; Doc. 26-11, Krokos Decl. at 4, 6; 26-12, Maldonado Decl. at 7-8; Doc. 26-13, McRae Decl. at 3; Doc. 26-17, Whyte Decl. at 3.

[26]  Dan Kane, *Coronavirus Outbreak at Butner Prison Continues to Surge. Now it's Spreading to Staff*, News & Observer (Apr. 9, 2020), https://www.newsobserver.com/news/local/crime/ article241901551 html.

[27]  *See* Ex. 14, June 15, 2020 Screenshot of BOP COVID-19 Cases from BOP Coronavirus Resource Page ("BOP COVID-19 Screenshot") (showing 914 incarcerated people had tested positive for COVID-19), Ex. 21, Nov. 2, 2020 BOP COVID-19 Screenshot (showing 100 staff members had tested positive for COVID-19).

6

Butner. This figure represents one-fifth of all COVID-19 deaths in BOP and more than twice as many as any other BOP facility.[28] Based on Defendants' statements, all these men would likely have been in the Subclass. Doc. 1-6, Federal Bureau of Prisons Press Releases on Inmate Deaths at FCC Butner.

The true infection rate at Butner is unknown, as testing is inconsistent and rare. Between September 1 and October 19, 2020, Defendants tested only 44 people.[29]

But the number of COVID-19 cases in North Carolina is rising,[30] as is the number of confirmed cases at Butner Butner's FMC jumped from no reported cases on October 14, to 10 on October 23, to 45 on October 27, to 62 on November 2.[31] People incarcerated at Butner report that people are again falling sick and that people are testing positive for a second time.[32] In fact, on September 17, 2020, a man incarcerated at Butner died from COVID-19. Doc. 1-6 at 27, Federal Bureau of Prisons Press Releases on Inmate Deaths at FCC Butner. Months earlier, he tested positive and then negative. *Id.*

## III.    Defendants' Inadequate Response to the Outbreak Places the Class and Subclass at Risk of Harm

Despite the threat from COVID-19, Defendants have done little to mitigate that risk.

### A.    Defendants are resisting directives to reduce the population at Butner

Public health experts urge rapid release from custody of those most vulnerable to COVID-19. Beyrer Decl. at 13-15, 27.[33] On April 3, 2020, Attorney General Barr directed Defendants to

---

[28]  Ex. 21, Nov. 2, 2020 BOP COVID-19 Screenshot.

[29]  *Compare* Ex. 15, Sept. 1, 2020 BOP COVID-19 Screenshot at 4 (reflecting that a total of 2,108 incarcerated people at Butner had been tested) *with* Ex. 18, Oct. 19, 2020 BOP COVID-19 Screenshot at 4 (reflecting that a total of 2,152 incarcerated people at Butner had been tested).

[30]  COVID-19 North Carolina Dashboard, NCDHH COVID-19 Response, https://covid19 ncdhhs.gov/dashboard (last visited Nov. 3, 2020).

[31]  Ex. 16, Oct. 14, 2020 BOP COVID-19 Screenshot; Ex. 19, Oct. 23, 2020 BOP COVID-19 Screenshot; Ex. 20, Oct. 27, 2020 BOP COVID-19 Screenshot; Ex. 21, Nov. 2, 2020 BOP COVID-19 Screenshot.

[32]  Ex. 1, Freeman Decl. at 4.

[33]  *See also* Josiah Rich, Scott Allen, and Mavis Nimoh, *We Must Release Prisoners to Lessen the Spread of Coronavirus*, Washington Post (Mar. 17, 2020), https://wapo.st/2JDVq7Y; *UNODC, WHO, UNAIDS and OHCHR*

take immediate and aggressive steps to transfer people to home confinement, recognizing "time is of the essence." Doc. 1-27 at 3, April 13, 2020 Memorandum for All Chief Executive Officers. Yet Defendants failed to use their authority to reduce Butner's population.

Early in the pandemic, few people were transferred to home confinement from Butner.[34] In spring 2020, Butner housed well over a thousand men who were minimum or low security, many of whom were medically vulnerable with disabilities.[35] By May, a fifth of all the COVID-19-related deaths in the BOP originated at Butner, more than any other BOP facility. Doc. 1-20 at 2, May 1, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website. By June 3, just 42 people from Butner – one percent of the population there – had been transferred to home confinement.[36] By contrast, BOP as a whole had transferred 2.5 percent of its population to home confinement.[37]

The few approved for transfer to home confinement were subject to delays that put them at additional risk. For example, John Dailey was a cancer patient serving a 27-month sentence at Butner.[38] Defendants approved Mr. Dailey's transfer to home confinement in late April, but decided he would not be transferred until August—four months after they determined he could be confined at home.[39] Mr. Dailey contracted COVID-19 and died on July 3, 2020. Doc. 1-6 at 25, Federal Bureau of Prisons Press Releases on Inmate Deaths at FCC Butner. Declarant Benjamin

---

*Joint Statement on COVID-19 in Prisons and Other Closed Settings*, World Health Organization (May 13, 2020) https://www.who.int/news/item/13-05-2020-unodc-who-unaids-and-ohchr-joint-statement-on-covid-19-in-prisons-and-other-closed-settings.

[34] *See Hallinan I*, Doc. 26-8, Hill Decl. at 8; Doc. 26-13, McRae Decl. at 5; Doc. 26-16, Titus Decl. at 6.

[35] *See Hallinan I*, Doc. 36, Statement of Material Facts on Resp'ts' Mot. to Dismiss, at 2-3.

[36] *Id.* at 23.

[37] Ex. 13, June 3, 2020 BOP COVID-19 Screenshot at 2-4 (showing population and total transfers to home confinement).

[38] Mr. Dailey was a plaintiff in *Hallinan I*. Doc. 26-3, Dailey Decl. at 1.

[39] *Hallinan I*, Doc. 26-3, Dailey Decl. at 6.

8

McRae was approved for transfer to home confinement in late April.[40] He suffered from hypertension and blood clotting issues, and was designated as Care Level 3.[41] Although Mr. McRae faced a heightened risk from COVID-19 and Defendants determined that he could safely be transferred to home confinement, they refused to remove him from Butner until June 9, 2020.[42]

Defendants also continue opposing motions for compassionate release.[43] For example, they opposed motions by Declarants Huntley, Krokos, Ayers, Hill, Harrington, and Goodwin, which courts nevertheless granted.[44]

### B. Defendants make social distancing nearly impossible

Defendants have failed to change practices to permit adequate distancing between people. As set out above, people incarcerated at Butner must engage in nearly all their daily activities within feet of one another. And Defendants know how to improve distancing. For example, Defendants created a plan that included not allowing people to line up to wait for phones.[45] But they have not implemented that plan, instead permitting people to line up for the phones throughout the pandemic.[46] Likewise, Defendants created a plan to limit the number of people in the bathroom

---

[40] Mr. McRae was a plaintiff in *Hallinan I*. He was approved for transfer to home confinement on April 21, 2020. *Hallinan I*, Doc. 26-13, McRae Decl. at 5.

