IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:20-CT-3333-M

CHARLES HALLINAN, JOSEAN )
KINARD, GEORGE RIDDICK, JORGE L. )
MALDONADO, WILLIAM BROWN, )
TERRANCE FREEMAN, ANTHONY )
BUTLER, DARYL WILLIAMS )
QUAMAIN JACKSON, AND LASALLE )
WALDRIP, on behalf of themselves and )
similarly situated individuals, )
 )
      Plaintiffs/Petitioners, )
 )
v. )
 )
THOMAS SCARANTINO, Complex )
Warden, Federal Correctional Complex )
Butner; MICHAEL CARVAJAL, Federal )
Bureau of Prisons Director; and JEFFERY )
ALLEN, Federal Bureau of Prisons Medical )
Director, in their official capacities, and the )
FEDERAL BUREAU OF PRISONS, )
 )
      Defendants/Respondents. )

DEFENDANTS' MEMORANDUM IN
SUPPORT OF DEFENDANTS'
MOTION TO DISMISS, OR IN THE
ALTERNATIVE, MOTION
FOR SUMMARY JUDGMENT

## **INTRODUCTION**

It is well established that "absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of [] prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities." Taylor v. Freeman, 34 F.3d 266, 268 (4th Cir.

1994).[1]  But that is precisely what Plaintiffs, yet again, ask this Court to do.  See Hallinan v. Scarantino, et al., 5:20-hc-02088-FL (E.D.N.C. June 11, 2020) [hereinafter "Hallinan I"], [D.E. 62] (denying Petitioners' motion for temporary restraining order and preliminary injunction on claims nearly identical to those raised here, ultimately resulting in Petitioners' voluntary dismissal.  The court held that the petitioners' evidence—"numerous declarations, expert witness testimony, and documentary evidence in support of their allegations that [respondents] have been deliberately indifferent to the risk of COVID-19"—did not "undermine the court's finding that respondents carefully and proactively responded to the pandemic").  Just like before, Plaintiffs' claims fail for many reasons.

Plaintiffs are a group of inmates incarcerated at four institutions located at the Federal Correctional Complex in Butner, North Carolina ("FCC Butner"), purporting to represent a diverse class consisting of all current and future inmates "while anyone on the premises is infected with COVID-19."  See Class Action Complaint for

[1] See also Thornburgh v. Abbott, 490 U.S. 401, 407–08 (1989); Procunier v. Martinez, 416 U.S. 396, 404–05, (1974), overruled by Thornburgh v. Abbott, 490 U.S. 401 (1989) ("Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody.  The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication.  Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.  Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.  Judicial recognition of that fact reflects no more than a healthy sense of realism.").

2

Injunctive and Declaratory Relief and Petition for Writ of Habeas Corpus [hereinafter "Complaint"], D.E. 1 at 4 ¶ 9. Plaintiffs allege their constitutional rights are being violated because of the possibility they may contract COVID-19 while incarcerated. See Complaint, D.E. 1 at 2 ¶ 2. Plaintiffs also claim that Defendants are violating the rights of inmates with disabilities. See Complaint, D.E. 1 at 2 ¶¶ 3-4. Plaintiffs seek various forms of injunctive and declaratory relief, to include release without quarantining at FCC Butner. Complaint, D.E. 1 at 88 ¶ E. If Plaintiffs obtain the relief they ultimately seek, it could result in hundreds (or even thousands) of inmates—some of whom are murderers, drug traffickers, child predators, and gang members—being released into the community without a plan to address safety and security, or the inmates' successful re-entry into society.

One of Plaintiffs' claims is a repeat from their first failed effort to challenge conditions of confinement at FCC Butner amid the novel coronavirus pandemic. The thrust of their current claims though is the same: the Court should substitute its judgment for that of Congress and the Federal Bureau of Prisons ("BOP"), and even qualified public health experts, to take charge of prison management and policy-making. It is clear that Plaintiffs seek to exploit the fear and hysteria of a global pandemic to secure premature release from lawfully imposed criminal sentences. Plaintiffs try to obscure this objective by seeking other forms of judicial relief, but each and every other form of relief echoes exactly what the BOP and FCC Butner have already done, that is: "create and implement a mitigation plan for prevention of COVID-19;" "provide all necessary and appropriate health care," and "identify all

3

incarcerated persons who are appropriate for release on home confinement, furlough, or other release mechanisms." <u>See</u> Complaint, D.E. 1 at 88-89 ¶¶ C-E.

The BOP process, however, takes into consideration lawfully enacted statutes, guidance from the Attorney General, and the individual circumstances of each inmate—inmates who may be child molesters; sexually dangerous persons and mentally ill and dangerous persons who have been civilly committed specifically to FCC Butner for mental health treatment; drug traffickers; and, in the case of Plaintiff George Riddick, convicted murderers. The BOP also considers gang affiliations; security levels; the need for medical, substance-abuse, or sex-offender treatment; records of institutional adjustment and discipline; and the dangers they may pose to other inmates and the community if released. Plaintiffs' "fear of contracting COVID-19 [may not be] unwarranted. Such a fear permeates American society . . . . But nothing in the Complaint rises to the level of circumstances that warrant [] relief." <u>Wragg v. Ortiz</u>, 462 F.Supp.3d 475, 505 (D.N.J. May 27, 2020). Accordingly, for a myriad reasons, the complaint should be dismissed in its entirety.

***First***, the complaint should be dismissed because Plaintiffs failed to exhaust any of their claims pursuant to the administrative remedy requirement under the Prison Litigation Reform Act ("PLRA"). Under this statute, "no action shall be brought with respect to **prison conditions** . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Plaintiffs have been aware of this requirement for no fewer than five (5) months, and offer no excuse whatsoever for their failure to comply with the mandatory provision of the statute. Recent court

decisions hold that this exhaustion requirement applies to COVID-19-related causes of action brought by incarcerated individuals.  See, e.g., United States v. Montanez, No. 15-CR-122-FPG, 2020 WL 2183093, at *11 (W.D.N.Y. May 5, 2020); Nellson v. Barnhart, No. 1:20-cv-00756-PAB, 2020 WL 1890670, at *5 (D. Colo. Apr. 16, 2020).

**Second**, Plaintiffs' Rehabilitation Act claims must be dismissed because they fail to plausibly allege any of the required elements of the claim.  Plaintiffs do not allege that they actually suffer from a protected disability under the statute, which requires a fact-specific, individualized review; they do not even purport to allege intentional or purposeful discrimination; and the only specific accommodation they request—release—is not an accommodation at all, but rather an attempt to usurp the authority of Congress, the BOP, and the criminal courts who imposed sentences on these convicted offenders expecting they be served to completion.

**Third**, Plaintiffs' challenge to the conditions of their confinement is not cognizable in a habeas proceeding.  Although "the Supreme Court [has] held that a writ of habeas corpus is the exclusive remedy for inmates seeking release from their confinement," this Court has expressly held that "release from confinement is not a remedy available for an Eighth Amendment conditions of confinement claim."  Hunt v. Johns, No. 5:10-HC-2176-FL, 2011 WL 3664553, at *2 (E.D.N.C. Aug. 18, 2011) (unpublished).  Rather, the appropriate cause of action for allegedly unconstitutional conditions of confinement would, in this case, be one pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), which Plaintiffs have deliberately declined to pursue, Id.; see Rodriguez v. Ratledge, 715 F.

5

App'x 261, 265 (4th Cir. 2017) (unpublished); <u>Preiser v. Rodriguez</u>, 411 U.S. 475 (1973); <u>Strader v. Troy</u>, 571 F.2d 1263, 1269 (4th Cir. 1978), or a civil action for injunctive relief. The appropriate remedy for any such claim, however, would be a judicially mandated change in conditions, not the release from custody that Plaintiffs seek. Moreover, a request for a release from custody in a case challenging prison conditions requires strict compliance with specific statutory conditions, and Plaintiffs cannot demonstrate such necessary and required pre-conditions exist. <u>See</u> 18 U.S.C. § 3626.

**_Fourth_**, Plaintiffs cannot credibly or plausibly show that Defendants have been deliberately indifferent. Conditions at FCC Butner are far less dire than Plaintiffs' often generic, unsubstantiated, and sensationalized allegations suggest. Notably, in June of 2020, United States District Judge Flanagan, presented with a markedly similar petition (filed by some of the same Plaintiffs), found that in "response to the COVID-19 outbreak, [Defendants] immediately implemented extensive efforts to limit the spread of the virus and protect inmate health and safety." <u>See</u> <u>Hallinan I</u>, Order, D.E. 62, at 28. As in the community at large, COVID-19 remains a threat, but nothing set forth in Plaintiffs' current complaint contradicts this finding. In fact, as recently as a week before Plaintiffs filed this complaint, Judge Flanagan recognized

> FCC-Butner suffered one of the largest COVID-19 outbreaks within the FBOP during May and June of this year. . . . As reflected in the current infection data, however, FCC-Butner has contained the spread of the virus. The current infection rate belies defendant's argument that FCC-Butner is "woefully out of line with the national policies [promulgated by the FBOP for preventing the spread of COVID-19]" and that FCC-

6

Butner "is a petri dish for spreading infectious disease throughout the general population."

United States of America v. Michael Anthony Jones, 5:11-CR-99-FL (E.D.N.C. Oct. 19, 2020), Order, D.E. 319 at 9 n.6. Accordingly, FCC Butner's conditions and responses to the ever-evolving global pandemic cannot possibly be constitutionally deficient.

**Finally**, the Court should strike Plaintiffs' class allegations. Plaintiffs cannot satisfy the Rule 23(a) or 23(b) elements for class certification. The inquiry before this court is highly fact-specific, and the proposed class members (including Plaintiffs) have different preexisting medical conditions and security classifications and designations, and are located in different facilities within the FCC Butner Complex. As one court recently held in denying class status to a COVID-19-related petition, "simply put, there is no way to decide which inmates should stay, and which inmates should go, without diving into an inmate-specific inquiry" antithetical to a class action lawsuit. Money v. Pritzker, No. 20-cv-2093, 2020 WL 1820660, at *15 (N.D. Ill. Apr. 10, 2020).

## SUMMARY STATEMENT OF THE FACTS[2]

As demonstrated in detail in Defendants' Statement of Material Facts, filed contemporaneously with this memorandum, Defendants have taken an extraordinary amount of precautionary and reactionary steps in order to prevent, reduce, and

---

[2] Because Defendants are moving in the alternative for summary judgment, Defendants are filing contemporaneously herewith a Statement of Material Facts and Appendix pursuant to Local Civil Rule 56.1.

7

mitigate the spread of COVID-19 within FCC Butner. The following recital of facts is a brief summary of FCC Butner's response to the COVID-19 pandemic.

FCC Butner is a federal prison complex that houses five separate institutions: a Federal Medical Center ("FMC Butner" or "FMC"), two medium security Federal Correctional Institutions ("FCI Butner I" or "FCI I", and "FCI Butner II" or "the FCI II"), a Low Security Institution ("LSCI Butner" or "LSCI"), and a federal prison camp, ("the Camp", "FPC Butner", or "FPC"). See Declaration of Phillip Clark [hereinafter "Clark Decl."], Defendants' Appendix [hereinafter "D.A."] 014. The inmate population of the complex as of December 1, 2020, is 3,737. Clark Decl., D.A. 014.

Since January 2020, in order to combat the spread of COVID-19 at its institutions, BOP has been coordinating with subject-matter experts at multiple organizations and agencies, including the World Health Organization ("WHO") and the Centers for Disease Control and Prevention ("CDC"). See Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited December 11, 2020). Specifically, in January 2020, BOP implemented an action plan consistent with WHO and CDC recommendations, to combat the spread on COVID-19 in individual facilities. See Declaration of Mary Strassel [hereinafter "Strassel Decl."], D.A. 172-73. Over the course of the pandemic, BOP has updated that plan on several occasions. See Declaration of Andrew Stock [hereinafter "Stock Decl."], D.A. 117. Currently, BOP has implemented nine phases of the plan. Strassel Decl., D.A. 205-06. This comprehensive action plan includes a multi-faceted response to the risks

8

posed by COVID-19, including:

**COVID-19 Screening**

On February 4, 2020, the BOP initiated and FCC Butner implemented an inmate screening tool for all newly committed inmates to ensure they were properly screened for COVID-19 signs and symptoms prior to entry into any BOP facility. Strassel Decl., D.A. 173. Since then, the screening tools for inmates, staff, and visitors have been updated numerous times in accordance with guidance from public health officials. Strassel Decl., D.A. 174-76, 182, 185-86, 188, 199, 205-06, 209.

**COVID-19 Testing**

FCC Butner has five FDA-authorized Abbott ID NOW COVID-19 testing machines on-site, and utilizes outside companies to conduct COVID-19 testing off-site as well. See Declaration of Kellie Harden [hereinafter "Harden Decl."], D.A. 545. FCC Butner is conducting testing in accordance with CDC guidelines. Harden Decl., D.A. 545-47. FCC Butner presently conducts COVID-19 testing on all inmates who are symptomatic for COVID-19. Harden Decl., D.A. 545-47. Inmates who are newly admitted to FCC Butner, or releasing or transferring from FCC Butner are tested for COVID-19 as well. Harden Decl., D.A. 546; See Stock Decl., D.A. 128. Where necessary and appropriate, FCC Butner has also employed limited mass testing of inmates in open-bay style housing units to determine appropriate quarantine and isolation status of inmates in accordance with their test results. Harden Decl., D.A. 546.

**Quarantine and Isolation Protocols**

9

FCC Butner utilizes quarantine and isolation protocols in accordance with BOP and CDC guidance and recommendations to limit the spread of COVID-19. Stock Decl., D.A. 125, 136-37. Each institution in the complex has identified housing units to utilize for quarantine, isolation, and recovery units, and has identified procedures for each unit. Stock Decl., D.A. 137.