[41] *Id.* at 2.

[42] *Hallinan I*, Doc. 36, Statement of Material Facts on Resp'ts' Mot. to Dismiss, at 27.

[43] *See Hallinan I*, Doc. 26-4, Goodwin Decl. at 4; Doc. 26-6, Harrington Decl. at 5; Doc. 26-12, Maldonado Decl. at 8-9; Doc. 26-9, Huntley Decl. at 5.

[44] Order Granting Defendant Lee Ayers' Motion for Compassionate Release, *United States v. Lee Ayers*, No. 2008 CF3 020985 (D.C. Super. Ct. Aug. 13, 2020); Order Granting Defendant Arnold Hill's Motion for Compassionate Release, *United States v. Arnold Hill*, No. 1987 FEL 11252 (D.C. Super. Ct. Aug. 3, 2020); Opinion, *United States v. Arnold Hill*, No. 1987 FEL 11252 (D.C. Super. Ct. Aug. 28, 2020); Order Granting Defendant's Renewed Motion for Compassionate Release, *United States v. Goodwin*, No. 4:18-cr-00021 (S.D. Iowa, Sept. 21, 2020), ECF No. 164; Order Granting Motion for Compassionate Release, *United States v. Harrington*, No. 1:15-cr-00338 (W.D. Tex., June 22, 2020), ECF No. 54; Order Granting Motion for Compassionate Release, *United States v. Krokos,* No. 2:12-cr-00527 (C.D. Cal. May 1, 2020); *Hallinan I*, Doc. 26-9, Huntley Decl. at 5.

[45] *Hallinan I*, Doc. 38-30, April 4-5, 2020 Plan.

[46] Ex. 2, Riddick Decl. at 6; Ex. 7, Ayers Decl. at 5; Ex. 9, Jackson Decl. at 4; Ex. 4, Williams Decl. at 5; Ex. 9, Kinard Decl. at 3; Ex. 6, Hallinan Decl. at 4; *Hallinan I*, 26-3, Dailey Decl. at 4; Doc. 26-7, Harris Decl. at 4; Doc. 26-8, Hill Decl. at 4; Doc. 26-9, Huntley Decl. at 3; Doc. 26-13, McRae Decl. at 3; Doc. 26-17, Whyte Decl. at 5.

9

areas, but they failed to carry it out.[47]  Defendants had a plan to close the TV rooms to avoid

crowding in them,[48] but some TV rooms were left open.[49]  Others were closed but the televisions

were left on and people were allowed to sit, close together, outside the rooms to watch television.[50]

### C.    Defendants have chosen not to find out who at Butner has COVID-19

Defendants' testing process is grossly inadequate.  Few people have been tested in recent

months, despite continuing cases and a COVID-19 death during that period.[51]

For the most part, Defendants have chosen to rely on sporadic temperature checks and

occasional questions about symptoms, rather than virus testing.[52]  Moreover, when people report

symptoms, Defendants have declined to test them, sending them back to their housing units.[53]  For

example, Declarant Antonio Ross, who had a heart transplant and is in kidney failure, became sick

in mid-March 2020.  He requested a sick call but was not seen for more than a week.  At that time,

the medical staff did not test him, but declared he had the flu and sent him back to his housing

unit.[54] Four days later, he tested positive for COVID-19.[55]

Defendants also do not test close contacts of people who contract COVID-19.[56]  For

example, Plaintiff Daryl Williams frequently assisted Billy Miller, a man who used a wheelchair.[57]

Mr. Miller died from COVID-19 on May 7, 2020.  Doc. 1-6, Federal Bureau of Prisons Press

---

[47]  Ex. 6, Hallinan Decl. at 3; Ex. 9, Kinard Decl. at 2; Ex. 7, Ayers Decl. at 4; *Hallinan I*, Doc. 38-30, April 4-5, 2020 Plan; Doc. 26-3, Dailey Decl. at 4; Doc. 26-9, Huntley Decl. at 3; Doc. 26-8, Hill Decl. at 3-4; Doc. 26-13, McRae Decl. at 3; Doc. 26-7, Harris Decl. at 3; Doc. 26-17, Whyte Decl. at 4.

[48]  *Hallinan I*, Doc. 38-30, April 4-5, 2020 Plan.

[49]  *Hallinan I*, Doc. 26-9, Huntley Decl. at 3-4; Doc. 26-12, Maldonado Decl. at 7.

[50]  *Hallinan I*, Doc. 26-3, Dailey Decl. at 5.

[51]  *See supra* at pp. 7-8 and n.29; *see also* Doc. 1-6 at 27.

[52]  Ex. 6, Hallinan Decl. at 5-6; Ex. 1, Freeman Decl. at 2; Ex. 4, Williams Decl. at 2; Ex. 5, Ross Decl. at 4; Ex. 9, Jackson Decl. at 4, 7; Ex. 2, Riddick Decl. at 9; Ex. 7, Ayers Decl. at 7; Ex. 3, Waldrip Decl. at 5; *Hallinan I*, Doc. 26-16, Titus Decl. at 4; Doc. 26-3, Dailey Decl. at 5; Doc. 26-7, Harris Decl. at 6; Doc. 26-13, McRae Decl. at 4.

[53]  *See, e.g.*, Ex. 1, Freeman Decl. at 2.

[54]  Ex. 5, Ross Decl. at 2.

[55]  *Id.* at 3.

[56]  Ex. 6, Hallinan Decl. at 6; Ex. 4, Williams Decl. at 3; *Hallinan I*, Doc. 26-7, Harris Decl. at 6; Doc. 26-17, Whyte Decl. at 10.

[57]  Ex. 4, Williams Decl. at 3.

Releases on Inmate Deaths at FCC Butner at 7.  Plaintiff Williams was not tested.[58]

Further, Defendants do not test Butner staff; relying instead on "temperature checks and COVID-19 screening."[59]  As of November 2, BOP reported 82 Butner staff had tested positive for COVID-19 and one died from the disease.[60]

Defendants have chosen to remain ignorant as to who at Butner has COVID-19, leaving an untold number of people infected with the virus in the general population where they can infect others.  These choices put all people incarcerated at Butner at risk, particularly those with conditions that make them especially vulnerable.

**D.    Defendants' dangerous isolation and quarantine conditions place the Class and Subclass at increased risk**

To prevent the spread of COVID-19, it is critical to separate those who have the virus or who have been exposed to the virus from others.  Beyrer Decl. at 23.[61]  Butner's isolation and quarantine procedures are not medically sound or effective.  *Id*. at 23-26.