FCC Butner quarantines inmates in designated areas in order to separate asymptomatic inmates who have been in contact with symptomatic inmates, inmates who have newly arrived, or inmates who will transfer out of the institution in the near future. Stock Decl., D.A. 120, 128, 130-31, 136-37. FCC Butner uses quarantine to separate asymptomatic inmates who have been in contact with symptomatic inmates during the incubation period, which is at least 14 days for COVID-19. Stock Decl., D.A. 136-37. Inmates are housed together for at least a 14-day period with other asymptomatic inmates in a housing unit. Stock Decl., D.A. 136-37. Steps are taken to not add or introduce new inmates to a quarantine housing unit after the 14-day quarantine clock has started. Stock Decl., D.A. 136-37. At the end of the 14-day period, the inmates may be released from quarantine if no inmates develop COVID-19 symptoms or are diagnosed with COVID-19, and once the inmate has one negative PCR/send out COVID-19 test. Stock Decl., D.A. 136-37. If additional inmates present with symptoms during the incubation period, these symptomatic inmates are isolated and the 14-day quarantine period begins anew for the remaining asymptomatic inmates if tests are confirmed positive. Stock Decl., D.A. 136-37. Inmates receive daily temperature checks, and if any symptoms are reported, they are documented.

Stock Decl., D.A. 136-37. If an inmate becomes symptomatic or has a forehead temperature of greater than or equal to 100.4 F, the inmate is placed in isolation. Stock Decl., D.A. 136-37.

Inmates are placed on isolation status, on the other hand, to remove them from the general population when they exhibit signs or symptoms of COVID-19 and/or when they test positive for the virus. Stock Decl., D.A. 136-37. In accordance with CDC guidelines and other guidance, inmates who have tested positive for COVID-19, and are asymptomatic, will remain on isolation until they have gone at least 10 days post positive test and with no symptoms and remain afebrile for 24 hours or greater without fever reducing medications. Stock Decl., D.A. 137.

Inmates who have tested positive for COVID-19, and are symptomatic, will remain on isolation until at least 10 days have elapsed after the first date of symptoms, and their symptoms have improved during the 10 days. Stock Decl., D.A. 137.

### Modified Operations

As early as March 13, 2020, operations at FCC Butner were modified to promote social distancing between inmates and staff. Strassel Decl., D.A. 175. Throughout the pandemic, all institutions at FCC Butner have implemented measures including, but not limited to, mandating that smaller groups go to the dining hall, education, recreation, chapel, and other activities at any one time. Strassel Decl., D.A. 137 ¶¶ 175, 184-85, 191, 195. Although activities like pill line are conducted differently at each institution, medication is distributed in ways to

11

maximize social distancing. Stock Decl., D.A. 145-47. Staff either go cell-to-cell and deliver the medication, or inmates line up in small groups at designated times, while required to wear their mask, and socially distance. Stock Decl., D.A. 146-47.

**Sanitation Protocols**

In the normal course of operations across the Complex, a sanitation plan is in place to ensure the cleanest, healthiest environment for both inmates and staff. See Declaration of Luis Martinez [hereinafter "Martinez Decl."], D.A. 550. FCC Butner is a medical complex, and as such, operates at the highest standard of sanitation and disinfectant procedures on a regular basis in order to protect the inmates of all health levels housed on the Complex. Martinez Decl., D.A. 550.

In March 2020, FCC Butner implemented a heightened sanitation plan developed in direct response to the potential of COVID-19 entering any of the institutions at the Complex, and it continues to be in effect. Martinez Decl., D.A. 550.

The following disinfectants have been readily available to all staff on the Complex during the COVID-19 pandemic: Virex II 256, bleach disinfectant wipes, and germicidal cleaners. Martinez Decl., D.A. 551. Virex II 256 is a one-step, quaternary-based disinfectant cleaner concentrate providing broad spectrum disinfection. Martinez Decl., D.A. 551. These disinfectants are utilized routinely in healthcare and other facilities for cleaning and prevention of cross-contamination. Martinez Decl., D.A. 551. Virex II 256 is bactericidal, virucidal, and fungicidal, and it, along with the other sanitizing options provided, are effective in killing the Coronavirus (SARS-CoV-2). Martinez Decl., D.A. 551.

12

**Personal Protective Equipment ("PPE")**

All staff at FCC Butner are provided the necessary Personal Protective Equipment ("PPE") to perform their assigned duties, including surgical masks, N-95 masks, and gloves. Strassel Decl., D.A. 181. Staff are required to wear face coverings where social distancing is not possible, and guidance emphasizing this requirement is regularly issued to staff. Strassel Decl., D.A. 185, 187, 203-04, 208-10. Inmates have also been provided masks during the pendency of the pandemic. Strassel Decl., D.A. 188-90; Stock Decl., D.A. 126. They are currently provided cloth masks, which they are required to wear at all times, and new masks are provided routinely and as needed. Strassel Decl., D.A. 187-88; Stock Decl., D.A. 126.

**Population Reduction**

FCC Butner has experienced a noticeable drop in its inmate population from March 1, 2020 to December 1, 2020. Clark Decl., D.A. 014. Overall, during that time period, FCC Butner's population has been reduced by approximately 21 percent, from 4,703 inmates to 3,737 inmates. Clark Decl., D.A. 014.

One contributing factor to the reduction in the inmate population is the increased transfer of inmates to home confinement. Since April of 2020, and continuing through the present, FCC Butner staff have screened all inmates at FCC Butner for home confinement eligibility under the CARES Act. Clark Decl., D.A. 023-24.[3] Since March 1, 2020, 123 inmates—including Plaintiff Maldonado—have been

---

[3] More specifically, the BOP has reviewed all of the named Plaintiffs for release to home confinement, consistent with the First Step Act and CARES Act. See Clark Decl., D.A. 024, 030-34, 036-40. Plaintiff Maldonado has been approved for, and

transferred to home confinement, and 448 inmates have been transferred to Residential Reentry Centers ("RRCs"). Clark Decl., D.A. 024. An additional 379 inmates are pending transfer to home confinement or an RRC. Clark Decl., D.A. 024. Forty-nine more inmates are currently awaiting final decision from the BOP's Residential Reentry Management Office, regarding their referral for home confinement. Clark Decl., D.A. 025.

In addition, since March 2020, another 174 inmates have been released from FCC Butner via compassionate release granted by the individual's sentencing court based upon various issues, including COVID-19. Clark Decl., D.A. 029-30.

Nevertheless, on May 26, 2020, Plaintiffs Hallinan, Kinard, Riddick, Maldonado, Butler, and others filed a putative class action petition for writ of habeas corpus challenging FCC Butner's response to COVID-19. See Hallinan I, Petition for Writ of Habeas Corpus, D.E. 1, filed on May 26, 2020. On May 28, 2020, Petitioners filed an emergency motion for a temporary restraining order. See Hallinan I, Emergency Motion, D.E. 24. On June 11, 2020, Judge Flanagan denied Petitioners' motion for temporary restraining order, preliminary injunction, and writ of habeas corpus, holding that petitioners did not make a clear showing "they are likely to succeed on the merits of their Eighth Amendment claim" as the "extensive evidence

---

actually released to home confinement on October 28, 2020. Clark Decl., D.A. 033. The remaining Plaintiffs have each been reviewed for home confinement eligibility under the CARES Act, but are not currently appropriate for home confinement for varying reasons, including, but not limited to, inadequate completion of his sentence, pending detainers, high PATTERN scores, recent disciplinary infractions, and history of or current offense of violence. Clark Decl., D.A. 030-34, 036-40.

presented, while raising isolated concerns about the FBOP's failure to enforce its plan to mitigate the spread of COVID-19, does not rise to the level of deliberate indifference to a known risk of harm." Hallinan I, Order, D.E. 62 at 34. Shortly thereafter, on June 29, 2020, Plaintiffs voluntarily dismissed the action without prejudice. See Hallinan I, Joint Stipulation of Dismissal Without Prejudice, D.E. 66.

On October 26, 2020, Plaintiffs filed the instant complaint alleging Defendants "have not taken adequate measures to control the spread of the virus that causes COVID-19," and such failure "violates the rights of people with disabilities who are entitled to a reasonable accommodation under the Rehabilitation Act of 1973." See Complaint, D.E. 1 at 1-2 ¶ 1, 3. On November 9, 2020, Plaintiffs filed a Motion to Certify Class Under Rule 23(b)(2). See Motion, D.E. 24. Prior to filing their complaint, not one of the named Plaintiffs filed a single administrative remedy with the BOP relating to unconstitutional conditions of confinement, the alleged deliberate indifference of Defendants in reference to COVID-19, or Defendants alleged violations of the Rehabilitation Act. See Declaration of Christina Kelley [hereinafter "Kelley Decl."], D.A. 649-51.

Two days after this complaint was filed, on October 28, 2020, Plaintiff Maldonado was transferred from FCC Butner to serve the remainder of his sentence on home confinement. See Clark Decl., D.A. 033.

On November 9, 2020, Plaintiff Butler was transferred from LSCI Butner to the United States Penitentiary in Yazoo City, Mississippi ("USP Yazoo City"). Clark Decl., D.A. 037.

## STANDARD OF REVIEW

**A. Motion to Dismiss Pursuant to Rule 12(b)(1).**

Federal district courts are courts of limited subject matter jurisdiction. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). When a district court lacks subject matter jurisdiction, the matter must be dismissed. Arbaugh v, Y&H Corp., 546 U.S. 500, 506–07 (2006). When a defendant challenges subject matter jurisdiction, the burden of proving subject matter jurisdiction rests with the plaintiff. See United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009); Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp., 166 F.3d 642, 647 (4th Cir. 1999); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Courts have recognized two distinct types of challenges under Rule 12(b)(1): a facial challenge to the subject matter jurisdiction, arguing that the allegations in the complaint are insufficient to establish jurisdiction; or a factual challenge asserting "that the jurisdictional allegations of the complaint [are] not true." Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). With respect to a facial challenge, a court can properly dismiss for lack of subject matter jurisdiction where a claim fails to allege facts upon which the court may base jurisdiction. Adams, 697 F.2d at 1219. In that case, all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under Fed. R. Civ. P. 12(b)(6). Id. A factual challenge, on the other hand, contends that the jurisdictional allegations of the complaint are not true, allowing a trial court to go beyond the allegations of the complaint in an evidentiary hearing to determine if there are facts to support the

16

jurisdictional allegations.  Id.

**B. Motion to Dismiss Pursuant to Rule 12(b)(6).**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see Fed. R. Civ. P. 12(b)(6).  A claim is facially plausible when it contains factual allegations that permit the court to reasonably infer the defendant is liable for the alleged misconduct.  Ashcroft, 556 U.S. at 678. Although a court must take all factual allegations as true for purposes of a Rule 12(b)(6) motion, the court need not "accept as true a legal conclusion couched as a factual allegation."  Id. (quoting Twombly, 550 U.S. at 555); see also, Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, L.L.C., 713 F.3d. 175, 182 (4th Cir. 2013) (a court "need not accept factual allegations that constitute nothing more than legal conclusions or naked assertions").  The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In ruling on a motion to dismiss pursuant to 12(b)(6), a court is not confined to the "four corners of the complaint."  United States ex rel Oberg v. Penn Higher Educ. Assist. Agency, 745 F.3d 131, 136 (4th Cir. 2014).  The court may consider exhibits to pleadings and documents attached to the motion to dismiss, "so long as they are integral to the complaint and authentic" or subject to judicial notice.  Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013) (quoting Philips v. Pitt Cnty.

17

Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)); Clatterbuck v. City of Charlottesville, 708 F.3d 549 (4th Cir. 2013) (in addition to the complaint, the court may also consider documents incorporated by reference in the complaint and matters subject to judicial notice).

### C. Motion for Summary Judgment Pursuant to Rule 56.

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that he or she is entitled to judgment as a matter of law. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004). Once a motion for summary judgment is made, the opposing party has the burden of showing that there is a genuine factual dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). A court must view the facts, and the inferences drawn from therefrom, in the light most favorable to the non-moving party. Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 332 (4th Cir. 2009). To avoid summary judgment, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007). The plaintiff instead must affirmatively show genuine disputes over material facts. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion

18

for summary judgment."); <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d Cir. 2005) ("At the summary judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'").[4]

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985) (citing <u>Barwick v. Celotex Corp.</u>, 736 F.2d 946, 963 (4th Cir. 1984)). Unsupported speculation is insufficient to defeat a summary judgment motion. <u>Ash v. United Parcel Serv.</u>, 800 F.2d 409, 411–12 (4th Cir. 1986); <u>Ross v. Commc'n Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985). A plaintiff's "naked opinion, without more," as to the merits of the case does not prevent summary judgment. <u>Goldberg v. B. Green & Co.</u>, 836 F.2d 845, 848 (4th Cir. 1988). "Only disputes over facts that might affect the outcome of the [litigation] . . . will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Summary judgment is thus proper "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there [being] no genuine issue for trial." <u>Matsushita</u>, 475 U.S. at 587 (internal quotations marks omitted).

## ARGUMENT

---

[4] A dispute is "genuine" only if it shows a true conflict between established facts. <u>Thompson Everett, Inc. v. Nat'l Cable Adv.</u>, 57 F.3d 1317, 1323 (4th Cir. 1995). A dispute is "material" only if it bears directly on "an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322.