**1.    Defendants' isolation practices are dangerous**

Throughout most of the pandemic, Defendants placed people who are suspected or confirmed to have COVID-19 in isolation in punitive conditions.[62]  This is *not* medical isolation with proper monitoring (Beyrer Decl. at 23-25);[63] this is solitary confinement.  For example, Roger Goodwin, who takes daily medications to control his diabetes and has a rare immunodeficiency

---

[58]  Ex. 4, Williams Decl. at 3.
[59]  *See BOP Implementing Modified Operations*, Federal Bureau of Prisons https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Nov. 3, 2020).
[60]  Ex. 21, Nov. 2, 2020 BOP COVID-19 Screenshot.
[61]  Medical isolation refers to separating someone with confirmed or suspected COVID-19 infection to prevent their contact with others and to reduce the risk of transmission.  Quarantine refers to the practice of separating individuals who have had close contact with someone with COVID-19 to determine whether they develop symptoms or test positive for the disease.  Doc. 1-16, July 22, 2020 Edition of Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, at 6-7.
[62]  Ex. 3, Waldrip Decl. at 5, 7; Ex. 6, Hallinan Decl. at 6; Ex. 2, Riddick Decl. at 7-8; *Hallinan I*, Doc. 26-4, Goodwin Decl. at 6; Doc. 26-8, Hill Decl. at 5; Doc. 26-3, Dailey Decl. at 5; Doc. 26-13, McRae Decl. at 3; Doc. 26-16, Titus Decl. at 4.
[63]  *See also* Ex. 3, Waldrip Decl. at 5; *Hallinan I*, Doc. 26-8, Hill Decl. at 5.

11

disorder, was taken to "isolation" in a filthy room in the Special Housing Unit or "SHU" after testing positive for COVID-19. He was not given his medications, his toiletries, or even a cup to drink from for days.[64] Other than the direction to drink fluids and once- or twice-daily checks of his vital signs, he received no medical advice or treatment for COVID-19 while in isolation.[65] After 17 days, he was transported back to his housing unit on a crowded bus without being retested for COVID-19.[66] Since no later than March 26, 2020, Defendants have known that people were hiding their symptoms to avoid being placed into this punitive isolation.[67] Yet the practice of sending people to the SHU if they test positive continues.[68]

Throughout the pandemic, Defendants have used North Carolina, a celled unit at Medium I, for isolation.[69] North Carolina is a celled unit, but the toilets and sinks are shared by the entire unit; each man who is sick and housed there must use the shared bathroom, which is not cleaned consistently.[70] The lack of a hygienic space and appropriate access to water increases the risk of COVID-19 transmission. Beyrer Decl. at 25.

Defendants also delay the isolation of people who, like Declarant Ross, exhibit symptoms and test positive. Beyrer Decl. at 25.[71] Declarant Goodwin fell sick around April 20, 2020, along with other men in his unit.[72] He was taken to the medical staff after passing out on April 21, but sent back to his housing unit without testing.[73] The following day, he passed out again, and was again taken to medical, where he was tested for COVID-19.[74] He was sent back to his housing

---

[64] *Hallinan I*, Doc. 26-4, Goodwin Decl. at 6-7.
[65] *Id.* at 7.
[66] *Id.*
[67] *Hallinan I*, Doc. 37-11, Strassel Decl. at 11-12.
[68] Ex. 3, Waldrip Decl. at 7; Ex. 6, Hallinan Decl. at 5-6; Ex. 1, Freeman Decl. at 4.
[69] Ex. 5, Ross Decl. at 3-4; Ex. 4, Williams Decl. at 2.
[70] Ex. 5, Ross Decl. at 3-4.
[71] *See also supra* p. 11; Ex. 5, Ross Decl. at 2-3.
[72] *Hallinan I*, Doc. 26-4, Goodwin Decl. at 5.
[73] *Id.*
[74] *Id.*

unit again, and then two hours later taken to the SHU because he had tested positive.[75]

In the Camp in April, symptomatic people were simply left in their housing units rather than being moved to isolation.[76] A man in Plaintiff Maldonado's housing unit coughed for days and passed out in the bathroom, but was not taken out of the unit for several more days, when he was so ill he had to be taken out on a stretcher.[77] A man in Plaintiff Freeman's unit repeatedly told staff he was sick, but they failed to move him until he required hospitalization; the men in the unit later learned he had died from COVID-19.[78] In Butner Low in May, many people were symptomatic, but were not placed into isolation.[79] Declarant Dailey was symptomatic for weeks before he was removed from his cubicle-style housing unit and had to be taken to the hospital by ambulance.[80] In Medium I, Plaintiff Williams estimated the majority of his unit were sick in April and May but were not taken out of the unit.[81]

On the rare occasions when Defendants have undertaken more widespread testing, they delay moving people who test positive into isolation. In late April, after one housing unit was tested,[82] Defendants did not move some residents who tested positive for the virus until *five days* after receiving the test results.[83] Thus, with full knowledge of the danger, Defendants kept known COVID-positive people in close quarters with uninfected people for five days.[84]

Defendants repeated this process on a much larger scale in June. Throughout May, the number of cases rose sharply in Butner Low and six people housed there died. Doc. 1-20, May 1,

---

[75] *Id.* at 5-6.
[76] Ex. 1, Freeman Decl. at 2-3; *Hallinan I*, Doc. 26-9, Huntley Decl. at 4-5; Doc. 26-12, Maldonado Decl. at 8.
[77] *Hallinan I*, Doc. 26-12, Maldonado Decl. at 8.
[78] Ex. 1, Freeman Decl. at 3.
[79] Ex. 6, Hallinan Decl. at 7; Ex. 3, Waldrip Decl. at 5-6; Ex. 8, Kinard Decl. at 4-5; *Hallinan I*, Doc. 26-7, Harris Decl. at 5.
[80] Ex. 3, Waldrip Decl. at 5-6.
[81] Ex. 4, Williams Decl at 3.
[82] *Hallinan I*, Doc. 26-9, Huntley Decl. at 5; Doc. 26-12, Maldonado Decl. at 8.
[83] *Hallinan I*, Doc. 26-12, Maldonado Decl. at 8.
[84] *Id.*

13

2020 Screenshot of the Federal Bureau of Prisons COVID-19 website; Doc. 1-21, May 31, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website. On about June 1, all people housed in Butner Low were tested for COVID-19.[85] Over the course of the next 10 days, BOP publicly recognized a growing number of cases at Butner Low, going from 137 cases on May 31, to 367 on June 3, to 534 cases on June 7, to 617 cases on June 8, to 642 cases on June 10. Doc. 1-21, May 31, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website; Doc. 1-22, June 3, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website; Doc. 1-23, June 7, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website; Doc. 1-24, June 8, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website; Doc. 1-25, June 9, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website; Doc. 1-26, June 10, 2020 Screenshot of the Federal Bureau of Prisons COVID-19 website.