As detailed herein, this Court should reject Plaintiffs' attempt to resurrect their meritless claims. Plaintiffs pursue three distinct causes of action in search of relief from the threat of exposure to COVID-19 in FCC Butner. Plaintiffs fail to state a legally viable claim in any of their three causes of action. First, Plaintiffs' Rehabilitation Act claims must be dismissed because Plaintiffs failed to exhaust available administrative remedies with the BOP and with the Department of Justice. However, even if they had first properly provided the agency with an opportunity to consider their claims of discrimination, this Court must dismiss this cause of action because Plaintiffs (1) fail to allege or state a claim that they actually suffer from a protected disability under the statute, (2) do not set forth any plausible evidence of intentional discrimination, and (3) request an accommodation that is patently unreasonable and would fundamentally alter the administration of FCC Butner's programs and services. Second, Plaintiffs' petition for writ of habeas corpus must be dismissed for failure to exhaust available BOP administrative remedies. Alternatively, it must be denied and dismissed because Plaintiffs do not challenge the fact or duration of their confinement, and therefore, their paradigmatic conditions-of-confinement challenge can only be pursued through a civil action that complies with the provisions of the Prison Litigation Reform Act. Third, Plaintiffs' declaratory cause of action that is governed by the Prison Litigation Reform Act must be dismissed for failure to comply with its mandatory administrative exhaustion requirement. In the alternative, this Court should grant summary judgment for Defendants because Plaintiffs cannot establish that Defendants acted with deliberate

20

indifference because Defendants reasonably responded to the risk of harm caused by a rapidly and continuously evolving global pandemic. Finally, the Court should deny Plaintiffs' motion to certify the class and strike Plaintiffs' class allegations.

## A. Plaintiffs' Rehabilitation Act Claim.

    1. <u>Plaintiffs' Claim Pursuant to Section 504 of the Rehabilitation Act of 1973 Should be Dismissed In its Entirety as Plaintiffs Failed to Exhaust Their Administrative Remedies.</u>

The Prison Litigation Reform Act ("PLRA") is abundantly clear: "**[n]o action** shall be brought with respect to prison conditions under section 1983 of this title, **or any other Federal law**, by a prisoner confined in any jail, prison, or other correctional facility **until** such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a) (emphasis added). With respect to Plaintiffs'[5] Rehabilitation Act claim, there are two available avenues of administrative remedy that Plaintiffs were required, yet failed, to pursue. First, Plaintiffs were required to exhaust the Bureau of Prisons' Administrative Remedy Program set forth in Part 542

---

[5] This claim is only brought by Plaintiffs Hallinan, Riddick, Maldonado, Brown, Freeman, Butler, Williams, and Waldrip. Complaint, D.E. 1 at 4, ¶ 9. However, inmate Maldonado has been released to home confinement, Clark Decl., D.A. 033, and inmate Butler has transferred to the United States Penitentiary in Yazoo City, Mississippi ("USP Yazoo City"). Clark Decl., D.A. 037. Therefore, Maldonado and Butler's Rehabilitation Act claims are moot. <u>See</u> LaFaut v. Smith, 834 F.2d 389, 395 (4th Cir. 1987) (holding that an inmate's Rehabilitation Act claim was moot because he had released from federal prison altogether prior to the district court's consideration of his claim); <u>see also</u> Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there."); Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Taylor v. Rogers, 781 F.2d 1047, 1048 n. 1 (4th Cir. 1986).

of Title 28 of the Code of Federal Regulations.[6]  Second, Plaintiffs should have submitted a complaint to the Director for Equal Employment Opportunity to request redress directly from the Department of Justice in accordance with compliance procedures set forth in Part 39 of Title 28 of the Code of Federal Regulations. Plaintiffs failed to provide either BOP or DOJ officials "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court," and Plaintiffs' failure to comply with the PLRA's statutory mandate requires their Rehabilitation Act claims be dismissed.  Jones v. Bock, 549 U.S. 199, 204 (2007).

Requiring proper exhaustion of administrative remedies serves several valuable purposes: "[i]t gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors[,]" it "discourages disregard of [the agency's] procedures[,]" it promotes efficiency, and "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration."  Woodford v. Ngo, 548 U.S. 81, 89-94 (2006). Exhaustion is "particularly appropriate where a federal agency can apply its special expertise."  Cooke v. U.S. Bureau of Prisons, 926 F. Supp. 2d 720, 733 (E.D.N.C. Feb. 27, 2013) (citing McKart v. United States, 395 U.S. 185, 194 (1969)).

Proper exhaustion of administrative remedies demands compliance with an agency's deadlines and other critical procedural rules.  Woodford, 548 U.S. at 90.  An

---

[6] This program is also explained in detail in Bureau of Prisons Program Statement 1330.18, Administrative Remedy Program ("PS 1330.18"), which is publicly available online at https://www.bop.gov/policy/progstat/1330_018.pdf.

inmate must complete all stages of the administrative remedy process before the process is considered properly exhausted. <u>Woodford</u>, 548 U.S. at 88–89; <u>Wright v. Morris</u>, 111 F.3d 414, 417 n.3 (6th Cir. 1997).

The only exception to the exhaustion requirement is when the administrative remedy process is unavailable, <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1858 (2016), but it is a high burden for an inmate to make such a showing. <u>See</u> <u>Tuckel v. Grover</u>, 660 F.2d 1249, 1254 (10th Cir. 2011) (indicating that although defendants bear the initial burden to show that a plaintiff has failed to exhaust, upon making the showing, "the onus falls on the plaintiff to show that remedies were unavailable to him"). The Supreme Court, in <u>Ross</u>, identified only three circumstances in which a prisoner can show that the administrative remedy process is "unavailable": (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end-with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it" and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." <u>Ross</u>, 136 S. Ct. at 1859–60.

The Bureau of Prisons has a four-tiered Administrative Remedy Program set forth in Part 542 of Title 28 of the Code of Federal Regulations. <u>See</u> 28 C.F.R. § 542.10, <u>et</u> <u>seq</u>. An inmate must first attempt resolution of his complaint informally by discussing his concern with a staff member. <u>See</u> 28 C.F.R. § 542.13. If the attempt at informal resolution does not provide the inmate with a satisfactory outcome, he

may file a formal complaint with the Warden within twenty (20) days of the date on which the basis of the complaint occurred. <u>Id.</u> at § 542.14. If the inmate is not satisfied with the Warden's response to his formal grievance, he may appeal the response to the appropriate Regional Director. <u>Id.</u> at § 542.15. Finally, if dissatisfied with the regional response, he may file an appeal with the General Counsel at the Bureau of Prisons' Central Office in Washington, D.C. <u>Id.</u> An inmate "must complete all stages of the administrative remedy process before the process is considered properly exhausted." <u>Gamble v. Onuoha</u>, No. 5:13-CT-3136-F, 2015 WL 736053, at *3 (E.D.N.C. Feb. 19, 2015) (citing <u>Woodford</u>, 548 U.S. at 90-91). Likewise, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." <u>Woodford</u>, 548 U.S. at 90. It does not permit an inmate to simply fail "to follow the required steps so that remedies that once were available to him no longer are." <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008).

Here, there are eight (8) named Plaintiffs who allege a violation of the Rehabilitation Act. Complaint, D.E. 1 at 4, ¶ 9. BOP records indicate that three (3) have failed to file a single formal administrative grievance during the entirety of their federal incarceration. Kelley Decl., D.A. 649. Of the remaining seven (7) Plaintiffs, not one has filed a request for administrative remedy citing discrimination on the basis of a disability in violation of the Rehabilitation Act of 1973. <u>See</u> <u>generally</u> Kelley Decl., D.A. 649-52, 660-83. No named Plaintiff has even completed the entire administrative remedy program with respect to **any** grievance prior to the filing of the instant complaint. Kelley Decl., D.A. 649-51. Accordingly, it is clear that each

and every Plaintiff has failed to exhaust his BOP prescribed, mandatory administrative remedies with respect to his Rehabilitation Act claim. This claim must therefore be dismissed in its entirety.

However, even if one or all of the Plaintiffs had completed the mandatory BOP administrative process, there is no evidence that any named Plaintiff, in his own right or on behalf of a class of similarly situated individuals, attempted to exhaust the administrative remedies made available by the Department of Justice. See generally Declaration of Nihar Vora [hereinafter "Vora Decl."], D.A 686.

The Department of Justice ("DOJ") promulgated Part 39 of Title 28 of the Code of Federal Regulations in order to effectuate "section 119 of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, which amended section 504 of the Rehabilitation Act of 1973 to prohibit discrimination on the basis of handicap in programs or activities conducted by Executive agencies . . . ." 28 C.F.R. § 39.101. The regulations contained in Part 39 include a section entitled "Compliance procedures." 28 C.F.R. § 39.170.

Section 39.170 applies "to all allegations of discrimination on the basis of handicap in programs or activities conducted by the agency." 28 C.F.R. § 39.170(a). Any person "who believes that he or she has been subjected to discrimination prohibited by this part may by him or herself or by his or her authorized representative file a complaint with the Official."[7] 28 C.F.R. § 39.170(d)(1)(i). In

---

[7] "*Official* or *Responsible Official* means the Director of Equal Employment Opportunity for the Department of Justice or his or her designee." 28 C.F.R. § 39.103.

addition, "[a]ny person who believes that any specific class of persons has been subjected to discrimination prohibited by this part and who is a member of that class or the authorized representative of a member of that class may file a complaint with the Official." 28 C.F.R. § 39.170(d)(1)(i).

Critically, these procedures unequivocally apply to inmates incarcerated in Bureau of Prisons facilities, and initially require the inmate to administratively present his claims to the BOP and exhaust the grievance procedures outlined within the BOP's administrative scheme. See 28 C.F.R. § 39.170(d)(1)(ii) ("Before filing a complaint under this section, an inmate of a Federal penal institution must exhaust the Bureau of Prisons Administrative Remedy Procedure as set forth in 28 CFR part 542."). Following completion of the BOP's administrative remedy procedure, the regulations describe the administrative process in detail. See generally 28 C.F.R. Part 39. The regulations include the timeframe within which a complaint should be filed and to whom it should be addressed, and provide for an investigation process. Id. Should either party be dissatisfied with the investigation and conclusion, the party may appeal to the Complaint Adjudication Officer and request a hearing. Id. Following a hearing conducted by an administrative law judge, the agency will render a final decision. Id.

District courts routinely require plaintiffs to exhaust the administrative remedy procedure outlined in 28 C.F.R. Part 39 prior to filing suit claiming violations of the Rehabilitation Act. See Cooke v. U.S. Bureau of Prisons, 926 F.Supp.2d 720, 728-735 (E.D.N.C. Feb. 27, 2013); Elliott v. Wilson, Case. No. 0:15-cv-01908-JNE-

26

KMM, 2017 WL 1185213, at *14 (D. Minn. Jan. 17, 2017); <u>Brown v. Cantrell</u>, Civil Action No. 11-cv-200-PAB-NEH, 2012 WL 4050300, at *2-4 (D. Colo. Sept. 14, 2012) (unpublished) (finding that the "PLRA's clear textual mandate should control" the issue regarding exhaustion, and concluding that "the PLRA's requirement that plaintiff exhaust all 'available' remedies requires federal inmates alleging disability discrimination to take advantage of § 39.170, which is 'available'"); <u>Haley v. Haynes</u>, Civil Action No. CV210-122, 2012 WL 112946, at *1 (S.D. Ga. Jan. 12, 2012) (unpublished) ("Requiring that an inmate seeking relief based on alleged violations of the ADA and [Rehabilitation Act] in correctional facilities file an administrative complaint with the Department of Justice is not a burden—it is only a procedural step which must occur before bringing a cause of action in federal court."); <u>Bryant v. U.S. Bureau of Prisons</u>, Case No. CV11-254 CAS (DTBx), 2011 WL 13261983, at *4 (C.D. Cal. July 11, 2011) (dismissing Rehabilitation Act claim where "plaintiff has not exhausted all the administrative remedies available to him for his Rehabilitation Act Claim, as required by the PLRA"); <u>Scott v. Goord</u>, No. 01Civ.0847(LTS)(AJP), 2004 WL 2403853, at *7-8 (S.D.N.Y. Oct. 27, 2004) (unpublished) (finding that the DOJ's compliance procedures constitute "precisely the sort of pre-litigation process contemplated . . . , and section 1997e clearly applies the exhaustion of remedies mandate to the ADA and Rehabilitation Act as "other Federal law"); <u>Burgess v. Goord</u>, No. 98 Civ.2077(SAS), 199 WL 33458, at *7 n. 6 (S.D.N.Y. Jan. 26, 1999) (unpublished); <u>Crowder v. True</u>, no. 91 C 7427, 1993 WL 532455, at *5-6 (N.D. Ill. Dec. 21, 1993) (unpublished) (holding that a plaintiff's failure to fully exhaust his

27

administrative remedies under the compliance procedures set forth in 28 C.F.R. Part 39 is "fatal" to his claims).

Here, Plaintiffs have not even endeavored to complete the first step in this process by exhausting administrative remedies prescribed by the BOP's Administrative Remedy Program. See generally Kelley Decl., D.A. 649-52, 654-83. Notwithstanding the fact that Plaintiffs admit that they have filed this cause of action "seven months after the first documented case of SARS-nCoV-2 ('coronavirus' or 'virus') at Butner," not one has properly presented allegations of discrimination to DOJ first. D.E. 1 at 2 ¶ 5; See Vora Decl., D.A. 686. Rather, Plaintiffs attempt to bypass the process altogether and seek redress directly from this Court without providing the BOP or DOJ an opportunity to address these allegations of wrongful discrimination or providing this Court the benefit of a developed administrative record produced by an agency with specific expertise. See Cooke, 926 F.Supp.2d at 733 ("Exhaustion is particularly appropriate where a federal agency can apply its special expertise." (citing McKart v. United States, 395 U.S. 185, 194 (1969))). Plaintiffs should not be permitted to flout the mandatory requirements of the PLRA and circumvent available procedures developed and promulgated by the DOJ, and their Rehabilitation Act claim should be dismissed for this reason alone.