During the weekend of June 6-7, a nurse came into a housing unit at Butner Low and remarked that most of the men had COVID-19.[86] But the men housed in Butner Low were not informed of the results until about June 10.[87] Housing assignments were then reshuffled to create COVID-19 positive and COVID-19 negative housing units, which took another couple of days.[88] Thus, again, Defendants knew of positive cases – this time hundreds of them – for a week or more before they separated the people they knew had the virus from people who had tested negative. Their decision allowed the disease to spread further through the population. Doc. 1-30, Beyrer Decl. at 19-20. By the time BOP separated people who had tested positive from those who had tested negative, Defendants had no way of knowing how many people with negative test results had subsequently contracted COVID-19. Doc. 1-30, Beyrer Decl. at 19-20, 26. People who had

---

[85] Ex. 6, Hallinan Decl. at 7; Ex. 3, Waldrip Decl. at 6; Ex. 8, Kinard Decl. at 5.
[86] Ex. 6, Hallinan Decl. at 7.
[87] *Id*.; Ex. 3, Waldrip Decl. at 6; *see also* Ex. 8, Kinard Decl. at 5.
[88] Ex. 6, Hallinan Decl. at 7-8; Ex. 3, Waldrip Decl. at 6; Ex. 8, Kinard Decl. at 5.

tested negative but were symptomatic by the time of the move were housed with other people who had tested negative.[89]  While Butner Low was divided into positive and negative units, people in negative units continued to contract COVID-19.[90]

Placing people into these cells without testing meant they may have been placed into cells with another person, without actual knowledge of who has the virus.  When Declarant Ross was placed into isolation, his test results had not yet come back.[91]  He was placed into a cell with another man who had symptoms, but also did not have test results.[92]  Thus, both men were at risk of being exposed to the virus by their new cellmate.  Doc. 1-30, Beyrer Decl. at 20.

Many people "in isolation" are not actually isolated.  For example, an impromptu isolation unit was set up next to a regular housing unit, sharing a bathroom and divided only by a make-shift wall.[93]  While Butner Low was divided into positive and negative housing units, there was traffic between units. For example, incarcerated people and staff moved between Granville A, a negative unit, and Granville B, a positive unit.[94]

At the FMC, men who have COVID-19 symptoms are isolated on the third floor, along with patients who are there for other medical reasons.[95]  The same people deliver food, laundry and commissary items to the men in isolation, the rest of the patients on the floor, and those on other floors.[96]

Defendants assigned a prisoner orderly to clean the SHU where infected people are housed; he then returned to his housing unit where people were presumed not to be infected.[97]

---

[89] Ex. 6, Hallinan Decl. at 7-8.
[90] Ex. 8, Kinard Decl. at 7; Ex. 3, Waldrip Decl. at 7.
[91] Ex. 5, Ross Decl. at 3.
[92] *Id.*
[93] *Hallinan I*, Doc. 26-12, Maldonado Decl. at 6.
[94] Ex. 8, Kinard Decl. at 6-7.
[95] Ex. 9, Jackson Decl. at 3.
[96] *Id.*; *Hallinan I*, Doc. 26-14, Ortiz Decl. at 2.
[97] *Hallinan I*, Doc. 26-3, Dailey Decl. at 6; Doc. 26-17, Whyte Decl. at 9.

15

Defendants have also failed to provide medical care and adequate monitoring to people confirmed to have the virus, increasing the risk. Doc. 1-30, Beyrer Decl. at 23-24. Declarants Ross and Goodwin both report that their only care while isolated at Butner was Tylenol and checks of their vital signs.[98] Plaintiff Freeman received no treatment after testing positive.[99] Men housed in COVID-19 positive units at Butner Low received even less care: they did not have their temperatures or other vital signs checked, nor were they asked about symptoms, during the first two weeks they were in isolation.[100]

### 2. Defendants' quarantine practices are also dangerous

Defendants' quarantine practices pose similar problems. Quarantine is necessary for prisoners "who are close contacts of a known or suspected case" and for new entrants into the facility.[101] Defendants set up quarantine in a deeply flawed manner.

Defendants do not quarantine people who are close contacts of known cases. As discussed above, Plaintiff Williams was a close contact of Billy Miller, who died from COVID-19.[102] Mr. Williams was not quarantined.[103]

When people are transferred between different parts of Butner, they are quarantined. However, there are few precautions to ensure this process itself does not spread the virus. Plaintiff Jackson was moved from the FMC to Medium II in late July 2020.[104] He was transported in a van with six other people from various floors at the FMC, including floors where there were cases of COVID-19 at the time, and he was then quarantined in the SHU at Medium II.[105] There were

---

[98] Ex. 5, Ross Decl. at 3; *Hallinan I*, Doc. 26-4, Goodwin Decl. at 6-7.
[99] Ex. 1, Freeman Decl. at 3.
[100] Ex. 6, Hallinan Decl. at 8.
[101] *See Hallinan I*, Doc. 26-24, *Memorandum for All Chief Executive Officers: Coronavirus (COVID-19) Phase Six Action Plan*, Federal Bureau of Prisons (Apr. 13, 2020), at 2-3.
[102] Ex. 4, Williams Decl. at 3.
[103] *Id.*
[104] Ex. 9, Declaration of Quamain Jackson ("Jackson Decl.") at 2, 5.
[105] *Id.* at 5.

16

people from all over Butner in the SHU.[106] Several days after Mr. Jackson arrived in the SHU, eight people were transferred out.[107] Two days after that, six more people transferred in.[108] Mr. Jackson was told he was supposed to be in quarantine for 14 days, but ended up staying about 20 days.[109] He was told the reason for the delay in his release from quarantine was that they were waiting on test results.[110]

In FMC Butner, men transferring into Butner (whose COVID-19 status is unknown) are "quarantined" in cells on the floor where cancer patients are housed.[111] The same workers deliver food to the quarantine cells and the cells of cancer patients and patients on other floors.[112]

There is also no monitoring of people who have been exposed to COVID-19. For example, as discussed above, in June, the men at Butner Low were divided into COVID positive and COVID negative units. The men who had tested negative were not monitored for symptoms despite having been living for weeks in close quarters with people who had tested positive.[113] Defendants' failure to implement appropriate isolation and quarantine practices puts all people incarcerated at Butner at risk, particularly those with conditions making them especially vulnerable to COVID-19.