2. Alternatively, Plaintiffs Fail to Adequately Plead a Violation of the Rehabilitation Act of 1973.

Even were this court to consider the merits of Plaintiffs' discrimination claim, Plaintiffs do not state a claim upon which relief can be granted under Section 504 of

28

the Rehabilitation Act.[8]  The Rehabilitation Act assures "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a).  Generally, a plaintiff seeking recovery under the Rehabilitation Act "must allege that (1) he has a disability; (2) he is otherwise qualified to receive the benefits or a public service, program, or activity; and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of h[is] disability." Spencer v. Earley, 278 F. App'x 254, 261 (4th Cir. 2008) (internal quotations marks omitted) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005).[9]

    Plaintiffs arguably fail to satisfy any elements of a Rehabilitation Act claim,

_____

[8] Defendants also dispute whether Plaintiffs may even pursue a private cause of action under section 504 of the Rehabilitation Act. See e.g., Cooke, 926 F.Supp.2d at 731 (noting that "a strong argument exists for holding that the source of the plaintiffs' cause of action should be the APA," rather than an implied private right of action (citing Clark v. Skinner, 937 F.2d1232, 125-26 (4th Cir. 1991))).  See also Mathis v. GEO Grp., Inc., No. 2:08-CT-21-D, 2009 WL 10736631, at *7 (E.D.N.C. Nov. 9, 2009) (refusing to "imply a private right of action under section 504 [of the Rehabilitation Act of 1973]  against the federal government or its officials") (citing Hines v. GEO Group, Inc., No. 5:08-CT03056-D, at *8 (E.D.N.C. Dec. 23, 2008) (unpublished); Jersey Heights Neighborhood Ass'n, 174 F.3d 180, 191 (4th Cir. 1999); Alexander v. Sandoval, 532 U.S. 275, 285 (2001)).

[9] The Fourth Circuit has repeatedly held that the "ADA and Rehabilitation Act generally are construed to impose the same requirements," and "[b]ecause the language of the Acts is substantially the same, [the Court applies] the same analysis to both." Spencer, 278 F. App'x at 261 (quoting Baird ex rel. Baird v. Rose, 192 F.3d 462, 468 (4th Cir. 1999); Doe v. University of Maryland Medical System Corp., 50 F.3d 1261, 1264 n. 9 (4th Cir. 1995)).

29

but undoubtedly fail to allege facts sufficient to satisfy each and every element, dooming their claim. First, the named Plaintiffs fail to allege facts demonstrating they, or putative class members, suffer from a qualifying disability. A disability is defined as "a physical or mental impairment that substantially limits[10] one or more major life activities of such individual." 42 U.S.C. § 12102. A physical or mental impairment is further defined to include:

> (i) [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine; or
> (ii) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term 'physical or mental impairment' includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and drug addiction and alcoholism.

28 C.F.R. § 39.103(1). See Bartlett v. Smith, No. 5:18-CT-3124-FL, 2019 WL 1051185, at *3 (E.D.N.C. Mar. 5, 2019), appeal dismissed, 776 F. App'x 115 (4th Cir. 2019) ("A plaintiff must prove (1) that he has a physical or mental impairment; (2) that this impairment implicates at least one major life activity; and (3) that the limitation is substantial." (citing Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 254 (4th Cir. 2006))). Major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning,

---

[10] To be "substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it." Hale v. King, 642 F.3d 492, 501 (5th Cir. 2011).

and working." 28 C.F.R. § 39.103(2). However, "[m]erely having an impairment . . . does not make one disabled for the purposes of the ADA [or Rehabilitation Act]." Hale v. King, 642 F.3d 492, 501 (5th Cir. 2011) (quoting Furnish v. SVI Sys., Inc., 270 F.3d 445, 450 (7th Cir. 2001)). See also Hamilton v. Sw. Bell Tel. Co., 136 F.3d 1047, 1050 (5th Cir. 1998) (noting that alleging that one suffers from a particular condition alone does not necessarily constitute a disability contemplated by the ADA or Rehabilitation Act; the "statute[s] require[] an impairment that substantially limits one or more of the major life activities").

Whether a person has a qualifying disability as defined by the Rehabilitation Act is necessarily a fact-intensive, individualized inquiry. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999), overturned on other grounds due to legislative action (2009) ("The definition of disability also requires that disabilities be evaluated 'with respect to an individual' and be determined based on whether an impairment substantially limits the 'major life activities of such individual.' § 12102(2). Thus, whether a person has a disability under the ADA is an individualized inquiry.") (citing Bragdon v. Abbott, 524 U.S. 624, 641-42 (1998) (declining to consider whether an HIV infection is a *per se* disability under the ADA)); see also 29 C.F.R. pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."); Albertson's, Inc. v. Kirkingburg, 527 U.S. 555 (1999) (emphasizing that the ADA and Rehabilitation Act clearly define disability "with respect to an individual," and

31

therefore the "determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis") (internal citations omitted).

Each and every named plaintiff in this action who claims to suffer from a disability merely alleges that he suffers from one or more medical conditions, and summarily concludes that he "is an individual with a disability for the purposes of the Rehab Act." Complaint, D.E. 1, at 10-12, ¶¶ 28, 30-35, 37. Not one named Plaintiff, however, alleges that the medical condition he suffers from constitutes a physical or mental impairment under the statute, nor does he allege that the medical condition(s) from which he suffers limits, let alone substantially limits any major life activity. See Complaint, D.E. 1, at 10-12, ¶¶ 28, 30-35, 37. Even the very definition of the putative "Disability Subclass" fails to comport with the definition of a protected disability under the statutory framework. See D.E. 1, at 4 ¶ 9. The Disability Subclass purports to consist of any inmate who has any of a number of named physical or mental impairments, but conspicuously fails to include any allegations that the conditions actually substantially limit a major life activity. See D.E. 1, at 4 ¶ 9. These allegations fail to establish that any named Plaintiff or putative member of the Disability Subclass suffers from a protected disability under the Rehabilitation Act. See Wragg v. Ortiz, 462 F. Supp. 3d 476, 513 (D.N.J. May 27, 2020) (hesitating to find that plaintiffs had a qualifying disability "because it lacks precision" where the "broadly-defined disability alleged by Petitioners" is that "their underlying medical conditions limit their life activities because they must be more cautious to guard against contracting COVID-19 than others").

32

Furthermore, even if Plaintiffs could establish—which they cannot—that they suffer from a disability and that they are otherwise "qualified to receive the benefits or public service, program, or activity," they fail to allege any facts indicating they were "denied the benefits of such service, program, or activity." Spencer, 278 F. App'x at 261 (internal citation omitted). The services, programs, and/or activities that appear to be at issue are access to food, medicine and medical treatment, recreation, housing, and communications. See Complaint, D.E. 1 at 26 ¶ 81. However, Plaintiffs do not allege, nor can they, that they do not have access to food, to medicine, to medical treatment, to participate in recreation, to shelter, or to communicate. See generally Complaint, D.E. 1. Rather, they claim that the inmates at FCC Butner who purportedly suffer from a disability are medically vulnerable, and are at increased risk of suffering severe illness *if* they contract COVID-19 while receiving the benefits of those services, programs and activities. See Complaint, D.E. 1 at 33-35, 74-76 ¶¶ 117, 118, 121, 123, 305-307. This is simply not a denial of services at all, let alone a denial based upon an individual's disability. See, e.g., Docherty v. Cape May Cty., Civ. No. 15-8785 (RMB), 2017 WL 2819963, at *12 (D.N.J. June 29, 2017) ("Plaintiffs have not alleged that corrections officers permit other inmates to access medical treatment without delay. These facts do not support the conclusion that, solely by reason of their disability, Defendants discriminate against insulin-dependent inmates.").

Finally, Plaintiffs fail to establish that they have been "otherwise discriminated against, on the basis of h[is] disability." Spencer, 278 F. App'x at 261

33

(internal citation omitted). To prove discrimination, Plaintiffs can pursue "three distinct grounds: '(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations.'" White v. City of Annapolis by & through City Council, 439 F. Supp. 3d 522, 542 (D. Md. 2020) (quoting Brown v. Dep't of Pub. Safety & Corr. Servs., 383 F. Supp. 3d 519, 552 (D. Md. 2019) (quoting A Helping Hand, LLC v. Balt. City, 515 F.3d 356, 362 (4th Cir. 2008))). Plaintiffs all but admit that there is clearly no intentional discrimination. See, e.g., Complaint, D.E. 1 at 73, ¶ 301. Rather, they claim failure to make reasonable accommodations and disparate impact. See Complaint, D.E. 1 at 73, ¶ 301. Both claims are unavailing.

In support of their claim, Plaintiffs emphasize that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). However, "[r]easonable modifications do not require prisons to employ any and all means to make services available to disabled persons." Moneyhan v. Keller, No. 5:10-CT-3053-BO, 2015 WL 11622479, at *4 (E.D.N.C. Feb. 25, 2015) (citing Miller v. Hinton, 288 Fed. Appx. 901, 902 (4th Cir. 2008)). Rather, reasonable accommodations depend on "the individual circumstances of each case, and require[] a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to" access the specific programs or services

34

in question.  K.N. v. Gloucester City Bd. of Educ., 379 F. Supp. 3d 334, 350 (D.N.J. 2019) (internal quotations omitted).  Both the disabled person and the public entity are expected to engage in an interactive process to develop the specific accommodation necessary, and feasible, for the particular situation.  See, e.g., Baxter v. Pennsylvania Dep't of Corr., 661 F. App'x 754, 757 (3d Cir. 2016) (finding no disability discrimination where the prison proposed an accommodation and plaintiff "said no to this offer and filed this civil action instead" of engaging in the interactive process).

Further, a public agency may "resist modifications that entail a 'fundamenta[l] alter[ation]' of the States' services and programs."  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 603 (1999) (quoting 28 C.F.R. § 35.130(b)(7)).  The intent of the Rehabilitation Act, as a remedial civil rights statute, is to create equality of opportunity for disabled persons, not to mandate preferential treatment.  See Filar v. Bd. of Educ. of City of Chicago, 526 F.3d 1054, 1067 (7th Cir. 2008) (concluding that plaintiff's "request would have amounted to preferential treatment, which the ADA does not require"); Kortyna v. Lafayette Coll., 47 F. Supp. 3d 225, 242–43 (E.D. Pa. Sept. 19, 2014) ("'The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled; it does not authorize a preference for disabled people generally.'") (quoting Felix v. N.Y.C. Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003)).

Plaintiffs repeatedly claim that Defendants have failed to make reasonable accommodations, but neglect to indicate what such a reasonable accommodation

might be.  Complaint, D.E. 1 at 2, 7, 33-35, 56, 73, 83 ¶¶ 3, 20, 117, 121, 123, 247, 301, 342, 344.  Rather, they assert that Defendants "have failed to provide reasonable accommodations, including the release of persons with disabilities," Complaint, D.E. 1 at 83, ¶ 344, and claim that such modification is "reasonable and would impose no fundamental alteration on BOP."  Complaint, D.E. 1 at 76 ¶ 311.  There can be no more fundamental alteration to the administration of programs and services to incarcerated individuals than removing the very fact of their incarceration itself.  The District of New Jersey has already concluded in a case similar to the one at bar that a:

> bold request to release any and all inmates who may have any disability is simply not a reasonable accommodation within the meaning of the Rehabilitation Act.  It is an all or nothing approach that deprives the prison from conducting an independent analysis of each inmate's individual circumstances and an accommodation that may address the inmate's needs.  That is what the Act requires.

Wragg, 462 F. Supp. 3d. at 513.  Full-scale release of incarcerated persons with time remaining on their lawfully imposed sentences is patently unreasonable.

Finally, the Supreme Court has held that "judicial review over each and every instance of disparate impact discrimination would be overly burdensome." Hollonbeck v. U.S. Olympic Comm., 513 F.3d 1191, 1197 (10th Cir. 2008) (citing Alexander v. Choate, 469 U.S. 287, 299 (1985)).  Accordingly, "disparate impact, by itself, does not state a prima facie case under § 504.  Rather, actionable disparate impact requires analysis of whether the individual is otherwise qualified and whether reasonable accommodations may provide meaningful access."  Id.  As noted above, Plaintiffs have not proposed a reasonable accommodation to allow those with

36

disabilities meaningful access to the challenged activities and services—chiefly the provision of food, medical care, housing, and access to communication and recreation. However, one is not necessary. Plaintiffs acknowledge that "[a]ll people, regardless of age or health, risk serious illness and death from COVID-19." Complaint, D.E. 1 at 15 ¶ 45. Further, FCC Butner's policies and procedures do not put those with disabilities at any greater risk of **contracting** the virus. Rather, medically vulnerable inmates "are exposed to the same risk of contracting COVID-19 as healthy inmates. What is different is how serious the complications may be for [them]. Thus, to level the playing field, Petitioners seek conditions that are not available at [the prison], virtually complete protection against contracting COVID-19." Wragg, 462 F. Supp. 3d. at 513. The Court in Wragg held that the petitioners "failed to allege that Respondents have acted in disregard of Petitioners' rights because they are disabled and the relief Petitioners seek goes well beyond what the Rehabilitation Act expects" and dismissed the petition for failure to state a claim. Id. at 514. That is precisely what this Court should do here. Simply because COVID-19 discriminates against those with certain pre-existing health conditions does not mean that FCC Butner has discriminated against inmates with qualifying disabilities.