### E. Defendants have failed to implement basic measures to reduce the risk

Defendants developed a plan for cleaning and disinfecting to reduce virus spread, but failed to implement it.[114] They have not adequately cleaned and disinfected living spaces and equipment

---

[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Hallinan I*, Doc. 26-14, Ortiz Decl. at 2.
[112] *Id.*; Ex. 9, Jackson Decl. at 2-3.
[113] Ex. 3, Waldrip Decl. at 6.
[114] *Compare Hallinan I*, Doc. 40-3, March 17, 2020 Sanitation Plan, *with* Ex. 6, Hallinan Decl. at 4-5; Ex. 4, Williams Decl. at 4-5; Ex. 9, Jackson Decl. at 4, 6-7; Ex. 5, Ross Decl. at 5-6; Ex. 2, Riddick Decl. at 6-7; Ex. 7, Ayers Decl. at 5-6; Ex. 3, Waldrip Decl. at 3-5, 7; *Hallinan I*, Doc. 40-4, FMC Sanitation Log.

often shared by more than 100 people incarcerated at Butner. Doc. 1-30, Beyrer Decl. at 17-18.[115] Defendants know that all high-touch surfaces must be frequently disinfected but have failed to ensure they are.[116] Shared bathrooms, phones, computers, and tables are cleaned only once or twice a day—if at all.[117] Door handles, ice machines, and hot water dispensers are rarely, if ever, cleaned.[118] When Defendants divided Butner Low into positive and negative units, they made no effort to clean the negative units following the departure of the people who tested positive.[119]

Defendants have chosen to use a chemical disinfectant they know must be allowed to sit on a surface for 10 minutes to kill the virus (Doc. 1-30, Beyrer Decl. at 17),[120] but they have not ensured the disinfectant is used this way.[121] In the meantime, scores of men touch surfaces in the bathrooms, and on the phones and computers—one after another.

Further, Defendants do not enforce mask use by staff or incarcerated people, thereby increasing the likelihood the virus will spread. (Doc. 1-30, Beyrer Decl. at 15-16.)[122] Defendants admit staff are "encouraged," not required, to wear masks.[123] Some staff require incarcerated people to wear masks; others do not.[124] Defendants' failure to implement the most basic prevention measures puts all people incarcerated at Butner at risk, particularly those with conditions that make

---

[115] *See also* Ex. 6, Hallinan Decl. at 5; Ex. 4, Williams Decl. at 4-5; Ex. 9, Jackson Decl. at 4, 6-7; Ex. 6, Ross Decl. at 5-6; Ex. 2, Riddick Decl. at 6-7; Ex. 7, Ayers Decl. at 5-6; Ex. 3, Waldrip Decl. at 3-5, 7; *Hallinan I*, Doc. 26-3, Dailey Decl. at 4; Doc. 26-8, Hill Decl. at 3-4; Doc. 26-13, McRae Decl. at 2-3.

[116] *Hallinan I*, Doc. 40-3, March 17, 2020 Sanitation Plan; *see also* Beyrer Decl. at 17.

[117] Ex. 3, Waldrip Decl. at 3-4; Ex. 4, Williams Decl. at 5; Ex. 6, Hallinan Decl. at 3; Ex. 7, Ayers Decl. at 5-6; Ex. 8, Kinard Decl. at 3; *Hallinan I*, Doc. 26-3, Dailey Decl. at 4; Doc. 26-7, Harris Decl. at 3-4; Doc. 26-11, Krokos Decl. at 5.

[118] Ex. 6, Hallinan Decl. at 5; Ex. 9, Jackson Decl. at 4, 7; Ex. 4, Williams Decl. at 5; Ex. 3, Waldrip Decl. at 4.

[119] Ex. 3, Waldrip Decl. at 7.

[120] *See also* Ex. 8, Kinard Decl. at 4; Ex. 3, Waldrip Decl. at 4; *Hallinan I*, Doc. 40-3, March 17, 2020 Sanitation Plan, at 3.

[121] Ex. 6, Hallinan Decl. at 3-5; Ex. 9, Jackson Decl. at 4, 7; Ex. 6, Ross Decl. at 5-6; Ex. 4, Williams Decl. at 4-5; Ex. 3, Waldrip Decl. at 3-4; Ex. 8, Kinard Decl. at 4.

[122] *See also* Ex. 7, Ayers Decl. at 6; Ex. 3, Waldrip Decl. at 7; Ex. 4, Williams Decl. at 6; Ex. 5, Ross Decl. at 6; Ex. 8, Kinard Decl. at 7-8; *Hallinan I*, Doc. 26-4, Goodwin Decl. at 3, 8; Doc. 26-11, Krokos Decl. at 6.

[123] *Hallinan I*, Doc. 36, Statement of Material Facts on Resp'ts' Mot. to Dismiss, at 6.

[124] Ex. 4, Williams Decl. at 6; Ex. 8, Kinard Decl. at 8.

them especially vulnerable to COVID-19.

## LEGAL STANDARD

Under Rule 23(a), class certification is appropriate where plaintiffs demonstrate the proposed class is numerous, the named plaintiffs' claims are common with and typical of those of the class, and the named plaintiffs and class counsel will adequately represent the class members' interests. *Berry v. Schulman*, 807 F.3d 600, 608-09 (4th Cir. 2015) (citing Fed. R. Civ. P. 23(a)). In addition to the requirements of Rule 23(a), the class must be precisely defined such that proposed class members are readily identifiable, and the class representatives must establish they are members of the class. *Haywood v. Barnes*, 109 F.R.D. 568, 576 (E.D.N.C. 1986) (citing *E. Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977); *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976)).

If Rule 23(a) is satisfied, plaintiffs must also show the proposed class is appropriate under Rule 23(b). *Berry*, 807 F.3d at 608-09. Civil rights class actions, including those of incarcerated people, are regularly certified under Rule 23(b)(2). *Scott v. Clarke*, 61 F. Supp. 3d 569, 591 (W.D. Va. 2014) (certifying a prisoner class action, and collecting cases); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 457 (E.D.N.C. 2011). Class certification under Rule 23(b)(2) is appropriate when "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

In making these determinations at the class-certification stage, courts may consider merits questions "only to the extent . . . that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013).

19

**ARGUMENT**

**I.      The Class and Subclass Meet the Requirements of Rule 23(a).**

**A.      The class and subclass are precisely defined and readily identifiable, and Plaintiffs are members of the class and subclass**

"[T]he court must initially find that a precisely defined class exists, and also that the class representatives are indeed members of the proposed class." *Haywood*, 109 F.R.D. at 576 (citing *E. Texas Motor Freight Sys.*, 431 U.S. at 403; *Roman*, 550 F.2d at 1348). It must be possible for a court to "readily identify the class members in reference to objective criteria." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). Class representatives may establish membership in the class through submission of declarations or other evidence. *See Haywood*, 109 F.R.D. at 576.

Here, the Class is precisely defined with objective criteria. The Class comprises individuals incarcerated at Butner, now or in the future, while anyone on the premises is infected with COVID-19. The temporal limit of the Class, "while anyone on the premises is infected with COVID-19," is precisely defined, and can be determined through testing. This class definition is measurable and provides the requisite precision.  Plaintiffs have submitted declarations establishing their membership in the Class.  Each is currently incarcerated at Butner, where COVID-19 is undeniably present.[125] More than 1,000 people have tested positive for COVID-19 at Butner, and 26 incarcerated people have died, including one in mid-September.[126] Even with the minimal testing currently conducted, Defendants acknowledge the continuing presence of COVID-19 at Butner.[127]

The Subclass is also precisely defined with objective criteria. It is comprised of those

---

[125] Ex. 6, Hallinan Decl. at 2; Ex. 1, Freeman Decl. at 2; Ex. 2, Riddick Decl. at 2; Ex. 9, Jackson Decl. at 2; Ex. 3, Waldrip Decl. at 2; Ex. 4, Williams Decl. at 2; Ex. 8, Kinard Decl. at 2; Ex. 10, Declaration of Anthony Butler ("Butler Decl.") at 2; Ex. 17, Declaration of William Brown ("Brown Decl.") at 2.