**B. Plaintiffs' Petition for Writ of Habeas Corpus.**

    1. <u>Plaintiffs' Habeas Claims Must Be Dismissed for Failure to Exhaust Administrative Remedies.</u>

As with Plaintiffs' Rehabilitation Act claims, Plaintiffs' habeas claims should be dismissed for failure to exhaust their administrative remedies. The principle of exhaustion of administrative remedies in section 2241 cases is "so well established

that the Fourth Circuit consistently summarily affirms dismissals of section 2241 petitions for failure to exhaust administrative remedies." See Van Buren v. Atkinson, No. 5:14-HC-2251-D, D.E. 14 n.2 (E.D.N.C. Aug. 31, 2015); see, e.g., Wallace v. Federal Bureau of Prisons, 604 F. App'x 329, 329 (4th Cir. 2015) (per curium) (unpublished); Hairston v. Wilson, 532 F. App'x 359, 359 (4th Cir. 2013) (per curium) (unpublished); Arce v. FCI-Williamsburg, 411 F. App'x 651, 651 (4th Cir. 2011) (unpublished).  The exhaustion requirement also applies when an inmate seeks injunctive relief.  Farmer v. Brennan, 511 U.S. 825, 847 (1994) (holding that in cases seeking injunctive relief to address "current" prison conditions, inmates are not "free to bypass adequate internal procedures and bring their health and safety concerns directly to court"). The Fourth Circuit has treated exhaustion of administrative remedies in a section 2241 action as jurisdictional.  See, e.g., Timms v. Johns, 627 F.3d 525, 533 (4th Cir. 2010).  The BOP's Administrative Remedy Program is detailed above in Section (A)(1).

As with their Rehabilitation Act claim, Plaintiffs have not even attempted to utilize the administrative remedy program to present their claims of unconstitutional confinement to the BOP.  As discussed fully in the Declaration of Christina Kelley, while several of the Plaintiffs have relied on the administrative remedy program to pursue other grievances or concerns, to include appealing the denial of their compassionate release requests, not a single Plaintiff has filed any administrative remedy request related to unconstitutional conditions of confinement, or the purported deliberate indifference of FCC Butner staff in response to COVID-19.  See

generally Kelley Decl., D.A. 649-51, 654-83. Thus, even after failing to exhaust their administrative remedies prior to filing their first petition, and even after Plaintiffs voluntarily dismissed that petition, they still failed to properly present the BOP with an opportunity to administratively review these claims prior to being once again haled into federal court. Id.

Further, Plaintiffs present no evidence—and there is none—that the administrative remedy process is unavailable. In fact, Plaintiffs make no reference to the administrative remedy program at all, and offer no explanation or excuse for their failure to complete it. FCC Butner reported its first case of COVID-19 on March 24, 2020. Strassel Decl., D.A. 179. Accordingly, Plaintiffs have been aware of the risk of contracting COVID-19 at FCC Butner for at least seven (7) months, or 216 days, prior to filing this lawsuit. An additional five (5) months, or 153 days, elapsed between the first petition Plaintiffs' filed, and the filing of the instant complaint. See Hallinan I, D.E. 1, filed on May 26, 2020. Accordingly, Plaintiffs have no excuse for not utilizing the program,[11] and cannot argue in good faith that they did not have sufficient time to do so prior to filing the instant complaint. As the Fourth Circuit held, the Court lacks jurisdiction over this cause of action, and should dismiss Plaintiffs' petition for writ of habeas corpus for failure to exhaust administrative remedies. See Timms, 627 F.3d at 533.

## 2. Alternatively, Plaintiffs' Habeas Claims Must be Dismissed for

---

[11] In fact, seven (7) of the named Plaintiffs have submitted requests for administrative remedy since March 1, 2020, but failed to submit any requests concerning their conditions of confinement during the COVID-19 pandemic. See Kelley Decl., D.A. 649-51.

<u>Lack of Jurisdiction Because Challenges to Conditions of
Confinement are not Cognizable Under Habeas Corpus.</u>

Even had Plaintiffs appropriately filed their petition for writ of habeas corpus following exhaustion of their administrative remedies, Plaintiffs again improperly pursued a cause of action challenging conditions of confinement pursuant 28 U.S.C. § 2241. Plaintiffs admit, as they must, that Judge Flanagan has already determined that a petition for writ of habeas corpus is not the appropriate vehicle through which to challenge Plaintiffs' conditions of confinement. <u>See</u> Complaint, D.E. 1 at 8 n.15 ("In a previous action brought by some of the Plaintiffs, Judge Flanagan made a . . . determination that their claims were not cognizable in a habeas corpus action."); <u>see also</u> <u>Hallinan I</u>, Order, D.E. 62, at 26 ("In sum, the court holds petitioners' conditions of confinement claims are not cognizable habeas claims under § 2241."). Even so, Plaintiffs again include a petition for writ of habeas corpus "to preserve those claims for appeal purposes." Complaint, D.E. 1 at 8 n.15. This Court should reject Plaintiffs' invitation to expand the scope of habeas corpus review, and dismiss their habeas claims for lack of subject matter jurisdiction.

This Court need look no further than to Judge Flanagan's well-reasoned and thorough order issued in <u>Hallinan I</u> which squarely confronts this issue. Judge Flanagan emphasized the fact that the gravamen of Plaintiffs' claims in <u>Hallinan I</u>— substantially similar to those at bar—consisted of "paradigmatic conditions of confinement claims" that do not fall within the ambit of a petition for writ of habeas corpus:

40

Petitioners do not challenge the validity of their sentences or convictions, or the FBOP's administrative calculation of their release dates, which is the traditional "essence" of habeas corpus. See Preiser, 411 U.S. at 484, 498-500. It is the nature of the substantive legal claim itself and the pertinent factual allegations – in addition to the relief sought – that determines whether the claim challenges "the validity of confinement" and thus sounds in habeas corpus. Hill v. McDonough, 547 U.S. 573, 579-81 (2006); see also Muhammad v. Close, 549 U.S. 749, 754-55 (2004) . . . ; Nelson v. Campbell, 541 U.S. 637, 644-46 (2004) . . . . Petitioners' claims challenging unconstitutional conditions of confinement do not sound in traditional habeas corpus, even though they seek release from confinement.

Petitioners also assert their claims are cognizable in a § 2241 petition because they are challenging the "fact" of their confinement, and no set of conditions can remedy the alleged constitutional violations. As noted, Preiser holds that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." 411 U.S. at 500. But read in context and in light of subsequent precedent, the phrase "fact of physical imprisonment" refers to a challenge to the legality vel non of the petitioner's conviction or sentence. See id. at 498-500 (distinguishing between inmate "who is making a constitutional challenge to the conditions of prison life, but not to the fact or length of his custody"); see also Nelson, 541 U.S. at 643 (explaining habeas is proper vehicle for challenging "the fact of [the inmate's] conviction or the duration of his sentence"); Muhammad, 549 U.S. at 754.

Thus, although there "may ultimately be an area of limited substantive overlap between . . . habeas corpus and § 1983," Lee v. Winston, 717 F.2d 888, 892 (4th Cir. 1983), petitioners have failed to establish that their paradigmatic conditions of confinement claims qualify for such special treatment and therefore are cognizable habeas claims. See Nettles, 830 F.3d at 931-32 (discussing importance of distinguishing between core habeas petitions and suits challenging conditions of confinement); Wilborn, 795 F. App'x at 163 (explaining "this case" presents no basis for deviating from the Fourth Circuit's prior holdings that conditions of confinement claims are not cognizable in habeas corpus proceedings).

Hallinan I, Order, D.E. 62 at 23-25.

Plaintiffs have included no novel or revolutionary factual allegations or

41

compelling legal authority in the instant complaint and petition that would warrant any different outcome here. As evidenced by Plaintiffs' incorporation of two additional causes of action in this suit, Plaintiffs have multiple other legal avenues at their disposal to challenge their conditions of confinement and seek remedial measures or release, including but not limited to a civil action for injunctive relief, a request for home confinement pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2) (2020), and a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act, Pub. L. No. 115-391, December 21, 2018, 132 Stat. 5194. Nevertheless, Plaintiffs continue their ill-conceived crusade to expand the purview of habeas corpus actions to include challenges to conditions of confinement. This Court should not permit Plaintiffs to exploit a global pandemic to increase the scope of habeas corpus well beyond "the traditional function of the writ"—"to secure release from illegal custody." Preiser v. Rodriguez, 411 U.S. 475, 484 (1973).

Conditions-of-confinement cases simply are not cognizable under habeas corpus. Wilborn v. Mansukhani, 795 F. App'x 157, 162–64 (4th Cir. 2019) (per curiam) (unpublished) (collecting cases); Hunt v. Johns, No. 5:10-HC-2176-FL, 2011 WL 3664553, at *2 (E.D.N.C. Aug 18, 2011) (unpublished).[12] As Judge Flanagan noted in Hallinan I, seven (7) "of the ten circuits that have addressed the issue in a

---

[12] Although the Supreme Court has theoretically left open the door to habeas relief in a conditions-of-confinement case, neither it nor the Fourth Circuit has yet allowed for such a use of § 2241. See Muhammad v. Close, 540 U.S. 749, 751 n.1 (2004) (observing that the Court has never followed the speculative dicta in Preiser); Wilborn, 795 F. App'x at 163–64.

published decision have concluded that claims challenging conditions of confinement cannot be brought in a habeas petition." Id.; see also Hallinan I, Order, D.E. 62, at 22. District courts in this Circuit also routinely dismiss such habeas petitions for lack of subject matter jurisdiction.[13]

Additionally, at least two other district courts within the Fourth Circuit have declined to grant habeas relief to a prisoner based on the potential spread of COVID-19. See United States v. Johnson, No. RBD-14-0441, 2020 WL 1663360, at *5 (D. Md. Apr. 3, 2020) ("As the Defendant is challenging the conditions of his confinement—namely, the potential spread of COVID-19—§ 2241 and § 2255 are not the appropriate vehicles for his petition.); McCarson v. Reherman, No. 2:20-01386-HMH-MGB, 2020 WL 2110770, at *1 (D.S.C. May 4, 2020) ("Although McCarson seeks relief pursuant to § 2241, the substantive content of her petition, coupled with her motion for injunctive relief, demonstrate that her claims are raised pursuant to the Coronavirus

---

[13] See, e.g., Rodriguez, 715 F. App'x at 266 (holding that the district court properly found petitioner's request to be transferred to another institution as not cognizable under § 2241, as it challenged a condition of confinement, rather than its fact or duration); Braddy v. Wilson, 580 F. App'x 172, 173 (4th Cir. 2014) (finding that when petitioner alleged constitutional violations "regarding only the conditions of his confinement" not the fact or duration of his sentence, his claims were properly brought under Bivens, not § 2241); Lee v. Winston, 717 F.2d 888, 892 (4th Cir. 1983) ("Although there may ultimately be an area of limited substantive overlap between … habeas corpus and § 1983, the main thrusts of the two are obviously quite different. The former is primarily a vehicle for attack by a confined person on the legality of his custody and the traditional remedial scope of the writ has been to secure absolute release—either immediate or conditional—from that custody. Conversely § 1983 cannot be used to seek release from illegal physical confinement[.]"); Wilborn v. Mansukhani, 795 F. App'x 157, 164 (4th Cir 2019) ("This case presents no basis to deviate from our previous holdings. Therefore, we conclude Wilborn's claim seeking to have the BOP reconsider where he is being housed is one that would not fall within the scope of habeas corpus.").

43

Aid, Relief, and Economic Security Act . . ., and the First Step Act, . . . . McCarson does not question the validity or constitutionality of her sentence, but rather contests her conditions of confinement. Therefore, McCarson's claims are not cognizable under § 2241.") (internal citations omitted)).

District courts outside of the Fourth Circuit have similarly ruled that habeas relief is not available to prisoners filing petitions based on the risk of contracting COVID-19. See Livas v. Myers, No. 20-422, 2020 WL 1939583, at *19–22 (W.D. La. Apr. 22, 2020) (declining to exercise jurisdiction over habeas petition challenging conditions related to COVID-19 or serve as a "serve as a de facto 'super warden'"); see also Grinis v. Spaulding, No. 20-10738, 2020 WL 2300313, at *5 (D. Mass. May 8, 2020) ("There is a substantial question whether the relief the petitioners seek," which is release because of COVID-19, is properly sought by means of a habeas petition under § 2241."); Wragg v. Ortiz, No. 20-5496, 2020 WL 2745247, at *18 (D.N.J. May 27, 2020) ("True, Petitioners seek early release from prison, but they do not do so on the basis that their convictions or sentences are invalid. Instead, they seek injunctive relief based on unconstitutional conditions of confinement, a type of challenge that neither the Supreme Court nor the Third Circuit has yet recognized as a cognizable habeas claim."); Mendez v. Kallis, No. 20-cv-924, 2020 WL 2572524 (D. Minn.); Travis v. Beard, No. CV 0:20-131-HRW, 2020 WL 6532822 (E.D. Ky. Nov. 5, 2020) (dismissing federal inmate's petition pursuant to § 2241 because "dissatisfaction with the sufficiency of BOP's [COVID-19] response does not, without more, make such claims cognizable in habeas corpus"); Savage v. Warden of FCI Pekin, No. 1:20-CV-

44

1181, 2020 WL 4060768 (C.D. Ill. July 20, 2020); <u>Nel v. Cole</u>, No. PE:20-CV-00048-DC, 2020 WL 6535787, at *4 (W.D. Tex. Oct. 31, 2020) (finding habeas relief unavailable in challenge to COVID-19 related conditions in contract federal correctional facility, emphasizing that "conditions-of-confinement—even if they are dangerous and unconstitutional—do not nullify an otherwise lawful detention"); <u>Cardona v. Bledsoe</u>, 681 F.3d 533, 537 (3d Cir. 2012). Thus, the petition should be dismissed for lack of subject matter jurisdiction.