[126] Ex. 14, June 15, 2020 BOP COVID-19 Screenshot (reflecting 932 cases of COVID-19 among incarcerated people at Butner); Ex. 21, Nov. 2, 2020 BOP COVID-19 Screenshot (reflecting 81 cases of COVID-19 among staff at Butner).  One BOP staff member at Butner has also died from COVID-19.  *Id.*

[127] *Id.*

members of the Class who have a disability placing them at higher risk for severe illness from COVID-19, as recognized by the CDC, than the Class as a whole. These conditions are each considered disabilities under federal law. The Subclass members can be objectively determined by review of their medical records for their diagnoses. All Plaintiffs other than Petitioner Kinard and Jackson are members of the Subclass and have submitted declarations establishing their vulnerabilities.[128] Defendants can readily identify all Class members, and Plaintiffs are members of the Class and Subclass they seek to represent.

**B.    The Class and Subclass are so numerous and fluid that joinder is impracticable.**

A class must be "so numerous that joinder of all members is impracticable." *Berry*, 807 F.3d at 608 (citing Fed. R. Civ. P. 23(a)). "In general, if a proposed class size exceeds 25 plaintiffs, joinder is usually presumed impracticable." *Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014); *see also Knight v. Lavine*, No. 1:12-CV-611, 2013 WL 427880, at *2 (E.D. Va. Feb. 4, 2013) (finding a class of 56 individuals "easily satisfies numerosity," and noting the Fourth Circuit has approved classes as small as 18). In prisoners' civil rights suits, "the fluidity of prison populations and [individual] prisoners' lack of access to counsel" weigh in favor of finding that numerosity is satisfied. *Scott*, 61 F. Supp. 3d at 584 (alteration in the original, quotation omitted). Here, looking solely at people currently incarcerated at Butner, the Class is nearly 4,000 people.[129] Numerosity is satisfied. *See Scott*, 61 F. Supp. 3d at 584; *Knight*, 2013 WL 427880, at *2.

The Subclass also satisfies numerosity. On the fourth floor of FMC Butner alone, there are approximately 240 people in the Subclass because they are currently in treatment for cancer.[130]

---

[128] Ex. 6, Hallinan Decl. at 2-3; Ex. 1, Freeman Decl. at 2; Ex. 2, Riddick Decl. at 2; Ex. 3, Waldrip Decl. at 2; Ex. 4, Williams Decl. at 2.

[129] *Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp#bop_pop_table (last visited Nov. 5, 2020).

[130] *Hallinan I*, Doc. 26-14, Ortiz Decl. at 2.

21

That number is nearly ten times the number that gives rise to a presumption that joinder is impracticable. *See Scott*, 61 F. Supp. 3d at 584. In addition to the 240 cancer patients, there are another approximately 240 people on the fifth floor of FMC Butner—most of whom are likely Subclass members.[131] The other facilities in FCC Butner also house many men who likely fall within the Subclass.[132]

### C.    Commonality is satisfied because each member of the Class and Subclass suffer the same injury

To certify a class, there must be "questions of law or fact common to the class." *Berry*, 807 F.3d at 608 (citing Fed. R. Civ. P. 23(a)). Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury," the common injury raised common questions, and class certification has the capacity to "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 349-50 (quotations omitted). A single common question of law or fact will satisfy the requirement. *Id*. at 359. Plaintiffs' allegations meet the requirements of the post-*Wal-Mart* analytical framework for determining "commonality."

As courts have repeatedly held since *Wal-Mart*, commonality is satisfied when plaintiffs allege "exposure, as a result of specified [ ] policies and practices that govern the overall conditions of . . . confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent." *Scott*, 61 F. Supp. 3d at 586-87 (quoting *Parsons v. Ryan*, 754 F.3d 657, 678-79 (9th Cir. 2014)); *Parsons*, 754 F.3d at 678-80 (upholding commonality for class alleging correctional system's policies and practices relating to medical care and conditions of confinement subjected them to a substantial risk of serious harm).[133] "[E]very inmate suffers exactly the same

---

[131] *Id*. at 3.

[132] Ex. 2, Riddick Decl. at 2, 5; Ex. 6, Hallinan Decl. at 5; *Hallinan I*, Doc. 26-13, McRae Decl. at 2; Doc. 26-12, Maldonado Decl. at 2-3.

[133] *See also Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016); *Jones v. Gusman*, 296 F.R.D. 416, 465-66 (E.D. La. 2013).

constitutional injury when he is exposed to a single [ ] policy or practice that creates a substantial risk of serious harm." *Id.*; *see also Bumgarner*, 276 F.R.D. at 456 (where plaintiffs "challenge policies and practices that affect all of the putative class members, factual differences regarding their [individual conditions] do[ ] not defeat commonality.").

The Class and Subclass seek relief from unconstitutional conditions of confinement in violation of the Eighth Amendment. To prevail, they must show: (1) the conditions to which they have been exposed subject them to a substantial risk of serious harm, and (2) Defendants acted with deliberate indifference to that risk, in that they knew of and disregarded the risk. *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 210-11 (4th Cir. 2017). Taking some action in response to the risk does not insulate a defendant from liability; the question is whether the actions taken are adequate. *Id.* at 212; *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

Class and Subclass members are all suffering the same injury: Defendants' policies and practices exposed and are exposing them to a substantial risk of serious harm, and Defendants are deliberately indifferent to this risk, in violation of the Eighth Amendment. The essential questions of law and fact in this case do not vary among Class members. Common questions of fact include whether Defendants have a policy or practice of failing to:

1. Reduce the population density at FCC Butner by transferring people to home confinement and supporting compassionate release motions;

2. Create conditions that allow for social distancing within FCC Butner;

3. Determine who at FCC Butner has COVID-19;

4. Establish safe and effective quarantine and isolation practices;

5. Adequately care for those who contract COVID-19 at FCC Butner; and

6. Take basic preventive measures such as providing for adequate cleaning and disinfecting, and enforcing the use of masks.

23

Common questions of law include:

1. Whether Defendants' policies and practices expose the members of the Class to a substantial risk of serious harm, including death, from COVID-19; and

2. Whether Defendants are deliberately indifferent to the substantial risk posed by COVID-19 to the persons incarcerated at FCC Butner.

Plaintiffs have alleged policies and practices that expose the members of the Class and subclass to a substantial risk of serious harm from COVID-19. Commonality is satisfied.