The Court's "inherent equitable authority" is no silver bullet to that jurisdictional bar. "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied . . . limitations," and "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." <u>Armstrong v. Exceptional Child Center, Inc.</u>, 575 U.S. 320, 327–28 (2015). As explained above, courts lack subject matter jurisdiction to consider habeas petitions seeking to redress allegedly unconstitutional conditions of confinement. Because subject matter jurisdiction "is an Article III . . . requirement" that "functions as a restriction on federal power," courts have no "inherent equitable authority" to manufacture habeas remedies where none exist. As the Supreme Court has explained, district courts "should withhold relief in [a] collateral habeas corpus action where an adequate remedy available in the criminal proceeding has not been exhausted." <u>Stack v. Boyle</u>, 342 U.S. 1, 6–7 (1951); <u>accord</u> <u>Cole v. Spear</u>, 747 F.2d 217, 220–21 (4th Cir. 1984) (en banc) (holding that district court should have declined to exercise jurisdiction over habeas action where petitioner, who sought separation

45

from military service as a conscientious objector, failed to exhaust her remedies under the military system of justice); see also Archuleta v. Hedrick, 365 F.3d 644, 648–49 (8th Cir. 2004) (noting that "habeas corpus is an extraordinary remedy typically available only when the petitioner has no other remedy"); Taniguchi v. Schultz, 303 F.3d 950, 955 (9th Cir. 2002).

That conclusion is consistent with long-standing principles of finality. Once a criminal judgment (including a custodial sentence) becomes final, for instance, a court has no inherent authority to reconsider or alter that judgment. Dillon v. United States, 560 U.S. 817, 825 (2010) ("A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment and may not be modified by a district court except in limited circumstances." (alterations and quotations omitted)); cf. Teague v. Lane, 489 U.S. 288, 309 (1989) (plurality opinion) (recognizing that finality is an important attribute of criminal judgments and "essential to the operation of our criminal justice system"). Rather, a court may only modify a sentence pursuant to statutory authorization. See United States v. Addonizio, 442 U.S. 178, 189 n.16 (1979) (except by rule or statute, "[t]he beginning of the service of the sentence in a criminal case ends the power of the court even in the same term to change it"); United States v. Goodwyn, 596 F.3d 233, 235 (4th Cir. 2010). Given the Court's limited authority to alter or amend final judgments, Plaintiffs should not be permitted to pursue relief in this case pursuant to a writ of habeas corpus.

In Plaintiffs' 89-page filing, they fail to compose even one sentence that includes a scintilla of legal authority in support of their claim that this Court in fact

46

has jurisdiction pursuant to 28 U.S.C. § 2241. Rather, they include a footnote wherein they assert Judge Flanagan's preliminary determination in Hallinan I that their claims were not cognizable in a habeas corpus action was "non-binding," and admit that they only "include claims under 28 U.S.C. § 2241 (habeas corpus) to reserve those claims for appeal purposes." Complaint, D.E. 1 at 8 n. 15. They assert that this court has jurisdiction over this petition for writ of habeas corpus "because Plaintiffs are detained within its jurisdiction in the custody of Thomas Scarantino, Complex Warden of Butner" and therefore, "in custody for the purposes of the federal habeas corpus statute, 28 U.S.C. § 2241."[14] Complaint D.E. 1 at 9 ¶ 25. The mere "fact that a civil rights claim is filed by a prisoner rather than by an unincarcerated individual does not turn a § 1983 case or a Bivens action into a habeas petition." McGee v. Martinez, 627 F.3d 933, 936 (3d Cir. 2010); see also Hallinan I, Order, at 23 ("[T]he fact that petitioners seek release from custody cannot transform their claims into a cognizable habeas corpus action."). A single footnote and a few paragraphs asserting that Plaintiffs are in custody simply do not provide a sufficient basis to allow Plaintiffs' petition for writ of habeas corpus to proceed. Accordingly, Plaintiffs' habeas claims should be dismissed, this time with prejudice.

### C. Eighth Amendment Claim.

_____

[14] In fact, two (2) of the named Plaintiffs are no longer in custody at FCC Butner. Plaintiff Maldonado was transferred to home confinement just two days after filing this complaint, and Plaintiff Butler was transferred from LSCI Butner to USP Yazoo City on November 9, 2020. Clark Decl., D.A. 033, 037. Accordingly, their habeas claims are moot. See Donaldson v. Tripp, No. 5:16-HC-2275-D, 2018 WL 3946560, at *3 (E.D.N.C. July 3, 2018), report and recommendation adopted, No. 5:16-HC-2275-D, 2018 WL 3945381 (E.D.N.C. Aug. 16, 2018), appeal dismissed, 752 F. App'x 177 (4th Cir. 2019) (citing Alston v. Adams, 178 F. App'x 295, 296 (4th Cir. 2006)).

1.  <u>Plaintiffs' Eighth Amendment Claim Must Be Dismissed for Failure to Exhaust Administrative Remedies.</u>

Plaintiffs' Eighth Amendment claim is a quintessential action "brought with respect to prison conditions" that is unequivocally governed by the PLRA. Accordingly, Plaintiffs' failure to exhaust available administrative remedies is fatal to their claim. <u>See</u> 42 U.S.C. § 1997e(a). As noted above in section A(1), the PLRA states that "[n]o action shall be brought **with respect to prison conditions** under section 1983 of this title, or **any other Federal law**, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a) (emphasis added). The language is mandatory, and the Supreme Court has made clear that the exhaustion requirement applies to all suits regarding prisoner life, <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002), and that "unexhausted claims cannot be brought in court," <u>Jones v. Bock</u>, 549 U.S. 199, 211 (2007). Indeed, the well-established doctrine of exhaustion of administrative remedies requires that in order for an individual to assert claims for judicial relief, he must first exhaust the prescribed administrative remedy made available to him. <u>See</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 88–89 (2006) (citing <u>McKart v. United States</u>, 395 U.S. 185, 193 (1969)). As the Court emphasized in their previous action, Plaintiffs

> cite no authority supporting their implied position that they can file a civil action for Eighth Amendment violations on behalf of current federal inmates and invoke the court's "equitable authority" to grant injunctive relief without complying with the Prison Litigation Reform Act ("PLRA"). The PLRA applies to all prisoner civil actions challenging conditions of confinement, and imposes strict requirements regarding filing fees, **administrative exhaustion**, and carefully crafted restrictions on injunctive relief. . . . Thus, petitioners' freestanding (non-habeas) claims for Eighth Amendment violations must be filed in a

48

prisoner civil rights action governed by the PLRA. See Porter v. Nussle, 534 U.S. 516, 523-28 (2002). And in the absence of a properly filed civil action that complies with the PLRA, the court lacks jurisdiction to order injunctive relief.

Hallinan I, Order, D.E. 62 at 25 (emphasis added). The exhaustion requirement is mandatory, and a global pandemic does not constitute an exception or provide an excuse for non-compliance. See Ross v. Blake, 136 S. Ct. 1850, 1856-57 (2016) ("And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. . . . [A] statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.") (citing Miller v. French, 530 U.S. 327, 337 (2000); McKart v. United States, 395 U.S. 185, 193 (1969); McNeil v. United States, 508 U.S. 106, 111 (1993)). At least one district court has already dismissed a putative class-action complaint alleging COVID-19 related Eighth Amendment violations in a federal prison for failure to exhaust available administrative remedies. Nellson et al., v. Barnhart, et al., Case No. 1:20-cv-00756-PAB-NYW, 2020 WL 6204275, at *2 (D. Colo. Oct. 22, 2020) (granting summary judgment for institution warden and BOP where the "undisputed evidence shows that plaintiff did not file any administrative grievances related to the COVI-19 pandemic before filing suit" and rejecting the argument that the administrative remedy system was unavailable because "total and immediate relief is not the standard for exhaustion, the possibility of some relief is").

As emphasized repeatedly herein, despite representation by competent

counsel, Plaintiffs have simply failed to properly file a civil action that complies with the PLRA. See generally Kelley Decl., D.A. 646-53. Not one Plaintiff has filed an administrative remedy at the institutional level, let alone all required levels, asserting that the conditions of confinement at any institution within the Federal Correctional Complex in Butner are unconstitutional. See Kelley Decl., D.A. 649-52, 645-83. As such, this claim too must be dismissed for failure to comply with the PLRA's exhaustion requirement.

    2.   <u>In the Alternative, Defendants are Entitled to Summary Judgment on Plaintiffs' Eighth Amendment Claim as Plaintiffs Cannot Demonstrate that Defendants Acted with Deliberate Indifference.</u>

Even if the Court had jurisdiction to consider Plaintiffs' Eighth Amendment claim, it would fail on its merits. To demonstrate an Eighth Amendment violation, Plaintiffs must establish that Defendants acted with "deliberate indifference" towards Plaintiffs' well-being by consciously disregarding an excessive risk of harm to their safety. <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986) ("[O]nly the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment" (internal quotations omitted)). To succeed, Plaintiffs must prove not only an objective component, but also a subjective component. <u>Porter v. Clarke</u>, 923 F. 3d 348, 355 (4th Cir. 2019) (citing <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016); <u>Farmer</u>, 511 U.S. at 834). To satisfy the objective prong, "a plaintiff inmate must demonstrate that the deprivation alleged was, objectively, sufficiently serious." <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 834 (internal quotation marks and brackets omitted)). To be "sufficiently serious," the alleged "deprivation must be

'extreme'—meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from . . . exposure to the challenged conditions.'" Id. (quoting De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003)); see also Farmer, 511 U.S. at 834 ("[A] prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." (internal citation and quotation marks omitted)). The Supreme Court has "made clear that whether a particular danger poses a substantial risk of serious harm in a prison must be evaluated in light of the steps that the facility has already taken to mitigate the danger." Chunn, et al. v. Edge, 465 F. Supp. 3d 168, 200 (E.D.N.Y. June 9, 2020) (citing Helling v. McKinney, 509 U.S. 25, 35-36 (1993)).

The second component of a properly pleaded Eighth Amendment claim requires a prison official to have a "sufficiently culpable state of mind"—"deliberate indifference." Farmer, 511 U.S. at 834. Plaintiffs must show that an official "knew of and disregarded an excessive risk to inmate health or safety." Scinto, 841 F. 3d at 225. However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844; Odom v. South Carolina Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003). In the context of exposing prisoners to risk of disease, a claim must be dismissed if it does not pose a threat that is so severe that it would be "contrary to current standards of decency for **anyone** to be so exposed." Helling v. McKinney, 509 U.S. 25, 35 (1993) (emphasis

added); Farmer v. Brennan, 511 U.S. 825, 844–45 (1994).

Like the criminal-law "mens rea requirement" for "subjective recklessness," deliberate indifference requires proof that officials "know[] of and disregard[] an excessive risk of inmate health or safety," Farmer, 511 U.S. at 836–837, 839–40, i.e., they must "'consciously disregard'" that risk by subjectively recognizing it while failing to "respond[] reasonably." Id. at 839, 844 (brackets and citation omitted). That subjective inquiry "incorporates due regard for [officials'] 'unenviable task of keeping dangerous men in safe custody under humane conditions,'" Farmer, 511 U.S. at 845 (citation omitted), by "leav[ing] ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources," Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011). Recognizing that the judiciary is "ill equipped to deal with the difficult and delicate problems of prison management," Thornburgh, 490 U.S. at 407–08 (1989) (internal quotations omitted), the Supreme Court has emphasized that courts must use "caution" in exercising their equitable power and warned that they may not "'enmesh[]'" themselves "'in the minutiae of prison operations,'" Farmer, 511 U.S. at 846–47 (citation omitted). Notably, a "lack of due care" or other "error in good faith" is insufficient to show wantonness. Wilson, 501 U.S. at 299 (citation and emphasis omitted).

It is undisputed that COVID-19 continues to pose significant health risks to the community at large, as well as the incarcerated population. However, in the Eighth Amendment context, "whether prison conditions pose a substantial risk of

52

serious harm from COVID-19, or any other risk, must be determined **'after accounting for the protective measures [the prison system] has taken**.'" Chunn, et al. v. Edge, 465 F. Supp. 3d 168, 200 (E.D.N.Y. June 9, 2020) (quoting Valentine v. Collier, 956 F.3d 797, 801 (5th Cir. 2020) (emphasis added)). As discussed in more detail below, the BOP has taken myriad protective measures beginning as early as January 2020, when it implemented the first phase of its National Action Plan in accordance with World Health Organization ("WHO") and CDC recommendations to prevent and mitigate the spread of COVID-19 in individual facilities. See Strassel Decl., D.A 172-73. The BOP has adapted and modified its plan as the pandemic progressed, implementing a total of nine phases of this action plan to adjust its response to the evolving nature of the pandemic. See Strassel Decl., D.A. 172; Stock Decl., D.A. 117-24. In accordance with national directives, FCC Butner has implemented this comprehensive strategy to combat and curtail the pandemic, targeting not only the introduction of the virus, but also employing strategies to mitigate its spread and manage those who contract the virus. FCC Butner has and continues to utilize screening tools for inmates and staff. Strassel Decl., D.A. 174-76, 182, 185-86, 188, 199, 205-06, 208-09. BOP has also established several quarantine units at FCC Butner, engaged in comprehensive testing and symptom checks, purchased specialized cleaning products, distributed personal protective equipment, and disseminated information on how to protect both inmates and staff from infection. See Stock Decl., D.A. 134-42; Harden Decl., D.A. 545-47; Martinez Decl., D.A. 550-51, 553. Each institution across the Complex has modified operations and

53

movement schedules to increase social distancing and limit contact between inmates. See Strassel Decl., D.A 175. Under these circumstances, there is absolutely no legal basis to conclude that Plaintiffs face a risk so grave that it violates "current standards of decency" or that BOP is taking actions that "constitute an unnecessary and wanton infliction of pain or [are] repugnant to the conscience of mankind," given the existing precautions in place at FCC Butner. Helling, 509 U.S. at 35; Estelle, 429 U.S. at 35.