The Subclass also brings a claim under the Rehabilitation Act pursuant to two distinct legal theories: failure to make a reasonable accommodation and a method of administration that has a disparate impact on them due to their disabilities. Plaintiffs will prevail on the failure to accommodate theory by showing Defendants failed to provide them the benefits of services, programs, and activities on an equal basis as they are provided to non-disabled incarcerated people. *Brown v. Dep't of Pub. Safety & Corr. Servs*., 383 F. Supp. 3d 519, 556 (D. Md. 2019) (citing 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a) and *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)).[134] Essentially everything done in a prison is a service, program, or activity. *Id*. (citing *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 381 (D. Md. 2011)). For example, a defendant prison must provide "equal access to safe housing." *Id*. at 559. This may require different housing arrangements for a disabled incarcerated person than for other incarcerated persons. *See id*.

Plaintiffs will prevail on a disparate impact theory by showing that "facially neutral rules or policies are applied in a way that affects the protected class differently from other groups." *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 911 F. Supp. 918, 939 (D. Md. 1996), *aff'd*, 124 F.3d 597 (4th Cir. 1997); 42 U.S.C. § 12112(b)(3)(A); *Smith–Berch, Inc. v. Baltimore Cnty.*, 68 F.

---

[134] These cases were brought under the Americans with Disabilities Act ("ADA"). "The ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999)

Supp. 2d 602, 621 (D. Md. 1999) ("Title II prohibits … any policies or practices that have a disparate impact on disabled individuals.").

There are several additional questions common to the members of the Subclass, including:

1. Whether Defendants have failed to make reasonable modifications for persons with disabilities to allow them the opportunity to benefit from programs, benefits and activities at Butner on an equal basis as persons incarcerated at Butner who do not have disabilities;

2. Whether Defendants have failed to make reasonable modifications for persons with disabilities to allow them equal access to food, medicine, reasonably safe housing, medical care, bathrooms, and recreation; and

3. Whether Defendants' methods of administering the following policies and practices at Butner have a disparate impact on persons with disabilities: housing arrangements; use of bathroom facilities; provision of food; provision of medication; provision of medical care; and recreation.

When, as here, persons with disabilities allege Defendants failed to make reasonable modifications to their policies and practices to provide them an equal opportunity to benefit from programs, services, and activities at a prison, such allegations satisfy the commonality requirement. *See Bumgarner*, 276 F.R.D. at 456-57. Because members of the Subclass must take on a greater risk of harm to access the basic services of Butner, they are not being provided with an equal opportunity to benefit from these services, and they are impacted differently by Defendants' policies and practices than persons who are not disabled. Commonality is satisfied through these questions as well as those that apply to the claims of the Class as a whole.

**D.     Typicality is satisfied because proving Plaintiffs' claims will prove the claims of the Class and Subclass.**

For class certification, "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." *Berry*, 807 F.3d at 608 (citing Fed. R. Civ. P. 23(a)). Typicality is satisfied if "[t]he representative party's interest in prosecuting his own case [ ] simultaneously tend[s] to advance the interests of the absent class members." *Deiter v. Microsoft*

25

*Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).

The standard is satisfied here. Plaintiffs' claims and the claims of the Class and Subclass are based on the same legal theories: deliberate indifference to the substantial risk of serious harm posed by COVID-19 and, for the Subclass, (1) a failure to make reasonable modifications to provide persons with disabilities an equal opportunity to access programs, services, and activities and (2) a method of administration of the prison that has a disparate impact on persons with disabilities. Likewise, both Plaintiffs' claims and the claims of the Class and Subclass arise from Defendants' policies and practices of failing to (1) transfer people to home confinement; (2) support (or not oppose) their motions for compassionate release, (3) take basic preventive measures to limit the spread of the virus at Butner, and (4) adequately test, quarantine, and isolate people at Butner to limit the virus's spread. If Plaintiffs establish these claims on their own behalf, they will necessarily establish these claims on behalf of the Class and Subclass. For example, one of the basic preventive measures Plaintiffs seek is the ability to maintain a distance of six feet between people. If Defendants' policies and practices do not provide for such distancing for Plaintiffs, they also do not provide it for the rest of the members of the Class and Subclass.

Plaintiffs allege Defendants have a policy and practice of failing to make reasonable modifications to the methods of providing food, housing, medicines and medical care, and recreation to persons with disabilities. Failure to make modifications requires Plaintiffs with disabilities and all members of the Subclass to expose themselves to greater risk to access these basic programs than do others at Butner, thus denying them equal access. If the allegations are proved for Plaintiffs with disabilities, they will also be proved for the rest of the Subclass.

By demonstrating the facts necessary to prove their own case, Plaintiffs would also prove the claims of the Class and Subclass members. *See Souter*, 498 F. App'x at 264; *Scott*, 61 F. Supp.

26

3d at 584. Typicality is satisfied.

E.    **Plaintiffs and their counsel of record will fairly and adequately protect the interests of the Class and Subclass**

Class certification is appropriate when "the representative parties will fairly and adequately protect the interests of the class." *Berry*, 807 F.3d at 608 (citing Fed. R. Civ. P. 23(a)). "This inquiry focuses on two factors: (a) the qualifications, experience and conduct of plaintiffs' counsel and (b) the interest and involvement of the named plaintiffs in the litigation." *Haywood*, 109 F.R.D. at 578 (citations omitted). "The burden is on the defendant to demonstrate that the representation will be inadequate." *Id.* at 579 (citations omitted).

As to the first factor, Plaintiffs are represented by experienced counsel with specialized expertise in constitutional and civil rights litigation in federal court, including litigation on behalf of people incarcerated in federal and state prisons.[135] Plaintiffs' counsel have conducted conflicts checks and have identified no conflicts of interest in representing the Class. Plaintiffs' counsel work for the American Civil Liberties Union of North Carolina Legal Foundation, the American Civil Liberties Union, Washington Lawyers' Committee for Civil Rights & Urban Affairs, and Winston & Strawn. All four organizations are committed to adequately funding and staffing this litigation.[136] Plaintiffs' counsel will adequately represent the Class and Subclass. *See Scott*, 61 F. Supp. 3d at 590 (finding adequacy of counsel where plaintiffs' counsel included "well-known public interest legal services organizations with substantial experience with respect to and involvement in civil rights litigation, including class actions").

As to the adequacy of the class representatives, satisfaction of this element turns on

---

[135] *See* Ex. 24, Declaration of Jacqueline Kutnik-Bauder ("Kutnik-Bauder Decl."); Ex. 22, Declaration of Emily Seawell ("Seawell Decl."); Ex. 23, Declaration of Maria V. Morris ("Morris Decl."); Declaration of Jeff Wilkerson at 4-5.