Additionally, and more importantly, Plaintiffs fail to show that Defendants— the Director of the BOP, the Medical Director of the BOP, and the Complex Warden of FCC Butner—possess the requisite subjective culpable state of mind to render their response to the COVID-19 pandemic unconstitutional. Plaintiffs beat the same drum of hysteria and fear as they did back in May, emphasizing the total number of positive cases and inmate deaths over a ten (10) month period. Complaint, D.E. 1 at 23, ¶ 71; 2 ¶ 5. However, even where in some instances "the harm ultimately was not averted," Defendants can and should be found "free from liability" because they "responded **reasonably** to the risk." Farmer, 511 U.S. at 844 (emphasis added). See also Hallinan I, Order, D.E. 62 at 32 (while evidence of a "recent increase in infections and deaths at FCC-Butner" is "tragic, continued spread of a novel, highly contagious virus cannot standing alone establish respondents failed to reasonably respond to the virus").

In June of this year, another district court judge in this district evaluated the careful and proactive response of BOP and FCC Butner officials to the COVID-19 pandemic. That court emphasized that those officials

54

immediately implemented extensive efforts to limit the spread of the virus and protect inmate health and safety. These efforts included screening inmates, staff and visitors for symptoms; isolating and quarantining inmates exposed to the virus (depending on whether they displayed symptoms); imposing limitations on movements within the facilities and visitation; and conducting inmate and staff testing in accordance with guidelines from the CDC. [Defendants] also have mandated extensive cleaning efforts, provided access to cleaning supplies and soap/hand sanitizer, educated inmates and staff about the virus, and provided face coverings for staff and inmates. This evidence shows that [defendants] have responded reasonably to the risk of harm caused by a rapidly evolving global pandemic.

Hallinan I, Order, D.E. 62 at 28-29.[15] The court also noted that isolated instances "of failure to follow the quarantine policy is hardly sufficient to establish deliberate indifference on the part of high-ranking BOP officials, particularly in the face of an emergent public health crisis." Id. at 30. Ultimately, the court held the "Eighth Amendment does not require FBOP officials to take all conceivable steps to prevent the spread of COVID-19, provided their response to the virus remains reasonable." Id. at 33 (citing Farmer, 511 U.S. at 844).

Plaintiffs have simply failed to set forth any additional facts or evidence in this complaint that would warrant a contrary finding today. Plaintiffs' complaint is replete with general, vague, ambiguous, conclusory and unsubstantiated assertions. It is not, however, supported by sworn statements of named Plaintiffs—or any other currently incarcerated inmates—or individuals with specific, first-hand knowledge of

---

[15] Defendants acknowledge that the denial of the temporary restraining order and preliminary injunction does not constitute a final judgment on the merits, but rather contend that the court conducted the same analysis of the deliberate indifference claim that is instructive here. See Hallinan I, Order, D.E. 62 at 28 ("Petitioners have not demonstrated they are likely to succeed on the merits as to the deliberate indifference component of their claim.").

55

current conditions at FCC Butner. Plaintiffs characterize the conditions at FCC Butner as a "crisis" (Complaint, D.E. 1 at 1, ¶ 1) and contend that Defendants have "failed to take the necessary steps to address the severe risks faced by the Class." Complaint, D.E. 1 at 6, ¶ 16. However, this is not the legal standard for deliberate indifference: Defendants need not take all conceivable, or even necessary, steps to prevent harm from befalling inmates in their custody; they must only respond reasonably to the risks posed by potential exposure to COVID-19. Hallinan I, Order, D.E. 62 at 33; Farmer, 511 U.S. at 844. Without question, they have done so.

Nevertheless, Plaintiffs baldly (and contrary to the overwhelming evidence) contend that Defendants are deliberately indifferent because they: (1) have not utilized available tools to reduce the population at FCC Butner, Complaint, D.E. 1 at 57; (2) have not created conditions to allow for physical distancing, Complaint, D.E. 1 at 60; (3) have not conducted widespread testing, Complaint, D.E. 1 at 61; (4) have failed to establish safe and effective quarantine and isolation practices, Complaint, D.E. 1 at 64; (5) have failed to eliminate contact between people in different housing units, Complaint, D.E. 1 at 69; and (6) have not ensured adequate cleaning or disinfecting of living spaces and equipment, Complaint, D.E. 1 at 70. Not only are Plaintiffs' allegations factually incorrect, but they again miss the forest for the trees. Plaintiffs wrongly focus on the total number of inmates and staff who have tested positive over the course of the pandemic, believing that alone establishes a prima facie case of deliberate indifference. They are wrong. Defendants' subjective culpability, is a component of the analysis, and Plaintiffs; bare assertions are devoid

of the factual enhancement necessary to survive a motion to dismiss. Iqbal, 556 U.S. at 678-79. Further, the overwhelming evidence establishes, as a matter of law, that Defendants were not deliberately indifferent.

First and foremost, it bears repeating that the BOP enacted Phase One of its National Action Plan for COVID-19 in January of 2020. See Stock Declaration, D.A. 117. Among other things, the BOP began coordinating with subject matter experts within and outside the agency, to include the World Health Organization ("WHO") and the CDC, to formulate its response to COVID-19. See Stock Declaration, D.A. 117. In response, and thereafter, BOP and FCC Butner officials thoughtfully discussed, promulgated, and implemented strategies to combat the spread of COVID-19. See generally Strassel Decl., D.A. 172-210; Stock Decl., D.A. 116-49; Harden Decl., D.A. 545-47; Martinez Decl., D.A. 550-54.

One of the BOP and FCC Butner's first strategies to combat the introduction of COVID-19 was the use of a screening tool for the virus. On February 4, 2020, the BOP initiated and FCC Butner implemented an inmate screening tool for all newly committed inmates to ensure they were properly screened for COVID-19 signs and symptoms prior to entry into any BOP facility. Strassel Decl., D.A. 173. Since then, the screening tools for inmates, staff,[16] and visitors have been updated numerous times in accordance with guidance from public health officials, and guidance has been

---

[16] Although FCC Butner does not test staff for COVID-19, FCC Butner staff have been educated about the importance of staying home if they feel ill, must self-report COVID-19 exposure, and must self-report any positive or pending COVID-19 test. Stock Decl., D.A. 132-33.

disseminated to staff. Screening remains a vital tool in use at the date of this filing. Strassel Decl., D.A. 174-76, 182, 185-86, 188, 199, 205-06, 209.

In addition to symptom screening, and contrary to Plaintiffs assertions, FCC Butner also employs robust, targeted testing in accordance with BOP policy and CDC recommendations. FCC Butner has five FDA-authorized Abbott ID NOW COVID-19 testing machines on-site, and utilizes outside companies to conduct COVID-19 testing off-site as well. Harden Decl., D.A. 545. Inmates who are newly admitted to FCC Butner, or releasing or transferring from FCC Butner are tested for COVID-19. Harden Decl., D.A. 546; See Stock Decl., D.A. 128. Where necessary and appropriate, FCC Butner has also employed limited mass testing of inmates in open-bay style housing units to determine appropriate quarantine and isolation status or inmates in accordance with their test results. Harden Decl., D.A. 546; Stock Decl., D.A. 135.[17]

In conjunction with screening and testing, FCC Butner utilizes quarantine and isolation protocols in accordance with BOP and CDC guidance and recommendations to limit the spread of COVID-19. Stock Decl., D.A. 124, 136-42. Each institution in the complex has identified housing units to utilize for quarantine, isolation, and recovery units, and has identified procedures for each unit. Stock Decl., D.A. 137.

---

[17] As of December 14, 2020, although 1,219 total inmates presently or formerly incarcerated at FCC Butner have tested positive for the virus, 911 of them have recovered and returned to the general population, 275 were released or have transferred, and only **six** cases remain active. Harden Decl., D.A. 547. Of the remaining Plaintiffs, only Hallinan, Brown, and Freeman have previously tested positive for the virus, and each has fully recovered. Stock Decl., D. A. 138, 154-55. Contrary to Plaintiffs unsubstantiated allegations in the complaint, none of them reported symptoms of the virus to health services staff. Stock Decl., D.A. 138, 154-55; cf. D.E. 1 at 44-45, ¶¶ 181-183.

FCC Butner quarantines inmates in designated areas in order to separate asymptomatic inmates who have been in contact with symptomatic inmates, inmates who have newly arrived, or inmates who will transfer out of the institution in the near future. Stock Decl., D.A. 120, 128, 130-31, 136-37. Inmates will only be removed from quarantine status after 14 days and a negative test result. Stock Decl., D.A. 136-37. Inmates are placed on isolation status, on the other hand, to remove them from the general population when they exhibit signs or symptoms of COVID-19 and/or when they test positive for the virus. Stock Decl., D.A. 136-37. Inmates are removed from isolation status in accordance with BOP and CDC guidance. Stock Decl., D.A. 136-37.

During the course of the pandemic, FCC Butner also implemented enhanced sanitation plans, including daily cleaning and sanitizing all common areas; and providing inmates with disinfectant cleaners, and continuous access to soap, water, and sanitizers. See Martinez Decl., D.A. 550-53. These procedures go above and beyond the high standard of sanitation and disinfectant procedures normally in place to ensure the health and safety of staff and inmates at a medical complex. Martinez Decl., D.A. 550-54.

Furthermore, all staff at FCC Butner are provided the necessary Personal Protective Equipment ("PPE") to perform their assigned duties, including surgical masks, N-95 masks, and gloves. Strassel Decl., D.A. 181. All staff are required to wear face coverings where social distancing is not possible, and guidance emphasizing this requirement is periodically issued to staff. Strassel Decl., D.A. 185, 187, 203-04,

208-09. Inmates have also been provided masks during the pendency of the pandemic. Strassel Decl., D.A. 188-98. They are currently provided cloth masks, which they are required to wear at all times. Strassel Decl., D.A. 188-90.

As early as March 13, 2020, operations at FCC Butner were modified to promote social distancing between inmates and staff. Strassel Decl., D.A. 175. Throughout the pandemic, all institutions at FCC Butner have implemented measures including, but not limited to, mandating that smaller groups go to the dining hall, education, recreation, chapel, and other activities at any one time. Strassel Decl., D.A 175, 184-85, 191, 195. Although activities like pill line are conducted differently at each institution, medication is distributed in ways to maximize social distancing. Stock Decl., D.A. 145-47. Staff either go cell-to-cell and deliver the medication, or inmates line up in small groups at designated times, while required to wear their mask, and socially distance. Stock Decl., D.A. 146-47.

FCC Butner also maintained its robust provision of medical care for the inmates in its custody. Although certain contract specialists were not permitted into the Complex during the height of the pandemic, several contract specialty providers have been going to each institution in recent months in order to see patients and provide specialty care. Stock Decl., D.A. 147-48. Medical needs have been, and are, addressed on a case-by-case basis, and where necessary, an inmate can be transported to the Emergency Room or community provider to receive necessary care. Stock Decl. D.A. 148-49.

Plaintiffs contend that social distancing is near impossible, and that the BOP

has not taken appropriate measures to reduce the inmate population. See e.g., Complaint, D.E. 1 at 57, ¶ 149. This is neither a fair, nor accurate representation of FCC Butner's population and mission. The BOP is charged with incarcerating offenders who have been committed to the custody of the Attorney General. 18 U.S.C. § 3621(a). Inmates shall be committed "until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624." Id. Nevertheless, FCC Butner has experienced a precipitous drop in its inmate population from March 1, 2020 to December 1, 2020. Clark Decl., D.A. 014. Overall, during that time period, FCC Butner's population has been reduced from 4,703 inmates to 3,737 inmates.[18] Clark Decl., D.A. 014.

Part of the reduction in Butner's population results from transfers to home confinement. Plaintiffs contend that "even though BOP officials have been instructed to transfer people to home confinement, Defendants have opposed such measures at Butner," and even "once a person is approved for home confinement, Defendants choose to delay transfer." Complaint, D.E. 1 at 57-58, ¶¶ 249-53. The indisputable evidence demonstrates this is false. BOP is not delaying, harassing, or engaging in any bad faith in order to prevent Plaintiffs from exercising the orderly process of seeking home confinement. In fact, consistent with guidance from the Attorney General, BOP is considering (and granting) home confinement requests on an

---

[18] Specifically, FMC Butner's population has declined from 957 inmates to 782; the Camp's population has decreased from 289 inmates to only 149; FCI Butner I's population reduced from 672 inmates to 569; FCI Butner II's population lowered from 1,539 inmates to 1,385; and the LSCI population dropped from 1,246 inmates to 852 inmates. Clark Decl., D.A. 014-18.

61

increasingly frequent basis to inmates that are suitable for such relief based on fact-specific and individualized determinations.[19]  See Clark Decl., D.A. 021-23.  Although Plaintiffs may disagree with the pace of and conclusions reached during those home-confinement reviews, see Complaint, D.E. 1 at 57-58 ¶¶ 249-52, such disagreement does not somehow create a constitutional violation for deliberate indifference.[20]

Indeed, FCC Butner staff have screened all inmates at FCC Butner under the CARES Act.  See Clark Decl., D.A. 024.[21]  Since March 1, 2020, 123 inmates—including Plaintiff Maldonado—have been transferred to home confinement, and 448 inmates have been transferred to Residential Reentry Centers ("RRCs").  Clark Decl., D.A. 024.  An additional 379 inmates are pending transfer to home confinement of an RRC.  Clark Decl., D.A. 024.  Forty-nine more inmates are currently awaiting final

---

[19] The BOP has limited statutory authority and discretion to transfer inmates to home confinement during the end portion of their sentence.  18 U.S.C. § 3624(c).  Although the CARES Act expanded this discretion, it does not automatically render any, let alone all, inmates eligible or appropriate for home confinement.  See Clark Decl., D.A. 018-25.