[136] *Id.*

27

"whether the named plaintiffs have interests conflicting with those of absent class members." *Scott*, 61 F. Supp. 3d at 590. There is no conflict here. Plaintiffs have common interests with the Class and Subclass—namely, they seek changes to Defendants' policies and practices to protect themselves and members of the Class and Subclass from COVID-19. These changes would benefit all people incarcerated at FCC Butner. Moreover, Plaintiffs have accepted their responsibility to vigorously prosecute the case on behalf of themselves and the Class.[137] Plaintiffs are committed to obtaining declaratory and injunctive relief that will benefit themselves and the Class.[138] Plaintiffs have a strong personal interest in the case and no conflicts with the Class members.[139] Plaintiffs are adequate. *See Scott*, 61 F. Supp. 3d at 590.

## II. By Failing to Mitigate the Risks Posed by COVID-19, Defendants Have Failed to Act on Grounds that Apply Generally to the Entire Class and Subclass

Once Rule 23(a) is satisfied, the court should certify the class where defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Class certification under Rule 23(b)(2) is appropriate where, as here, "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

The Fourth Circuit has expressly acknowledged that "Rule 23(b)(2) was created to facilitate civil rights class actions." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 n.24 (4th Cir. 2006). Courts routinely certify Rule 23(b)(2) classes in cases involving constitutional claims of prisoners seeking changes to policies and practices. *Scott*, 61 F. Supp. 3d at 591

---

[137] Ex. 6, Hallinan Decl. at 9; Ex. 1, Freeman Decl. at 4-5; Ex. 2, Riddick Decl. at 11; Ex. 9, Jackson Decl. at 7-8; Ex. 3, Waldrip Decl. at 7-8; Ex. 4, Williams Decl. at 6-7; Ex. 8, Kinard Decl. at 10; Ex. 10, Butler Decl. at 3-4; Ex. 17, Brown Decl. at 4.
[138] *Id*.
[139] *Id*.

(collecting cases); *Bumgarner*, 276 F.R.D. at 457-58. As one court recently noted, "a case like this one in which a group of prisoners seeks to challenge the constitutionality of a prison policy is so well suited for Rule 23(b)(2) class treatment that the leading class-action and federal-practice treatises both use it as the exemplar of a case fitting within that subsection." *Postawko v. Mo. Dep't of Corr.*, 2017 WL 3185155, at \*14 (W.D. Mo. July 26, 2017), *aff'd*, 910 F.3d 1030 (8th Cir. 2018) (citations omitted).

As in other cases arising out of prison conditions in which federal district courts have found Rule 23(b)(2) satisfied, Plaintiffs here allege Defendants' policies and practices place them at a substantial risk of serious harm, and Defendants' failure to mitigate that risk constitutes deliberate indifference. Plaintiffs seek "a single injunction or declaratory judgment [that] would provide relief to each member of the class" by ordering actions to protect all members of the Class and subclass through a single improved COVID-19 management policy. *Wal-Mart*, 564 U.S. at 360; Compl. ¶¶ 330-34. Defendants fail to use the tools available to them to reduce the density of the population at FCC Butner or to remove medically vulnerable people with disabilities from Butner. *See supra*, Factual Background Part III.A. They fail to create conditions that allow for social distancing. *See id.* Part III.B. They choose not to find out who at Butner has COVID-19. *See id.* Part III.C. They fail to establish safe and effective quarantine and isolation practices. *See id.* Part III.D. They fail to limit the contacts between housing units. *See id*. They fail to adequately clean and disinfect living spaces and common-use equipment, or to enforce the use of masks by staff. *See id.* Part III.E. Each of these failures has occurred throughout Butner. Because Defendants' refusal to act is based on grounds that apply generally to all members of the Class and Subclass, declaratory and injunctive relief are appropriate, and the Court should accordingly find Rule 23(b)(2) satisfied.

III.    **The Court Should Appoint Plaintiffs' Counsel as Class Counsel.**

After certifying a class, a court must appoint class counsel, taking into consideration:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).

As discussed in Argument Part I.E above, Plaintiffs' counsel are experienced civil rights attorneys with expertise litigating complex constitutional claims in federal court and representing incarcerated Plaintiffs seeking injunctive and declaratory relief, including under the Eighth Amendment and Rehabilitation Act.[140] Plaintiffs' counsel have conducted and continue to conduct an investigation into Defendants' action and inaction in response to COVID-19 at Butner.[141] Plaintiffs' counsel have specialized expertise in constitutional law and prisoners' rights issues, including in class action lawsuits, and their organizations are committed to providing adequate resources to litigate this case as a class action.[142] Plaintiffs' counsel are competent to represent the Class, and the Court should appoint their organizations as Class counsel.

## CONCLUSION

Plaintiffs request the Court certify the Class and Subclass, appoint Plaintiffs as Class Representatives and all Plaintiffs except Petitioner Kinard and Jackson as Subclass Representatives, and appoint Plaintiffs' counsel of record as Class and Subclass counsel.

Respectfully submitted this 9th day of November, 2020.

---

[140] *See* Wilkerson Decl. at 4-5; Ex. 24, Kutnik-Bauder Decl.; Ex. 22, Seawell Decl.; Ex. 23, Morris Decl.
[141] *Id.*
[142] *Id.*

30

/s/ Jeff Wilkerson
Jeff Wilkerson [N.C. State Bar No. 51209]
Gretchen Scavo [N.C. State Bar No. 48589]
Elizabeth Ireland [N.C. State Bar No. 47059]
Patrick Doerr [N.C. State Bar No. 50673]
WINSTON & STRAWN LLP
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
jwilkerson@winston.com
gscavo@winston.com
eireland@winston.com
pdoerr@winston.com

Maria V. Morris
[N.Y. State Bar No. 4091435]
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, DC 20005
Tel.: (202) 548-6607
mmorris@aclu.org

Sarah Hinger[†]
[N.Y. State Bar No. 4823878][†]
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
New York, NY 10004
Tel.: (212) 519-7882
shinger@aclu.org

Jonathan M. Smith [D.C. Bar No. 396578][†]
Jacqueline Kutnik-Bauder [Mo. Bar No. 45014] [†]
Mirela Missova [D.C. Bar No. 1024571][†]
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS & URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 319-1000
Fax: (202) 319-1010
jonathan_smith@washlaw.org
jacqueline_kutnik-bauder@washlaw.org.

Emily E. Seawell [N.C. Bar No. 50207]
Jaclyn Maffetore [N.C. Bar No. 50849]
AMERICAN CIVIL LIBERTIES UNION
OF NORTH CAROLINA
LEGAL FOUNDATION
Post Office Box 28004
Raleigh, NC 27611
Tel.: (919) 834-3466
Fax: (866) 511-1344
eseawell@acluofnc.org
jmaffetore@acluofnc.org

[†] Special Appearance Forthcoming

*Counsel for Plaintiffs/Petitioners*

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY CLASS UNDER RULE 23(b)(2) was served on Respondents'/Defendants' counsel of record with the Clerk of Court using the CM/ECF document filing system.

This 9th Day of November, 2020.

/s/ Jeff Wilkerson
Jeff Wilkerson