[20] Furthermore, although the CARES ACT gives BOP broad discretion to expand the use of home confinement during the COVID-19 pandemic, courts have no authority under that provision to place a prisoner in home confinement.  See United States v. Gray, No. 4:12-cr-54-FL, 2020 U.S. Dist. Lexis 70270, *6–7 (E.D.N.C. Apr. 22, 2020) (denying the defendant's motion for home confinement on the grounds that the court was without jurisdiction to order the BOP to place him in home confinement).

[21] The BOP has reviewed all of the named Plaintiffs for release to home confinement, consistent with the First Step Act and CARES Act.  See Clark Decl., D.A. 024, 030-40.  Plaintiff Maldonado has been approved for, and actually released to home confinement on October 28, 2020.  Clark Decl., D.A. 033.  The remaining Plaintiffs have each been reviewed for home confinement eligibility under the CARES Act, but are not currently appropriate for home confinement for varying reasons, including, but not limited to, inadequate completion of his sentence, pending detainers, high PATTERN scores, recent disciplinary infractions, and history or current offense history of violence.  See generally Clark Decl., D.A. 030-40.

decision from the BOP's Residential Reentry Management Office, regarding their referral for home confinement. Clark Decl., D.A. 025.

In addition, since March 2020, another 174 inmates have been released from FCC Butner via compassionate release granted by the individual's sentencing court based upon various issues, including COVID-19. Clark Decl., D.A. 029-30. That the BOP has not moved to reduce the named Plaintiffs' sentences is not indicative of deliberate indifference. Plaintiffs Hallinan, Kinard, Maldonado, Brown, Freeman, Butler, Williams, Jackson, and Waldrip—all but Plaintiff Riddick—have filed requests with their respective FCC Butner warden requesting a compassionate release. See Clark Decl., D.A. 030-40. Each request was subsequently denied by the respective warden, meaning that Plaintiffs could then utilize the administrative remedy system to seek redress prior to filing a motion for compassionate release with their sentencing court pursuant to 18 U.S.C. § 3582(c)(1)(A). Clark Decl., D.A. 030-40. In fact, Plaintiffs Maldonado, Butler, Freeman, Brown, Kinard, Williams, and Riddick have all filed motions for compassionate release with their sentencing courts as of the date of this filing. See Emergency Motion to Reduce Sentence Amended Emergency Motion for Compassionate Release, United States v. Maldonado, No. 4:15-CR-00044-MW-MAF, D.E. 494 (N.D. Fla. filed May 4, 2020); Pro Se Motion for Compassionate Release, United States v. Butler, No. 5:18-CR-00475-BO, D.E. 56 (E.D.N.C. filed Apr. 23, 2020); United States v. Freeman, No. 2:14-CR-20315-SHM-1 (W.D. Tenn. filed Apr. 24, 2020); United States v. Brown, No. 4:12-CR-00291-GAF-17 (W.D. Mo. filed May 18, 2020, June 8, 2020, and Sept. 14, 2020); United States v.

Kinard, 1:17-CR-00067-MR-WCM-1 (W.D.N.C. filed July 30, 2020, and Aug. 31, 2020); United States v. Williams, 5:11-CR-00031-cr-1 (D. Vt. filed Oct. 5, 2020, and Dec. 7, 2020); United States v. Riddick, 2005 FEL 001314 (D.D.C.). With the exception of Plaintiff Williams, those plaintiffs' respective sentencing courts have denied the requests for compassionate release, which shows not only that the orderly process for raising and adjudicating individual claims works, but that FCC Butner's decision not to recommend release of those plaintiffs was reasonable. See United States v. Maldonado, No. 4:15-CR-00044-MW-MAF, D.E. 501 (N.D. Fla. May 13, 2020); United States v. Butler, No. 5:18-CR-00475-BO, D.E. 60 (E.D.N.C. May 19, 2020); United States v. Freeman, No. 2:14-CR-20315-SHM-1 (W.D. Tenn. May 21, 2020); United States v. Brown, No. 4:12-CR-00291-GAF-17 (W.D. Mo. June 19, 2020, June 30, 2020, and Oct. 7, 2020); United States v. Kinard, 1:17-CR-00067-MR-WCM-1 (W.D.N.C. Aug. 10, 2020, and Sept. 14, 2020); United States v. Riddick, 2005 FEL 001314 (D.D.C. Oct. 15, 2020).

In light of the above, it is unquestionable that BOP is taking significant measures to address the spread of coronavirus among the inmate population at FCC Butner.[22] While Plaintiffs may believe more or different actions should be taken, a

---

[22] In September of 2020, BOP's Central Office even dispatched a COVID Compliance Team to FCC Butner for three (3) days to assess each institution's compliance with best practices for COVID-19 prevention and control. The team found that FCC Butner was substantially in compliance with best practices pertaining to sanitation, cleaning, disinfecting, testing, and quarantine/isolation procedures as recommended by the Central Office in conjunction with CDC and other authorities. Strassel Decl., D.A. 206-07; Harden Decl., D.A. 547. In response, FCC Butner drafted a comprehensive plan and submitted it to Central Office detailing any and all corrective actions taken. Strassel Decl., D.A. 209-10.

disagreement about the measures being taken does not rise to the level of deliberate indifference.  Indeed, numerous other courts have already rejected similar claims. See Wragg, 2020 WL 2745247 ("In the end, the ugly picture Petitioners paint of FCI Fort Dix is not really a fair one.  Petitioners' bold statement that the mitigated health risk at FCI Ft Dix is so grave that it violates 'standards of decency for anyone to be so exposed ignores almost the entire record presented . . . .  The record simply does not support that the Respondents have been deliberately indifferent to the inmates' concerns.  That physical distancing is not possible in a prison setting . . . does not an Eighth Amendment claim make."); Nellson, 2020 WL 1890670, at *6; see also, Order, Lucero-Gonzalez, et al, v. Kline, et al., No. 2:20-cv-901 (D. Ariz., June 2, 2020) (finding very fact that defendant correctional complex has enacted policies to address the risks posed by COVID-19, supports that they have not been subjectively indifferent to Plaintiffs); Swain v. Junior, 961 F.3d 1276 (11th Cir. June 15, 2020); Valentine v. Collier, 956 F.3d 797, 802 (5th Cir. April 22, 2020); Wilson v. Williams, 961 F.3d 829, 844 (6th Cir. 2020) ("[H]ere the BOP has not turned a blind eye or a deaf ear to a known problem that would indicate such a lack of concern for petitioners' welfare. The BOP has in fact put in place and updated its protocols to address the novel risks from COVID-19."); Chunn v. Edge, 465 F. Supp. 3d 168 (E.D.N.Y. June 9, 2020); see also Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (noting that an inmate does not establish an Eighth Amendment violation (or, in other words, the existence of deliberate indifference) merely because he disagrees with prison officials' decisions on how to treat a medical condition, or finds such treatment "insufficient").

65

As Plaintiffs acknowledge, under "even the best of circumstances, with people following rigorous physical distancing and good hygiene practices, our society can only hope to limit the spread of coronavirus." Complaint, D.E. 1 at 5 ¶ 13. Even so, Plaintiffs expect FCC Butner and the BOP to all but guarantee absolute protection from this global pandemic. This is simply not possible,[23] nor is it the standard imposed by the United States Constitution. "Failing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference." Swain v. Junior, 961 F.3d 1276, 1287 (11th Cir.2020). Accordingly, the Court should grant summary judgment for the Defendants and dismiss Plaintiffs' Eighth Amendment claims.

### D. The PLRA Prevents the Court from Granting Plaintiffs' Request for Unprecedented Relief of Release from FCC Butner.

Plaintiffs' request "to identify all incarcerated persons who are appropriate for release on home confinement, furlough or other release mechanisms, and order and/or grant a writ of habeas corpus requiring Defendants to release, without quarantining at Butner, all persons identified through that process"—should also be dismissed under the PLRA, which precludes this Court from releasing inmates from FCC Butner. Complaint, D.E. 1 at 88 ¶ E. Congress enacted the PLRA to "revive the hands-off doctrine" and remove the federal judiciary from day-to-day prison management. Gilmore v. California, 220 F.3d 987, 991, 996-97 (9th Cir. 2000). The PLRA "restrict[s]

---

[23] Even the CDC acknowledges that "[t]here is no way to ensure [anyone has] zero risk of infection." *People with Certain Medical Conditions*, Centers for Disease Control and Prevention (last updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 14, 2020).

the equity jurisdiction of federal courts," Id. at 999, and "the circumstances in which a court may enter an order 'that has the purpose or effect of reducing or limiting the prison population.'" Brown v. Plata, 563 U.S. 493, 511 (2011). Because "[t]he release of prisoners . . . is a matter of undoubted, grave concern," the PLRA "ensure[s] that the 'last remedy' of a population limit is not imposed 'as a first step.'" Id. at 501, 514. To that end, the PLRA places strict limits on a district court's ability to order the release of inmates "in any civil action with respect to prison conditions," and precludes a single district court judge from doing so. See 18 U.S.C. § 3626(a)(3)(A)-(B).

In cases presenting a challenge to inmates' conditions of confinement, the PLRA applies. Alvarez v. Larose, 445 F. Supp. 3d 861, 866 (S.D. Cal. May 12, 2020). The law applies to "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." 18 U.S.C. § 3626(g)(2); See Alvarez, 445 F. Supp. 3d at 866 (". . . the PLRA specifically contemplates 'prisoner release orders' in 'civil action[s] concerning 'prison conditions.'").

In such a suit, the court "may enter a temporary restraining order or an order for preliminary injunctive relief," but such relief "must be narrowly drawn, extend no further than necessary to correct the harm," and "be the least intrusive means necessary to correct that harm." Id. § 3626(a)(2). A "prisoner release order," which "includes any order … that has the purpose or effect of reducing or limiting the prison population" or "directs the release from or nonadmission of prisoners to a prison," § 3626(g)(4), may "be

67

entered only by a three-judge court," § 3626(a)(3)(B).

Insofar as Plaintiffs seek release as a remedy for the alleged unconstitutional conditions at FCC Butner, the PLRA squarely prevents this Court from granting that relief.  Pursuant to Section 3626(a)(3)(B), "[t]he authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court."  Plata, 563 U.S. at 500; 18 U.S.C. § 3626(a)(3)(B).  Such an order may not be entered unless "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation … and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders."  Id. § 3626(a)(3)(A).  Even then, a three-judge court may order prisoners released only upon "clear and convincing evidence" that "crowding is the primary cause of the violation" and "no other relief will remedy [it.]"  Id. § 3626(a)(3)(E)(i)-(ii).

As discussed above, there can be no dispute that the instant lawsuit is a "civil action with respect to prison conditions" governed by § 3626, which defines "civil action with respect to prison conditions" broadly to mean "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison."  18 U.S.C. § 3626(g)(2). See, e.g., Alvarez, 445 F. Supp. 3d 861, 865-66 (holding "the PLRA applies to Plaintiffs' claims and divests the Court of authority to grant" their "release"); Money v. Pritzker, 2020 WL 1820660, at *10-14 (N.D. Ill. Apr. 10, 2020).  Accordingly, as none of the conditions set forth in section 3626(a)(3)(A) have been satisfied, and this complaint is

68

not properly before a three-judge court, the PLRA precludes the Court from releasing Plaintiffs, or any other inmates, from FCC Butner as requested in the Complaint. Id. § 3626(a)(3)(B). See, e.g., Grinis v. Spaulding, 1:20-cv-10738-GAO, 2020 WL 3097360, at *2-5 (D. Mass. June 11, 2020). As the "release of prisoners . . . is a matter of undoubted, grave concern;" Plata, 563 U.S. at 501, this Court should not, and indeed cannot, grant the relief sough in contravention of established law.

**E. Class Certification.**

Defendants intend to file a response in opposition to Plaintiffs' Motion for Class Certification. For the reasons set forth therein, Defendants respectfully request that Plaintiffs' request for class action certification be denied and the class action allegations be dismissed with prejudice.

## CONCLUSION

As set forth above, the Court should dismiss the entirety of Plaintiffs' Class Action Complaint for Injunctive and Declaratory Relief and Petition for Writ of Habeas Corpus. Plaintiffs' first cause of action should be dismissed for failure to exhaust administrative remedies, and alternatively, should be dismissed for failure to state a claim. The Court must dismiss Plaintiffs' second cause of action for failure to exhaust under the PLRA, or the Court should grant summary judgment for Defendants on the merits. Plaintiffs' petition for writ of habeas corpus should be dismissed for failure to exhaust administrative remedies, or alternatively, for lack of jurisdiction. Finally, Court should dismiss Plaintiffs' class allegations, as the purported classes do not satisfy the prerequisites.

69

Respectfully submitted this 18th day of December, 2020.

ROBERT J. HIGDON, JR.
United States Attorney

By: /s/ Michael Bredenberg
MICHAEL BREDENBERG
Special Assistant United States Attorney
U.S. Attorney's Office, Civil Division
Email: michael.bredenberg@usdoj.gov
N.C. Bar # 26068

/s/ Lauren A. Golden
LAUREN A. GOLDEN
Assistant United States Attorney
U.S. Attorney's Office, Civil Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4870
Email: lauren.golden@usdoj.gov
N.C. Bar # 43071
Attorneys for Respondents/Defendants

Of Counsel:
Holly Paxson Pratesi
BOP Agency Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this 18th day of December, 2020, served a copy of the foregoing upon Plaintiffs' counsel of record by filing the same via the District Court's CM/ECF Document Filing System.

ROBERT J. HIGDON, JR.
United States Attorney

By: <u>/s/ Michael Bredenberg</u>
MICHAEL BREDENBERG
Special Assistant United States Attorney
U.S. Attorney's Office
Civil Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone:   (919) 856-4530
                     (919) 575-3900 x 6078
Facsimile:   (919) 856-4821
Email: michael.bredenberg@usdoj.gov
N.C. Bar # 26068
Attorney for Defendants

71