**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CT-03333-M**

CHARLES HALLINAN, JOSEAN KINARD,   )
GEORGE RIDDICK, JORGE L.   )
MALDONADO, WILLIAM BROWN,   )
TERRANCE FREEMAN, ANTHONY   )
BUTLER, DARYL WILLIAMS, QUAMAIN   )
JACKSON, AND LASALLE WALDRIP, on   )
behalf of themselves and similarly situated   )
individuals,   )
  )
*Plaintiffs/Petitioners,*   )
  )     **PLAINTIFFS' OPPOSITION TO**
v.   )     **DEFENDANTS' MOTION TO DISMISS,**
  )     **OR IN THE ALTERNATIVE, MOTION**
THOMAS SCARANTINO, Complex   )     **FOR SUMMARY JUDGMENT**
Warden, Federal Correctional Complex   )
Butner; MICHAEL CARVAJAL, Federal   )
Bureau of Prisons Director; and JEFFERY   )
ALLEN, Federal Bureau of Prisons Medical   )
Director, in their official capacities, and the   )
FEDERAL BUREAU OF PRISONS,   )
  )
*Defendants/Respondents.*  

---

Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment should

be denied, and this case should proceed immediately to discovery.

## INTRODUCTION

COVID-19 is devastating Federal Correctional Complex Butner ("Butner"). Nearly *one in*

*three* men incarcerated there has been infected since Butner reported its first case in the Spring of 2020.

Far more COVID-related deaths (29 total, including one staff member) have occurred at Butner than

at any other BOP facility. Each of the men incarcerated at Butner who died from COVID-related

complications had an underlying disability that increased his risk of death from the virus. And despite

Defendants' protestations to the contrary, the situation at Butner is not under control. Indeed, since

1

Defendants moved to dismiss last month, more than 200 additional incarcerated men and staff at Butner have contracted COVID-19, and two more men have died.

The risks at Butner have long been obvious. It is a crowded facility with a vulnerable population, including many of the sickest people in the entire BOP. People sleep within a few feet of each other and share bathrooms, phones, computers, and common spaces. Respondents/Defendants ("Defendants") know the extraordinary danger COVID-19 poses at Butner, and particularly to incarcerated men living with disabilities. Yet they have failed to meaningfully mitigate the risks to the proposed class members. They could have reduced the risk but have failed to do so in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act") and the Eighth Amendment. Their arguments for dismissing this case, or, in the alternative, for summary judgment, should be rejected and this case should proceed to discovery.

Defendants' argument that dismissal is warranted because Plaintiffs have failed to exhaust administrative remedies fails. Failure to exhaust is an affirmative defense, not a pleading requirement. Plaintiffs thus did not need to allege exhaustion to state any of their claims. In any event, Plaintiffs have exhausted the administrative remedies available to them, as explained below. And under the principle of vicarious exhaustion, the rest of the proposed class is deemed to have likewise exhausted those remedies.

Defendants' argument that Plaintiffs have failed to allege the elements of a discrimination claim under the Rehabilitation Act likewise fails. As detailed below, Plaintiffs' allegations are more than enough to give rise to such a claim.

Defendants argue that Plaintiffs' habeas claim should be dismissed because habeas claims challenging conditions of confinement, rather than the fact of confinement, are not cognizable. Defendants are incorrect. While Plaintiffs' Complaint does challenge the deplorable conditions at Butner in light of COVID-19, it also challenges the *fact* of Plaintiffs' and the proposed class'

confinement under such circumstances. And even if it did not, no published Fourth Circuit or Supreme Court opinion forecloses such claims in the habeas context. Plaintiffs' habeas claim should proceed.

Finally, conceding that Plaintiffs have stated a claim for violating the Eighth Amendment, Defendants instead resort to prematurely asking the Court to grant summary judgment on that claim—even though Plaintiffs have not yet had the ability to take *any* discovery. Pre-discovery summary judgment motions are highly disfavored and should be denied, particularly when, as in this case, the evidence Plaintiffs need to prove their claims is in Defendants' control and involves Defendants' subjective state of mind.

Not only is Defendants' summary judgment motion premature, it also hinges on statements of material fact that are vehemently disputed—as evidenced both by Plaintiffs' own accounts of what is happening on the ground at FCC Butner and also, critically, by the Department of Justice's Office of the Inspector General's ("OIG") January 2021 report regarding its inspection of FCC Butner's response to COVID-19. As explained below, the OIG's lengthy report details multiple findings that directly conflict with Defendants' assertions in their moving brief. This underscores the importance of, and Plaintiffs' need for, written and oral discovery. The Court should deny, or at least delay ruling on, Defendants' motion under Rule 56(d) until Plaintiffs have a chance to take discovery.

<u>**SUMMARY OF FACTS ALLEGED IN THE COMPLAINT**</u>

**I.   COVID-19 Is a Dangerous, Contagious Illness that Poses a Significant Risk of Serious Illness and Death.**

COVID-19 is a deadly and highly contagious disease caused by a novel coronavirus. COVID-19 spreads through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects, where the virus can survive for up to three days. All people, regardless of age or health, risk serious illness and death from COVID-19. The case fatality rate can be significantly higher depending on the presence of certain demographic and health factors. The rate is higher in men, and varies significantly with advancing age, rising after age 50, and is above 10 percent (1 in 10 cases) for

3

those with pre-existing medical conditions including cardiovascular disease. (D.E. 1, Compl. ¶¶ 43-45.)

Certain categories of people face especially high risks of serious illness or death from COVID-19, including people aged 50 years or older. If infected, people in this group are more likely to require hospitalization, more likely to be admitted to intensive care units ("ICUs"), and more likely to die. According to the Centers for Disease Control and Prevention ("CDC"), people aged 50-64 who develop COVID-19 are four times more likely to be hospitalized than 18 to 29-year-olds, and 30 times more likely to die. People aged 65 to 74 are five times more likely to be hospitalized—and are 90 times more likely to die—than people aged 18 to 29. Additionally, people of all ages face higher risk of hospitalization and death if they have underlying medical conditions. People who do recover may still suffer serious and potentially permanent harm. (D.E. 1, Compl. ¶¶ 46-53.)

## II.     The Risk from COVID-19 Is Particularly High in Prisons.

According to CDC guidelines, only three measures are known to effectively reduce the spread of this fatal disease: (i) diligent "social or physical distancing" to avoid transmission of the virus; (ii) covering the mouth and nose with a mask or cloth; and (iii) vigilant hygiene practices, including frequently washing hands and disinfecting surfaces. (*Id.* ¶ 54.)

Incarcerated people, by virtue of their incarceration, have little autonomy or control over their movements. As a result, incarcerated people are highly susceptible to rapid transmission of the virus through contact with other people, including asymptomatic carriers, and touching common surfaces. Prisons are also at an increased risk for the rapid spread of an infectious disease—like COVID-19—because of the high number of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and limitations on physical distancing. For these reasons, the CDC and the World Health Organization ("WHO") have also identified prisons as especially susceptible to rapid outbreaks of infection due to close person-to-person contact among large, confined populations. (*Id.* ¶¶ 56-61.)

4

Among the specific recommendations from the CDC for mitigating the risk of COVID-19—tailored to prison realities—is the implementation of distancing strategies to increase physical space between incarcerated people—"ideally 6 feet between all individuals, regardless of symptoms." (*Id.* ¶¶ 62-63.) Distancing strategy includes reassigning or rearranging bunks to provide more space, enforcing increased space between people in common areas, staggering recreation times, and staggering meals. (*Id.*) The CDC also recommends, among other things: (i) individually quarantining and medically monitoring close contacts of confirmed COVID-19 cases—including testing; (ii) daily temperature checks in housing units where COVID-19 cases have been identified; (iii) face mask usage for all individuals as much as safely possible; (iv) immediately placing symptomatic individuals into individual medical isolation that is "distinct from punitive solitary confinement" and ensuring that they "receive[] regular visits from medical staff"; (iv) actively encouraging staff to stay home when sick; and (v) frequent and thorough cleaning and disinfection of surfaces, objects, and areas. (*Id.*)

## III. COVID-19 Has Spread Rapidly at Butner.

Butner has experienced one of the worst COVID-19 outbreaks of any BOP facility. At the end of March 2020, BOP reported that two incarcerated people at Butner had COVID-19. By April 10, BOP reported that 60 incarcerated people at Butner had it. By April 13, four people at Butner had died of COVID-19. By the end of April, more than 200 people at Butner had COVID-19. By the time this lawsuit was filed at the end of October 2020, at least 900 incarcerated people and 81 staff members at FCC Butner had tested positive for the virus, despite the lack of widespread testing. Twenty-six people held at Butner had died from COVID-19—more than twice as many as at any other BOP facility and one-fifth of all the deaths in the BOP. (*Id.* ¶¶ 65-71, 261-69.) And in the three months since the lawsuit was filed, the numbers at Butner have continued to rise: two more men have died (now 28 total, along

5

with one staff member), at least 300 more have contracted COVID-19, and the number of infected staff has almost doubled.[1]

## IV.    Defendants' Actions—and Inaction—Put People Incarcerated at Butner at a Very High Risk.

Butner's housing conditions make it impossible for incarcerated people to physically distance. The increased risks of the prison layout are exacerbated by the many people housed at the prison with disabilities and who are otherwise medically vulnerable.  Despite the high risk, Defendants have tested too few people at Butner, too infrequently, and too late.  Screening for symptoms has also been sporadic and ineffectual.  Defendants have also failed to implement cleaning and disinfection procedures to adequately protect the men housed at Butner.  When people do get sick with COVID-19, treatment is almost non-existent.  Defendants' actions put all people incarcerated at Butner at substantial risk of serious harm.  (D.E. 1, Compl. ¶¶ 72-299)

Defendants have also failed to make reasonable modifications for people at Butner whose disabilities put them at a heightened risk from the virus.  Defendants have not ensured that people with disabilities can access food, medicine and medical treatment, recreation, housing, or communications on an equal basis with the other people housed at Butner.  (*Id.* ¶¶ 301-11)

## LEGAL STANDARDS

### A.    Rule 12(b)(1)

A motion under Rule 12(b)(1) raises the question of whether the court has subject matter jurisdiction over the matters at issue.  "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredricksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citation omitted).  The plaintiff bears the burden of proof.  *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

---

[1] *See* https://www.bop.gov/coronavirus/ (last accessed January 29, 2021).

### B. Rule 12(b)(6)

In a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court determines solely whether the allegations in the complaint provide "sufficient 'factual matter (taken as true) to suggest' a cognizable cause of action." *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007). The court must accept as true all factual allegations in the Complaint. *Id*.

In prisoner civil rights cases, as in other civil litigation, "Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim." *Jones v. Bock*, 549 U.S. 199, 212, 127 S. Ct. 910, 919, 166 L. Ed. 2d 798 (2007). Specific facts are not necessary, and the Complaint "need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. 555 (internal quotation marks omitted)).

### C. Rule 56(d)

Generally, "summary judgment [under Rule 56] is appropriate only after adequate time for discovery." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). "[A] district court should decline to grant summary judgment where the nonmoving party has not had the opportunity to discover information necessary to oppose summary judgment." *Sutton v. Roth, L.L.C.*, 361 F. App'x 543, 549 (4th Cir. 2010).

Federal Rule of Civil Procedure 56(d) permits a court to deny a motion for summary judgment or delay ruling on such a motion if the nonmoving party requires discovery to identify "facts essential to justify the party's opposition." *Crawford-El v. Britton*, 523 U.S. 574, 599 n.20 (1998) (quotation omitted); *Nader v. Blair*, 549 F.3d 953, 961-62 (4th Cir. 2008). Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). Requests for relief under Rule 56(d) "are 'broadly favored and should be liberally granted' in order to protect non-moving parties from premature summary judgment motions." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 484 (4th Cir. 2014) (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013)).

A grant of summary judgment before discovery "can be particularly inappropriate when a case involves complex factual questions about intent and motive." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 247 (4th Cir. 2002). The Fourth Circuit places "great weight on the [Rule 56(d)] affidavit." *Evans*, 80 F.3d at 961.

## ARGUMENT

### I. Plaintiffs' Claims Should Not Be Dismissed Based on Exhaustion.

Defendants argue that Plaintiffs' claims should be dismissed for failure to exhaust administrative remedies.[2] (D.E. 37, Defendants' Memorandum of Law at 21, 37, 48.) Defendants are correct that, under the Prison Litigation Reform Act ("PLRA"), Plaintiffs' Eighth Amendment and Rehabilitation Act claims must be administratively exhausted before filing. 42 U.S.C. § 1997(e)(a). But the rest of Defendants' exhaustion argument misses its mark.[3]

---

[2] Defendants set forth standards for motions to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (D.E. 31 at 16-18.) They do not identify under which standard they are arguing that the case should be dismissed for failure to exhaust. (*Id.* at 21-28.) However, the Fourth Circuit has long recognized that the PLRA exhaustion requirement is not jurisdictional. *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 678 (4th Cir. 2005). Therefore, this question should be considered under Rule 12(b)(6) or disregarded if Defendants move to dismiss under Rule 12(b)(1).

[3] The PLRA's exhaustion requirement does not apply to habeas petitions. 18 U.S.C. § 3626(g)(2). The exhaustion requirements for Section 2241 are judicially imposed rather than statutory. If the Court determines exhaustion for Plaintiffs' habeas claim is required here, Plaintiffs have met that requirement for the same reasons they have satisfied the PLRA requirement.

## A. Exhaustion of Administrative Remedies is an Affirmative Defense, Not a Pleading Requirement.

Failure to exhaust administrative remedies under the PLRA is an affirmative defense, and incarcerated persons are therefore "not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 211; *Wilcox v. Brown*, 877 F.3d 161, 167 (4th Cir. 2017) ("[Wilcox] was not required to affirmatively show exhaustion in his complaint. Rather, failure-to-exhaust is an affirmative defense that must be raised by the defendant.") (citing *Jones*, 549 U.S. at 216).

Because failure to exhaust is an affirmative defense, "a district court, at the pleadings stage, may not dismiss a claim based on the plaintiff's failure to affirmatively show exhaustion, even when the court has first allowed the plaintiff to address the issue." *Wilcox*, 877 F.3d at 167 (citing *Custis v. Davis*, 851 F.3d 358, 361-62 (4th Cir. 2017)). Dismissal at the pleading stage for failure to exhaust administrative remedies is thus appropriate only in the "rare case" that the failure to exhaust is "apparent from the face of the complaint." *Id*.

Here, as there is no discussion of the grievance process in the Complaint, there is no reasonable argument that a failure to exhaust is "apparent from the face of the complaint." Accordingly, the Court should reject Defendants' exhaustion argument outright.

## B. Plaintiffs Hallinan, Williams, and Kinard Fully Exhausted the BOP Process, Satisfying the PLRA on behalf of Themselves and the Proposed Class.

Defendants give two bases for their assertion that none of the Plaintiffs exhausted the BOP administrative remedies process: (1) Plaintiffs did not complete the administrative remedies process before the complaint was filed; and (2) Plaintiffs did not mention the Rehabilitation Act in their grievances. (D.E. 31, Defendants' Memorandum in Support of Defendants; Motion to Dismiss, or in the Alternative, Motion for Summary Judgment ("Moving Br.") at 24.) Neither withstands scrutiny.

### 1. Plaintiff Hallinan fully exhausted his administrative remedies.

Plaintiff Hallinan went through each of the steps in the BOP Administrative Remedy Program ("ARP"), in order, seeking relief from the risk from COVID-19 that he faced at FCC Butner because

9

of his age and medical conditions. *See* Supplemental Declaration of Jeffrey Wilkerson ("Supplemental Wilkerson Decl."), Ex. 1, Supplemental Declaration of Charles Hallinan (Supplemental "Hallinan Decl."), ¶¶ 2-11. He submitted the final step, the BP-11, on or about July 31, 2020, and received the response denying his request on September 16, 2020. *Id.* ¶¶ 7-9. The responses he received did not state that there was any problem with the filing of any level of the grievance or grievance appeal. *Id.* ¶ 11. Upon receipt of the response to the BP-11, Plaintiff Hallinan understood that he had completed the grievance process. *Id.* ¶ 10. His understanding of the grievance process was based on the information in the LCSI Butner Inmate Handbook, which was provided to him by FCC Butner upon his arrival there. *Id.* ¶¶ 12-13. Plaintiffs filed their Complaint a month later, on October 26, 2020.

The purpose of the exhaustion requirement is to give the prison notice of a problem and the opportunity to remedy it. *Wilcox*, 877 F.3d at 167 n.4. "Thus, once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." *Id.*; *see also Carter v. Fleming*, 879 F.3d 132, 136 n.2 (4th Cir. 2018) ("[W]hile [plaintiff's] grievance was not a model of clarity, we conclude that it did provide prison officials sufficient notice of these complaints.") If the problem or condition continues, the incarcerated person need not "file multiple, successive grievances raising the same issue (such as prison conditions or policies)." *Id.* (quoting *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013)). Plaintiff Hallinan's grievance and subsequent appeals were sufficient to put the prison on notice; he has thus satisfied the exhaustion requirement.

To the extent that Defendants assert that Plaintiff Hallinan did not fully exhaust, they are wrong. Defendants have a clearly established, four-step process for grievances and appeals:

1. The BP-8 or informal grievance,

2. The BP-9 or formal grievance to the Warden of the institution (or their designee)

3. The BP-10, which goes to the Regional Director; and

4. The BP-11, which goes to the Central Office, General Counsel.

10

Supplemental Wilkerson Decl., Ex. 2 (BOP Program Statement 1330.18) ¶¶ 8-9; *see also* D.E. 39-7,

Declaration of Christina Kelly ("Kelly Decl.") at 2-3.  The BOP policies set forth timelines for both

the incarcerated person and the BOP to follow at each step:

| *Time Limits (in calendar days)*: | *Filing* | |
| --- | --- | --- |
| | | BP-229: 15 days of incident |
| | | BP-230: 20 days from BP-9 response |
| | | BP-231: 30 days from BP-10 response |
| | *Response* | *Extensions* |
| | BP-229: 15 days | BP-229: 15 days |
| | BP-230: 30 days | BP-230: 30 days |
| | BP-231: 30 days | BP-231: 30 days |

Supplemental Wilkerson Decl., Ex. 3 (LSCI Butner Inmate Handbook or "Handbook") at 40 and Ex.

2 (BOP Program Statement 1330.18) ¶¶ 8-9, 12.[4]  Plaintiff Hallinan followed this procedure.

Wilkerson Supplemental Decl., Ex. 1, Hallinan Supplemental Decl. ¶¶ 2-9.

When BOP fails to provide a response in the time allotted, the policy sets forth contradicting

processes to follow.  According to the policy, if the BOP fails to respond within the time allotted, that

failure may be treated as a denial of the grievance or appeal, and the incarcerated person may move on

to the next level in the process.  Supplemental Wilkerson Decl., Ex. 2 (BOP Program Statement

1330.18) ¶ 12.  But the policy also requires that the incarcerated person's submission at each level of

appeal include the prior submissions and BOP's *responses*—responses that the incarcerated person

logically does not (and cannot) have when BOP fails to respond.  Supplemental Wilkerson Decl., Ex.

3 (LSCI Butner Inmate Handbook) at 40.

---

[4] The LSCI Butner Inmate Handbook and the Program Statement state that the BP-229 is the BP-9, the BP-230 is the BP-10, and the BP-231 is the BP-11.  Supplemental Wilkerson Decl., Ex. 3 (LSCI Butner Inmate Handbook) at 40 and Ex. 2 (BOP Program Statement 1330.18) ¶ 8.  The timeframes set forth in the Handbook and Program Statement are inconsistent in ways that do not impact the argument here. *Compare* Ex. 3 at 40 *with* Ex. 2 ¶¶ 8 (regarding timing for filing BP-9) and 12 (regarding timing for response to BP-9 and BP-11.)

11

Based on the declaration of Christina Kelly (an attorney employed by Defendants at FCC Butner) submitted with Defendants' Motion, it appears that Defendants are exploiting this inconsistency—created by the BOP, and relevant only when the BOP fails to follow its own procedures—as the basis to assert that Plaintiff Hallinan did not exhaust his administrative remedies. According to the declaration, the timeline and progress of Plaintiff Hallinan's grievance and appeals was as follows:[5]

|        | Filing Date | Response Due Date | Response Date | Outcome |
|--------|-------------|-------------------|---------------|---------|
| BP-9   | 6/2/20      | 6/17/20           | 6/17/20       | Denied  |
| BP-10  | 6/26/20     | 7/26/20           | 8/29/20       | Denied  |
| BP-11  | 7/31/20     | 8/30/20           | 8/18/20       | Rejected for failure to comply with filing requirements |

(D.E. 39-7, Kelly Decl. at 4-5.) Ms. Kelley does not reveal what the "failure to comply with the filing requirements," was.[6] *Id.* But the timeline strongly suggests that the "failure" was the failure to submit the non-existent BP-10 response with the BP-11. When Plaintiff Hallinan filed the BP-11 on July 31, 2020, his BP-10 had been constructively denied (due to BOP's failure to respond by the July 26, 2020 deadline) and could therefore be appealed. Plaintiff Hallinan, however, did not have the BOP's BP-10 response to attach to his BP-11—again, because BOP did not follow its own procedures. Wilkerson Supplemental Decl., Ex. 1, Supplemental Hallinan Decl. ¶ 7.

---

[5] Ms. Kelley does not discuss the first step of the grievance process, the informal grievance. (*See* D.E. 39-7, Kelly Decl.) But according to policy, if a BP-9 is submitted without there having been an informal grievance, it is either accepted if there is a valid reason for failing to go through the informal process or rejected for the failure to do so. Supplemental Wilkerson Decl., Ex. 2 (BOP Program Statement 1330.18) ¶ 8.b. Mr. Hallinan's BP-9 was processed and denied.

[6] Defendants should not be permitted on reply to argue that there was a different reason that Mr. Hallinan's grievance was rejected. They have the grievance, appeals, and responses in their possession, and they could have explained the alleged "failure" in their opening brief. Having chosen not to do so, they should not be given a second opportunity.

Defendants have known for a decade that (1) this inconsistency in their policies about what happens when they fail to timely respond exists, and (2) it is not a valid basis for asserting a failure to exhaust. *See Risher v. Lappin*, 639 F.3d 236, 240–41 (6th Cir. 2011). In *Risher*, the plaintiff was in the same situation as Plaintiff Hallinan:

> Risher did not attempt to bypass the administrative grievance process detailed above; he affirmatively endeavored to comply with it. The Bureau's failure to deliver the Regional Director's response to Risher, however, prevented him from submitting that response to the Central Office along with his BP–11 form. Risher nonetheless attempted to follow the Bureau's regulations by treating the Regional Director's failure to respond to his appeal as a denial, as he was instructed he could do by 28 C.F.R. § 542.18, and appealing that denial to the Central Office.

*Id*. at 240. The Sixth Circuit reversed the dismissal of Risher's complaint for failure to exhaust, finding that Risher had indeed exhausted. *Id*. at 240-41. "Risher's efforts were sufficient," the court explained, because "[i]t is well established that 'administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance.'" *Id*. at 240 (citing *Boyd v. Corr. Corp.*, 380 F.3d 989, 996 (6th Cir. 2004)); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir. 2001); and *Powe v. Ennis,* 177 F.3d 393, 394 (5th Cir. 1999)). As recognized by the Sixth Circuit, Risher "was not required to make additional efforts beyond the scope of the Bureau's regulations simply because the Regional Director failed to supply him with a document, something it was obligated to do. *Risher*, 639 F.3d at 240.

The same reasoning applies to any purported deficiency in Plaintiff Hallinan's BP-11, the only step in the exhaustion process that Defendants argue was not properly completed. (*See* D.E. 39-7 at 4-5.) Plaintiff Hallinan filed the BP-11 five days after the BOP deadline for responding to his BP-10 had passed without a response. *Id*. Due to BOP's failure to follow its own policies, Plaintiff Hallinan had no response to submit with his BP-11 and thus "failed to comply with filing requirements." (*Id*.) But Plaintiff Hallinan did what was required of him under the BOP policies. His grievance was thus fully exhausted. *See Risher*, 639 F.3d at 240-41.

13

## 2. Plaintiffs Williams and Kinard fully exhausted the available administrative remedies.

Plaintiffs Williams and Kinard also exhausted those remedies available to them. Defendants admit that these two Plaintiffs proceeded through the filing of the BP-10s to the Regional Office on July 15, 2020 and October 5, 2020, respectively. (D.E. 39-7, Kelly Decl. at 5-6.) Defendants also admit that BOP did not respond to either of their BP-10s, despite the responses being long since due. *Id*. Because Defendants reject submissions of BP-11s that do not have the response to the BP-10 attached, the BP-11 appeal process was unavailable to Plaintiffs Williams and Kinard. *See Risher*, 639 F.3d at 240-41; *see also* D.E. 39-7, Kelly Decl. at 5 (discussing Plaintiff Hallinan). Because they proceeded through the BP-10 and that was all that was available to them, Plaintiffs Williams and Kinard fully exhausted the available administrative remedies.

## 3. There is no requirement that an incarcerated person identify the law under which a claim may be brought in a grievance.

Defendants' only argument regarding the contents of Plaintiffs' grievances is that they do not mention the Rehabilitation Act. (D.E. 31, Moving Br. at 24.) But a grievance need not reference any law, and to require it would be to improperly create new requirements of PLRA. *Cf. Jones*, 549 U.S. at 217-219 (holding that it is improper to interpret the PLRA exhaustion requirement to include details that are not in the text of the PLRA).

The purpose of the exhaustion requirement is to allow a prison "to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Wilcox*, 877 F.3d at 167 n.4 (quoting *Moore v. Bennette*, 517 F.3d 717, 726 (4th Cir. 2008)). Grievances thus "generally need only be sufficient to 'alert the prison to the nature of the wrong for which redress is sought.'" *Id*. (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). And they need not mention the specific law at issue to provide adequate notice. *Carter v. Fleming*,

14

879 F.3d 132, 136 n.2 (4th Cir. 2018) (finding grievance that did not mention RLUIPA still "provide[d] provide prison officials sufficient notice of [RLUIPA] complaints.").

### 4. Dismissal of class members' claims for failure to exhaust is unwarranted.

As discussed above, Plaintiff Hallinan exhausted the entire Administrative Remedy Process. Thus, even if the Court considers the evidence about exhaustion at the pleading stage (which it should not), dismissal of Hallinan's claims is unwarranted.

Likewise, Plaintiffs Williams, and Kinard exhausted the remedies available to them, in that they submitted grievances and appeals through the BP-10 stage, and BOP then made further administrative process unavailable through its delay and inconsistent policy about the effect of delay. (D.E. 39-7 at 5-6.) Thus, their claims also should not be dismissed for failure to exhaust.

Exhaustion by Plaintiffs Hallinan, Williams, and Kinard also bars dismissal of the claims of other class members. Because the purpose of the exhaustion requirement is to put the defendants on notice, it is met when "one or more class members" have exhausted. *Scott v. Clarke*, 64 F. Supp. 3d 813, 832 n.10 (W.D. Va. 2014); *see also Jarboe v. Maryland Dep't of Pub. Safety & Corr. Servs.*, No. CIV.A. ELH-12-572, 2013 WL 1010357, at *13 (D. Md. Mar. 13, 2013) (analyzing applicability of "vicarious liability" or "the single-filing rule" beyond the class action context). Because this is a class case, dismissal of any other Plaintiff or class member's claims is inappropriate.

Finally, because other members of the putative class or subclass may have exhausted individually, it would be premature to dismiss prior to class certification and related discovery. *See Scott*, 64 F. Supp. 3d at 832 n.10. (noting, at the summary judgment stage, after the close of discovery, that the exhaustion by class members other than the named plaintiffs, satisfied the exhaustion requirement).

15

### C. In the Alternative, Defendants' Administrative Remedies Process Is Unavailable.

Plaintiffs are required to exhaust only those administrative remedies that are available. 42 U.S.C. § 1997e(a); *Ross v. Blake*, 136 S. Ct. 1850, 1855-58, 195 L. Ed. 2d 117 (2016). If the Court should disagree with Plaintiffs' argument above and hold that, because Plaintiff Hallinan's BP-11 was rejected for failure to comply with the filing requirements, he did not exhaust, the Court should hold that the portion of BOP's administrative remedies process that he was deemed not to have completed is unavailable.

In *Ross*, the Supreme Court held that administrative remedies may not be available, even when there is technically a process for administrative remedies. *Ross*, 136 S. Ct. at 1858-62. The Court gave three examples of when administrative remedies are unavailable: (1) "when (despite what regulations or guidance materials may promise) [an administrative procedure] operates as a simple dead end"; (2) when the established process is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.[7]

Here, the situation falls well within the examples of unavailability set forth by the Supreme Court. As explained above, the BOP's process requires each subsequent appeal to include a copy of the BOP's response from the prior level of the process—a response which the incarcerated person will not have if the BOP failed to respond. In such a situation, when the incarcerated person files the next level appeal without the response, the BOP rejects the appeal for not complying with the filing requirements, then claims the incarcerated person failed to exhaust. *See Risher*, 639 F.3d at 240. This process thwarts incarcerated persons from using the prescribed procedure. *See Patel v. Moron*, 897 F.

---

[7] In *Ross*, the Court recognized that there is overlap between these examples of unavailability. In discussing the example of a procedure being unavailable because prison administrators thwarted inmates from using it, the Court noted that such situations included "blind alleys and quagmires" that would also result in a system being too opaque to use. *Ross*, 136 S. Ct. at 1860.

Supp. 2d 389, 398 (E.D.N.C. 2012) ("[A] prisoner is not responsible when he follows the proper grievance procedures and prison officials nevertheless mishandle the grievance.") (citing *Hill v. O'Brien*, 387 F. App'x 396, 400-01 (4th Cir. 2010) and *Dole v. Chandler*, 438 F.3d 804, 811 (7th Cir. 2006)).

Plaintiff Hallinan's experience is not anomalous. Ms. Kelley's declaration describes the timeline of responses to recent grievances and appeals from five Plaintiffs.[8] A clear pattern of delayed responses is evident:

1. Plaintiff Hallinan submitted a BP-10 on June 26, 2020 and Defendants did not respond until August 29;

2. Plaintiff Kinard submitted a BP-10 on October 5, 2020 and, as of the date of Ms. Kelley's declaration, December 14, 2020, Defendants had not responded;

3. Plaintiff Waldrip submitted a BP-10 on July 15, 2020 and Defendants did not respond until August 29;

4. Plaintiff Williams submitted a BP-10 on July 15, 2020 and, as of December 14, 2020, Defendants had not responded.

At the very least, Plaintiffs Hallinan, Kinard, and Williams should be considered to not have any available administrative remedies beyond what they submitted, as they have either had their submissions rejected as a result of Defendants' delays (Plaintiff Hallinan) or they have simply not received a response required for attachment to an appeal (Plaintiffs Kinard and Williams). *See Patel*, 897 F. Supp. 2d at 399 (denying the defendants' motion for summary judgment on exhaustion when the plaintiff "submitted evidence suggesting that BOP prison officials interfered with his ability to exhaust his administrative remedies," including by refusing to accept his BP-10s and refusing to provide him with grievance forms).

---

[8] Ms. Kelley states that three of the Plaintiffs have filed no grievances at all, that one (Plaintiff Brown) filed a grievance on March 17, 2020 but gives no information about the timeline for its resolution, and that another (Plaintiff Maldonado) has not filed any recent grievances. (D.E. 39-7, Kelly Decl. at 4-5.)

**D.    Plaintiffs Need Not Exhaust the EEO Process to Bring Their Rehabilitation Act Claim.**

Defendants contend that double exhaustion is required for Plaintiffs' Rehabilitation Act claim—first the BOP process, and then exhaustion of the process of DOJ's Director for Equal Employment Opportunity ("EEO process"), 28 C.F.R. § 39.170. (D.E. 31, Moving Br. at 21-28.) Defendants are wrong for three reasons. First, the PLRA simply does not require exhaustion of the EEO Process. Second, to read such a requirement into the PLRA would itself violate the Rehabilitation Act. And third, the EEO process is unavailable.

**1.    Neither the PLRA nor the Rehabilitation Act require exhaustion of the EEO process.**

The Supreme Court has explained that the PLRA requires only internal (*i.e.*, BOP) exhaustion at the prison:

> In *Woodford*, we held that to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules," 548 U.S., at 88, 126 S.Ct. 2378—rules that are defined not by the PLRA, but by the prison grievance process itself. ***Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust."***

549 U.S. at 218 (emphasis added).

This reading is consistent with the PLRA's legislative history. In *Rumbles v. Hill*, 182 F.3d 1064 (9th Cir. 1999), the Ninth Circuit considered whether the PLRA required a state prisoner to exhaust administrative procedures beyond those provided by the state prison system, specifically a state administrative process that was available to the prisoner. 182 F.3d at 1069, *overruled on other grounds*, *Booth v. Churner*, 532 U.S. 731, 121 S. Ct. 1819, 149 L.Ed.2d 958 (2001). Reviewing the legislative history of the PLRA, the Ninth Circuit explained that Congress did not intend to impose such a requirement:

> The language of the PLRA, as well the language of the pre-PLRA version of section 1997e, indicates that Congress had internal prison grievance procedures in mind when it passed the PLRA. That is, while Congress certainly intended to require prisoners to exhaust available prison administrative grievance procedures, there is

18

> no indication that it intended prisoners also to exhaust state tort claim procedures.
> For example, section 1997e(b) tellingly provides that "the failure of a State to adopt
> or adhere to an ***administrative grievance procedure*** shall not constitute the basis
> for an action." It thus appears that throughout § 1997e Congress is referring to
> institutional grievance processes and not state tort claims procedures.

*Id*. at 1069-70 (internal citations and quotations omitted; emphasis in the original). The Court

explained that the PLRA's sponsors appeared to understand the term "administrative remedies" to refer

to the internal "prison grievance system." *Id.* at 1070 (quoting 141 Cong. Rec. S7526-7527 (May 25,

1995)). Administrative procedures external to the prison system were "not 'available administrative

remedies' that a prisoner must exhaust for purposes of section 1997e(a)." *Id*. The Ninth Circuit later

made clear that this applied equally in the context of the Rehabilitation Act. *O'Guinn v. Lovelock

Corr. Ctr.*, 502 F.3d 1056, 1062 (9th Cir. 2007) (citing *Jones*, 549 U.S. 199). There is no reason for

this Court to depart from the sound reasoning of *Rumbles* and *O'Guinn*.

Defendants' argument that the Rehabilitation Act itself requires double exhaustion is also

wrong. *Shariff v. Artuz*, No. 99-cv-0321, 2000 WL 1219381, at *3 (S.D.N.Y. Aug. 28, 2000)

("Neither Title II of the ADA nor § 504 of the Rehabilitation Act requires a complainant to exhaust

administrative remedies with DOJ prior to filing suit."); *Veloz v. New York*, 339 F. Supp. 2d 505,

519 (S.D.N.Y. 2004), *aff'd*, 178 F. App'x. 39 (2d Cir. 2006) (an incarcerated person need not

exhaust administrative remedies under the ADA to satisfy the PLRA); *Mitchell v. Cmty. Mental

Health of Cent. Michigan*, 243 F. Supp. 3d 822, 833 (E.D. Mich. 2017) ("The plaintiffs' federal

claims are based on 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, and section

504 of the Rehabilitation Act. None of those statutes contains an exhaustion prerequisite."). 

Compliance with 28 C.F.R. § 39.170 is simply not a requirement here.

The text of § 39.170 also does not require a person incarcerated in the BOP to go through

the EEO process. Contrary to Defendants' argument, that section provides only that persons

incarcerated in the BOP are *permitted* to bring a complaint through the EEO process, and that, should

they choose do so, they must first exhaust the BOP process. 28 C.F.R. § 39.170(d)(1)(ii). It does

19

not impose any *requirement* that prisoners with disabilities to go through a second administrative process to bring their civil rights concerns to the court. *Id.*; *Jones*, 549 U.S. at 218. As discussed above, the purpose of the PLRA administrative remedies requirement is to put the prison on notice of the problem and give it an opportunity to correct it. *Carter*, 879 F.3d at 136 n.2. A plaintiff need not submit "multiple, successive grievances raising the same issue (such as prison conditions or policies)." *Id.*

Plaintiffs acknowledge that Defendants cite a handful of non-binding, mostly unpublished, opinions in support of their argument that there is a special double exhaustion requirement imposed on disabled prisoners.[9] But as the Supreme Court recognized in *Jones*, and as the Ninth Circuit explained in *Rumbles* and *O'Guinn*, that simply is not the law.

> **2.** **To read a double exhaustion requirement into the PLRA for violations of the Rehabilitation Act would itself discriminate against persons with disabilities.**

If the PLRA exhaustion requirement were read as Defendants argue it should be, it would itself violate the Rehabilitation Act and its implementing regulations. Under Section 504 of the Rehabilitation Act:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination … under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). Federal agencies may not "limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or

---

[9] The only published case relied on by Defendants is *Cooke v. U.S. Bureau of Prisons*, 926 F. Supp. 2d 720 (E.D.N.C. 2013). But in *Cooke*, the court did not find that the PLRA required incarcerated people with disabilities to exhaust twice. Instead, *Cooke* held that the plaintiffs were "not subject to the PLRA's exhaustion requirement because plaintiffs were not 'prisoners' as defined in the PLRA on the date that they filed suit. Accordingly, the PLRA did not require them to exhaust administrative remedies before filing suit." *Id.* at 726. Thus, *Cooke* cannot be read to say anything about the meaning of exhaustion under the PLRA.

service." 28 C.F.R. 39.130(b)(1)(vi).

Under Defendants' theory of exhaustion, however, a person incarcerated in the BOP who does not have a disability could go to federal court to seek judicial review of a violation of his or her federally protected rights about five months after the violation arises,[10] while a person incarcerated in the BOP who does have a disability would have to wait approximately ***seventeen months*** to seek judicial review, going first through the BOP process then through the EEO process. *See* 28 C.F.R. § 39.170.[11] Moreover, in the EEO process, the incarcerated person may need to incur expenses for the consideration of their complaint, while there is no such a requirement in the BOP process. *See* C.F.R. § 39.170(k)(5)(iii), (vi). Requiring a person with a disability to wait more than three times as long as a person without a disability, and potentially incur significant expenses before litigation, just for the right to bring a case before a federal court is discrimination against the person with a disability. It cannot be the law that the Rehabilitation Act requires this.

### 3. In the alternative, the EEO Process is unavailable to Plaintiffs.

Even if exhaustion of the EEO process were generally required for Rehabilitation Act claims (which it is not), it would be required only if the EEO process were available, which it is not. *See Ross*, 136 S. Ct. at 1858-59.

In *Ross*, the Supreme Court explained that an administrative grievance process is unavailable "when a remedy is, in Judge Carnes's phrasing, essentially "unknowable"—so that no ordinary

---

[10]  The BOP exhaustion process takes up takes up to 150 days, assuming that the incarcerated person files each step as soon as permitted. Supplemental Wilkerson Decl., Ex. 3 (Handbook) at 40.

[11] Once a complaint is filed with the Director of the Equal Employment Opportunity, the agency has 180 days to conduct an investigation. 28 C.F.R. § 39.170 (g). Either party can then submit an appeal within 30 days. 28 C.F.R. § 39.170 (i). If any party requests a hearing, the administrative law judge has 60 days to commence the hearing. 28 C.F.R. § 39.170 (k)(1). The administrative law judge has 30 days after the hearing or after the receipt of the transcripts, whichever is later, to issue the recommended decision. 28 C.F.R. § 39.170 (k)(6). The parties have 25 days after the recommended decision to object and reply to the other party's objection. 28 C.F.R. § 39.170 (k)(7). The Complaint Adjudication Officer then has 60 days to make the final decision. 28 C.F.R. § 39.170 (l)(1). Thus, if the incarcerated person submits whatever he or she must submit on the first day that he or she can do so, the process can still take 355 days.

prisoner can make sense of what it demands." *Id*. The exemplar citation for this type of unavailability was Judge Carnes's opinion in *Goebert v. Lee Cnty.,* 510 F.3d 1312, 1323 (11th Cir. 2007). *Id*.

In *Goebert*, a woman detained in a jail sued under 42 U.S.C. § 1983, alleging deliberate indifference to serious medical needs. 510 F.3d at 1316. Before suing, she had submitted a complaint about her medical care to the jail administrator. *Id*. at 1318. She did not appeal the response to the complaint because she did not know there was an appeal process. *Id*. at 1322. Defendants argued that, because Goebert did not appeal the jail administrator's response, she had not exhausted her administrative remedies. *Id*. The district court granted summary judgment on these grounds. *Id*.

The Eleventh Circuit reversed. The court explained there was nothing in the inmate handbook, which set forth the grievance process, "about the any procedure for appealing the denial of a complaint or any request." *Id*. Instead, the appeal process was explained only in the jail's General Operating Procedures, which were not made available to people in the jail. *Id*. The remedies "available" to incarcerated persons, the court held, do not include "remedies or requirements for remedies that an inmate does not know about, and cannot discover through reasonable effort by the time they are needed." *Id.* The contrary argument, the court said, "could have been inspired by the Queen of Hearts Croquet game, since there is nothing on this side of the rabbit hole to support it." *Id*. at 1322-23. "If we allowed jails and prisons to play hide-and-seek with administrative remedies," the court said, "they could keep all remedies under wraps until after a lawsuit is filed and then uncover them and proclaim that the remedies were available all along." *Id.* at 1323. "The Queen would be proud." *Id.*

Here, as in *Goebert*, Defendants seek to benefit from having kept Plaintiffs in the dark about the process they were required to follow. Defendants provide people incarcerated at FCC Butner with an Inmate Handbook that purports to set out a four-step "Administrative Remedy Process." Supplemental Wilkerson Decl., Ex. 2, Handbook at 39-40. Importantly, although the Handbook's description of the process mentions several laws for which the Administrative Remedy Process is

not the mechanism for seeking redress, the Rehabilitation Act is not among them, nor is it mentioned anywhere within the Handbook.[12]  *Id.* at 39.

Defendants also have a policy entitled "Administrative Remedy Program."  Supplemental Wilkerson Decl., Ex. 2, BOP Program Statement 1330.18.  It sets forth, over sixteen pages, the administrative remedy process in the BOP.  *Id.*  In a section titled "Statutorily-mandated Procedures," the policy states that there are statutorily mandated procedures in place for redress of certain claims and provides the citation with the C.F.R. for each of those procedures.  *Id.*  Rehabilitation Act claims, however, are not among the claims identified as having different procedures than the BOP process.  *Id.*  The policy also states that "[i]f an inmate raises an issue in a request or appeal that cannot be resolved through the Administrative Remedy Program, the Bureau will refer the inmate to the appropriate statutorily-mandated procedures."  (*Id.*)  Neither the Rehabilitation Act nor the EEO process are mentioned anywhere in the Administrative Remedy Program policy.  (*Id.*)

Defendants thus told the men at Butner that the BOP process is the administrative remedy procedure.  They purported to identify a set of claims for which other procedures were required and did not include the Rehabilitation Act among them.  As the Eleventh Circuit held in *Goebert*, and as the Supreme Court affirmed in *Ross*, when a prison "play[s] hide-and-seek with administrative remedies," the hidden remedies are not available.  *Goebert*, 510 F.3d at 1322-23; *Ross*, 136 S. Ct. at 1859 (citing *Goebert* with approval).

---

[12] Additionally, in the section on "Inmate Rights and Responsibilities," the Handbook states that people incarcerated at Butner "have the right to be informed of the rules, procedures, and scheduled [sic] concerning the operation of the institution."  (*Id*. at 42.)  But the only administrative remedy procedure the Handbook informs them of is the BOP procedure, not the EEO process.  (*Id*. at 39-40.)  The EEO process is not mentioned anywhere within the Handbook.

## II. Plaintiffs' Rehabilitation Act Claim Should Not Be Dismissed.

Plaintiffs have properly pled their discrimination claim under Section 504 of the Rehabilitation Act. To state a claim for relief under Section 504, a plaintiff must allege "(1) that he has a disability; (2) that he is otherwise qualified for the benefit in question; and (3) that he was excluded from the benefit due to discrimination solely on the basis of the disability." *Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999). Plaintiffs have alleged facts sufficient to meet each of these elements.

### A. Plaintiffs Properly Pled that They Suffer from a Qualifying Disability.

The Rehabilitation Act defines "disabled individual" as a person who (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. 29 U.S.C. § 705(20)(B). As Defendants concede, a "physical impairment" includes "any physiological disorder or condition . . . or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory . . . ; cardiovascular, reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine." It also includes, but is not limited to, such diseases and conditions as "orthopedic, visual, speech, and hearing impairments, . . . cancer, heart disease, [and] diabetes." (*See* D.E. 31, Moving Br. at 30 (quoting 28 C.F.R. § 39.103(1)).) The term "major life activities" is likewise defined broadly to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 39.103(2). "In considering whether an impairment substantially limits an individual in a major life activity, [courts should] construe the statutory text broadly in favor of expansive coverage, keeping in mind that the language is not meant to be a demanding standard." *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019) (internal citations and quotation marks omitted).[13]

---

[13] As Defendants acknowledge, the Fourth Circuit has repeatedly held that the Americans With Disabilities Act ("ADA") and Rehabilitation Act generally are construed to impose the same requirements, and the same analysis is appropriate under both. (D.E. 31, Moving Br. at 29 n.9 (citing cases).)

Here, the Complaint contains detailed factual allegations that the Plaintiffs asserting the Rehabilitation Act claim suffer from myriad physical impairments (and, in some cases, also have a history of suffering from such impairments), which—per the above definitions and by their very nature—limit one or more of their life activities. (D.E. 1, Compl. ¶ 28 (Plaintiff Hallinan suffers from bladder and prostate cancer, hypertension, cardiovascular disease (including a bypass surgery), and celiac disease, resulting in anemia); ¶ 30 (Plaintiff Riddick suffers from lymphoma (in remission), diabetes, asthma, sleep apnea, and a history of arthritis, and he takes an immunosuppressant to prevent rejection of a graft corneal transplant); ¶ 31 (Plaintiff Maldonado suffers from kidney disease and has had two kidney transplants which requires him to take an immunosuppressant for the rest of his life, and he also has malignant hypertension, tachycardia, and squamous cell carcinoma[14]); ¶ 32 (Plaintiff Brown has had two kidney transplants and must take an immunosuppressant for the rest of his life, and he suffers from diabetes, hypertension, and sleep apnea (for which he uses a breathing machine)); ¶ 33 (Plaintiff Freeman has a history of heart problems, including congestive heart failure that required open heart surgery, and he suffers from hypertension, respiratory deficiency, and a kidney injury); ¶ 34 (Plaintiff Butler suffers from diabetes, Hepatitis B, and a heart murmur that causes him shortness of breath[15]); ¶ 35 (Plaintiff Williams suffers from Type 2 diabetes and chronic kidney disease, and he previously had colon and skin cancer); ¶ 37 (Plaintiff Waldrip suffers from Type 2 diabetes and hypertension[16]).)[17]  This is particularly so given Plaintiffs' repeated allegations in the Complaint that

---

[14]  After Plaintiffs filed their Complaint, Mr. Maldonado was transferred to home confinement.

[15]  After Plaintiffs filed their Complaint, BOP transferred Mr. Butler to a different BOP facility.

[16] Mr. Waldrip has recently been moved to a different BOP facility.

[17]  Plaintiffs Hallinan, Riddick, Brown, Freeman, Williams, and Waldrip seek to represent a Subclass of "current and future people incarcerated at Butner who are medically vulnerable and at high risk of severe illness or death from COVID-19 due to disabilities protected under Section 504 of the Rehabilitation Act, including those with the following conditions: cancer; chronic kidney disease; chronic obstructive pulmonary disease ("COPD") or moderate to severe asthma; immunocompromised state from solid organ transplant, blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids or other

their physical impairments place them at a much greater risk of suffering severe complications, including death, from COVID-19. This more than satisfies their pleading burden. *See White v. City of Annapolis by and through City Council*, 439 F. Supp. 3d 522, 543 (D. Md. 2020) (denying motion to dismiss claim under ADA and Rehabilitation Act, reasoning that "whether a disability meets the statutory definitions . . . is fact-specific" and that it was "reasonable to infer [at the motion to dismiss stage] that the medical conditions alleged [asthma] could substantially limit one or more major life activities"). To be sure, all 28 individuals that have died at FCC Butner from COVID-19 suffered from pre-existing health conditions that likewise increased their chances of severe complications from COVID-19. (D.E. 1, Compl. ¶ 5).

Defendants' arguments in favor of dismissal on this ground are misplaced. First, they argue that whether a person has a qualifying disability under the Rehabilitation Act is a "fact-intensive, individualized inquiry." (D.E. 31, Moving Br. at 31.) While perhaps relevant to Plaintiffs' motion for class certification,[18] this argument has no relevance on a Rule 12(b)(6) motion for failure to state a claim. Instead, the question is whether Plaintiffs have alleged "sufficient 'factual matter (taken as true) to suggest' a cognizable cause of action." *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (quoting *Twombly*, 550 U.S. at 556). Whether and to what extent individualized inquiry is necessary to determine whether a person is a "disabled individual" under the Rehabilitation Act simply does not affect whether a plaintiff has adequately stated a claim under that statute.

---

immune weakening medicines; serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; diabetes; cerebrovascular disease; cystic fibrosis; hypertension; neurologic conditions such as dementia; liver disease; pulmonary fibrosis; and thalassemia (the "Disability Subclass")." (D.E. 1, Compl. ¶ 19.) Messrs. Maldonado, Butler, and Waldrip were also listed as proposed class representatives in the Complaint, but they are no longer at FCC Butner.

[18] While arguments about whether the proposed representatives of the Subclass have qualifying disabilities could have been raised for consideration in Defendants' opposition to class certification, they were not. (*See generally* D.E. 43.)

Defendants next assert that Plaintiffs have not alleged that their medical conditions constitute a physical or mental impairment under the Rehabilitation Act, or that those conditions substantially limit any major life activity. Again, their argument disregards the well-pled allegations, including those addressing the impact of COVID-19 on persons with pre-existing health conditions that render them particularly vulnerable to severe illness and death. (D.E. 1, Compl. ¶¶ 4, 7, 9, 81, 117-18, 304-05.) Defendants' argument ignores the impact of COVID-19 on incarcerated persons who suffer from pre-existing physical impairments that render them—per well-accepted medical guidance—particularly vulnerable to suffering severe complications from COVID-19. It also ignores the fact that those persons may easily contract COVID-19 from doing major life activities that they cannot avoid—most notably, by simply breathing.

### B. Plaintiffs Adequately Allege That They Were "Denied the Benefits or Public Service, Program, or Activity."

Defendants do not dispute that Plaintiffs have properly pled they are "qualified to receive the benefits or public service, program or activity"—here, safe conditions at FCC Butner, including safe access to food, medicine, and communication, and adequate measures to combat the spread of COVID-19 within FCC Butner's facilities. Nor could they. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners. . . ."). Instead, Defendants argue that Plaintiffs have not alleged facts showing that they were denied the benefits of that service, program, or activity. This is so, Defendants claim, because Plaintiffs did not allege that they were completely denied access to food, medicine, medical treatment, shelter, recreation, or communication. (D.E. 31 at 33). But this argument ignores—and indeed

contradicts—the well-pled allegations in the Complaint. *See Woods*, 855 F.3d at 648 (court must accept well-pled factual allegations as true for purposes of a Rule 12(b)(6) motion to dismiss).

Plaintiffs repeatedly allege that they, and others who suffer from medical conditions that render them vulnerable to severe complications from COVID-19, were denied ***equal access*** to programs, services, and activities, including:

- Access to medicines and appropriate medical care, including adequate testing and treatment for COVID-19, as well as adequate treatment for non-COVID-19 medical conditions (D.E. 1, Compl. ¶¶ 7, 81, 117, ¶ 345);

- Access to food without coming into close contact with others (*Id*. ¶¶ 118-119, 306)

- Access to phones, computers, restrooms, and bathing facilities without coming into close contact with others (*Id*. ¶ 120-25);

- Equal access to safe housing (*Id*. ¶ 307).

As the Complaint alleges, to access these programs, services, and activities at FCC Butner, people with disabilities are required to place themselves at a significantly higher risk of suffering serious medical harm or death as a result of contracting COVID-19 than people without disabilities. (D.E. 1, Compl. ¶¶ 47, 304-07, 310, 349.) As a result, they are denied equal access to these benefits. Analogously, if person with a mobility impairment was offered a shower, but no grab bars or shower chair, the person would have to take on more risk of falling and injuring himself in the shower than would persons without such an impairment. This would clearly violate the Rehabilitation Act. Allegations that Plaintiffs with disabilities must take on more risk than incarcerated people without disabilities to access basic services in FCC Butner more than satisfy Plaintiffs' pleading burden.

**C. Plaintiffs Adequately Allege That They Have Been Discriminated Against Because of Their Disability.**

To state a discrimination claim under Section 504 of the Rehabilitation Act, Plaintiffs need not allege intentional discrimination on the basis of their disability. Rather, as Defendants acknowledge, Plaintiffs need only allege that (1) they suffered a disparate impact because of their disability—i.e., that "facially neutral rules or policies are applied in a way that affects the protected class differently

28

from other groups," *Bryant Woods Inn, Inc. v. Howard Cty., Md.*, 911 F. Supp. 918, 939 (D. Md. 1996), *aff'd*, 124 F.3d 597 (4th Cir. 1997);[19] or (2) that Defendants failed to make reasonable accommodations. (D.E. 31, Moving Br. at 34 (citing *White v. City of Annapolis by & through City Council*, 439 F. Supp. 3d 522, 542 (D. Md. 2020)). Plaintiffs assert both theories here. (D.E. 1, Compl. ¶ 302 ("Defendants have discriminated against the [Rehab Act] Plaintiffs and others with disabilities by failing to make reasonable accommodations and by implementing facially neutral policies that affect people with disabilities more harshly than those without disabilities.")).

> **1.    Plaintiffs have alleged a Rehabilitation Act claim based on Defendants'
> failure to provide reasonable accommodations**.

Section 504 forbids not only facial discrimination against individuals with disabilities, but also requires that executive agencies such as BOP alter their policies and practices to prevent discrimination on the basis of disability. Reasonable modifications are required unless those modifications would create a "fundamental alteration" of the relevant program, service, or activity, or would impose an undue hardship. *See Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 n.17 (1987); *Alexander v. Choate*, 469 U.S. 287, 300 (1985); *see also* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."). Here, Defendants have not made reasonable accommodations necessary to ensure equal access to programs, services, and activities for people incarcerated at FCC Butner with disabilities that render them at high risk of complications or death in the event of a COVID-19 infection. (D.E. 1, Compl. ¶ 341.)

The Complaint is replete with allegations that (1) Defendants are aware of Plaintiffs' medical conditions and the resulting increased vulnerability to severe complications from COVID-19; and

---

[19] *See also* 42 U.S.C. § 12112(b)(3)(A); *Smith–Berch, Inc. v. Baltimore Cty.*, 68 F. Supp. 2d 602, 621 (D. Md. 1999) ("Title II prohibits not only intentional discrimination against disabled individuals, but also any policies or practices that have a disparate impact on disabled individuals.").

(2) have failed to make reasonable accommodations to reduce the risk to incarcerated people with disabilities to enable them to enjoy the benefits of medical care, food, communication, and other services at FCC Butner on an equal basis with those who do not have disabilities. (*Id.* ¶¶ 301-311.) Defendants acknowledge those allegations but argue that Plaintiffs' claim still fails because they do not "indicate what such a reasonable accommodation might be." (D.E. 31, Moving Br. at 35.) Defendants, however, point to no authority (and Plaintiffs are aware of none) that requires a plaintiff, at the pleading stage, to allege in detail the specific reasonable accommodations to which they are entitled.

Even if such detail were needed to survive at Rule 12(b)(6) motion, Plaintiffs have met that burden. As Defendants acknowledge, the Complaint suggests that one (though not the only) reasonable accommodation would be to prioritize the release of persons with disabilities to home confinement. (D.E. 1, Compl. ¶ 310.) If, as Defendants contend, release is not appropriate, then other accommodations could be made—including, but not limited to, those recommended by the CDC. (*See id.* ¶¶ 62-63.) In particular, the CDC has recommended specifically for prisons the implementation of distancing strategies to increase physical space between incarcerated people—"ideally 6 feet between all individuals, regardless of symptoms," including reassigning or rearranging bunks to provide more space, enforcing increased space between people in common areas, staggering recreation times, and staggering meals. (*Id.*) The CDC also recommends, among other things: (i) individually quarantining and medically monitoring close contacts of confirmed COVID-19 cases—including testing; (ii) daily temperature checks in housing units where COVID-19 cases have been identified; (iii) face mask usage for all individuals as much as safely possible; (iv) immediately placing symptomatic individuals into individual medical isolation that is "distinct from punitive solitary confinement" and ensuring that they "receive[] regular visits from medical staff"; (iv) actively encouraging staff to stay home when sick; and (v) frequent and thorough cleaning and disinfection of surfaces, objects, and areas. (*Id.*) These allegations are more than sufficient to meet Plaintiffs' pleading burden.

Finally, Defendants suggest that Plaintiffs' claim should be dismissed because reasonable accommodations here would require a "fundamental alteration" of BOP's services and programs. (D.E. 31, Moving Br. at 35.)  But whether reasonable accommodations under the circumstances would amount to a "fundamental alteration" is a question of fact that is not suitable for resolution on a motion to dismiss.  *See Nat'l Fed. Of the Blind, Inc. v. Lamone*, 438 F. Supp. 3d 510, 531 (D. Md. 2020) (holding that the defendants' "fundamental alteration defense was not proper for consideration at the motion to dismiss stage of ADA," stating that a determination whether a proposed accommodation would qualify as a fundamental alteration and a "much more developed record would be required.").[20]

### 2. Plaintiffs have alleged a Rehabilitation Act claim based on the disparate impact of Defendants' policies, procedures, and methods of administration.

Section 504 forbids not only facial discrimination against individuals with disabilities, but also any policies or practices that have a disparate impact on disabled individuals.  *White v. City of Annapolis by & through City Council*, 439 F. Supp. 3d 522, 542 (D. Md. 2020) ("[A] facially neutral practice may be discriminatory if it 'fall[s] more harshly on one group than another.'") (internal citation omitted).  As the Complaint alleges, Defendants have enacted policies and procedures that have a disparate impact on the Disability Subclass by subjecting them to a much higher risk of, and rate of, death from COVID-19 than persons incarcerated at Butner who do not have disabilities.  (D.E. 1, Compl. ¶ 349.)

Defendants argue that they cannot be held liable on a disparate impact theory here because all people, regardless of age or health, risk serious illness and death from COVID-19.  (D.E. 31, Moving Br. at 37.)  While that is true, individuals with certain pre-existing medical conditions are demonstrably

---

[20] Moreover, it cannot be that transferring certain individuals from FCC Butner to home confinement because of their medical conditions would be a fundamental alteration.  As the Complaint alleges, Attorney General Barr, the then-head of the Department of Justice, instructed the BOP, an arm of the Department of Justice, identified such transfers as "[o]ne of BOP's tools to manage the prison population and keep [incarcerated people] safe" from COVID-19.  (D.E. 1, Compl. ¶ 236.)

31

and significantly *more* vulnerable to suffering severe complications and death from COVID-19—a fact that BOP itself has repeatedly and publicly acknowledged. (*See* D.E. 1-6, BOP Press Releases re: Prisoner Deaths; Supplemental Wilkerson Decl. at Ex. 4 (BOP Press Releases re: Butner Deaths in November 2020 and January 2021)). This conclusion is reinforced by virtually universal guidance from public health authorities, as well as the indisputable evidence on the ground at FCC Butner—*i.e.*, that all 28 incarcerated individuals who died from COVID-19 complications at FCC Butner had pre-existing medical conditions that made them more vulnerable to suffering severe complications from COVID-19. (*Id.*)

Defendants effectively concede that they are treating people with disabilities at FCC Butner the same as they treat everyone else. They argue that there can therefore be no disparate impact. But Defendants misunderstand the nature of what the Rehabilitation Act requires. When—as here— Defendants' facially neutral policies, procedures, or practices fall more harshly on persons with disabilities than persons without disabilities, Defendants violate Section 504. Because Plaintiffs have adequately alleged that persons with disabilities incarcerated at FCC Butner are disparately impacted by Defendants' policies, procedures, and methods of administration, they have sufficiently pled their claim. *See White v. City of Annapolis by & through City Council*, 439 F. Supp. 3d 522, 542 (D. Md. 2020) (denying motion to dismiss Rehabilitation Act claim on a disparate impact theory when the plaintiffs alleged that the defendants' policy "fell more heavily" on persons with disabilities); *see also Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (Rehabilitation Act "contemplates that prophylactic steps must be taken to avoid discrimination.").

**III.      There is No Basis to Dismiss Plaintiffs' Petition for Writ of Habeas Corpus.**

**A.      This Court has jurisdiction over Plaintiffs' habeas claim.**

Defendants' argument that this Court lacks jurisdiction over Plaintiffs' claims because they challenge only "conditions of confinement" relies primarily on Judge Flanagan's decision to that effect in a prior case brought by Mr. Hallinan.  (D.E. 31, Mov. Br. at 40-47 (citing *Hallinan v. Scarantino, et al.*, 5:20-hc-02088-FL (E.D.N.C. June 11, 2020) (*Hallinan I*), D.E. No. 62).)  Plaintiffs acknowledge this decision, which itself noted that it was a "preliminary determination" that was "not binding" in future proceedings, and that the issue at hand was "unsettled" and had not been resolved by the Fourth Circuit.  *Hallinan I*, D.E. 62 at 24 n.3, 26 n.5.  But Plaintiffs respectfully submit that this decision was incorrect for two reasons.

First, while Defendants describe Plaintiffs' habeas claim as challenging only "conditions of confinement," that is incorrect.  While the conditions at Butner are deplorable, Plaintiffs' habeas claim challenges the *fact* of their confinement, and so is squarely within § 2241's ambit.  *See Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Challenges to the validity of any confinement . . . are the province of habeas corpus.").  Plaintiffs assert that *release* of medically vulnerable men at Butner is required because, in the face of COVID-19 and given the nature of the facilities, Defendant cannot provide *any* set of constitutional conditions of confinement for medically vulnerable class members.  (*See* D.E. 1, Compl. ¶¶ 20, 249, 257, 310, 318-22, 369.)  Several courts have held that such claims are properly construed as challenges to the *fact* rather than the conditions of confinement and are thus appropriately raised under § 2241.  *See, e.g.*, *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 429 (D. Conn. 2020) (finding § 2241 an appropriate basis to order transfer to home confinement due to spread of COVID-19) (collecting cases); *United States v. Taylor*, 2020 WL 2084974, at *5 (M.D. Pa. Apr. 30, 2020) ("[E]mergency petitions for release, based on COVID19 are properly construed pursuant to 28 U.S.C. § 2241."); *Coreas v. Bounds*, 451 F. Supp. 3d 407, 419 (D. Md. 2020) ("[A]lthough the grounds on

33

which they seek release relate to their conditions of confinement, Petitioners seek complete release from confinement, which is 'the heart of habeas corpus.'").

Second, even if Plaintiffs' claims challenged only conditions of confinement (and they do not), Defendants' argument that such claims are foreclosed as a matter of law is wrong. The Supreme Court has not foreclosed such claims. *E.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal."). Nor has any published Fourth Circuit case held that conditions claims cannot sound in habeas. And even the Fourth Circuit's unpublished decisions have left open the possibility that conditions of confinement could be challenged under § 2241. *Wilborn v. Mansukhani*, 795 F. App'x 157, 163-64 (4th Cir. 2019) (acknowledging the possibility, but finding: "*This case* presents no basis to deviate from our previous [unpublished] holdings.") (emphasis added)). At the very least, Plaintiffs' habeas claim is certainly not, as Judge Flanagan concluded, a "paradigmatic conditions of confinement claim." *Hallinan I*, D.E. 24. Given the risk of severe and illness and death posed by the conditions at Butner, and the release Plaintiffs seek for medically vulnerable class members, this claim is properly brought under § 2241.

## IV.    Plaintiffs' Eighth Amendment Claim

### A.    BOP's Motion for Summary Judgment Should be Denied as Premature, or in the Alternative, Continued Until Plaintiffs Have Conducted the Necessary Discovery.

Defendants do not dispute that Plaintiffs have properly pled the elements of their Eighth Amendment claim. Instead—even though there has been *zero* discovery in this case or in the previous action against the Defendants in *Hallinan I*—Defendants ask the Court to grant summary judgment in their favor on Plaintiffs' Eighth Amendment claim. But because that claim involves complex and thus-far disputed issues of fact, and Plaintiffs have not yet had the benefit of discovery, the Court should deny Defendants' motion for summary judgment or, in the alternative, continue the motion until the parties have completed discovery on the essential facts, under Federal Rule of Civil Procedure 56(d).

*Sutton v. Roth, L.L.C.*, 361 F. App'x 543, 549 (4th Cir. 2010) ("a district court should decline to grant summary judgment where the nonmoving party has not had the opportunity to discover information necessary to oppose summary judgment").

In support of their request and in accordance with Rule 56, Plaintiffs have attached a Declaration setting forth the specific discovery needed to support Plaintiffs' Eighth Amendment claim. *See* Supplemental Wilkerson Decl., Ex. 5, Rule 56(d) Declaration of Patrick A. Doerr ("Rule 56(d) Declaration"). Courts in the Fourth Circuit give "great weight" to Rule 56(d) affidavits. *See Heyer v. U.S. Bureau of Prisons*, 2013 WL 943406 (E.D.N.C. Mar. 22, 2013) (granting relief under Rule 56(d) when the plaintiff's attorney submitted a Rule 56(d) affidavit, which noted that the defendants' summary judgment motion "rel[ies] on declarations submitted by witnesses who have not been deposed or otherwise subjected to cross-examination concerning their allegations," thereby warranting discovery).

The Fourth Circuit has repeatedly held that summary judgment is rarely appropriate before the parties have had an opportunity to take discovery. *See Tyree v. United States*, 642 F. App'x 228 (4th Cir. 2016) (reversing district court's grant of summary judgment before discovery); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) (generally, "summary judgment [under Rule 56] is appropriate only after adequate time for discovery"). This is particularly so when, as here, the claims involve disputed issues of fact. *See Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (reversing, in part, district court's grant of summary judgment where there were genuine issues of material fact on the plaintiff's Eighth Amendment claim). Rule 56(d) is "intended to as a safeguard against a premature grant of summary judgment." *Tyree*, 642 F. App'x at 230 (quoting *King v. Cooke*, 26 F.3d 720, 726 (7th Cir. 1994)).

As Defendants acknowledge in their opening brief, to prove their deliberate indifference claim under the Eighth Amendment, Plaintiffs must show Defendants' objective and subjective knowledge, including a "sufficiently culpable state of mind" on Defendants' part. (D.E. 31, Moving Br. at 50-51

35

(citing cases).) Proving a party's state of mind necessarily requires factual discovery. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 247 (4th Cir. 2002) (overturning summary judgment as premature and noting that summary judgment before discovery "can be particularly inappropriate when a case involves complex factual questions about intent and motive"). And Plaintiffs cannot prove this element without discovery that is in Defendants' sole control. *See Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) ("A court should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant."); *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 196-197 (concluding that the district court prematurely granted summary judgment without an opportunity for the plaintiff to take discovery, explaining that "court should hesitate before denying Rule [56(d)] motions when the party opposing summary judgment is attempting to obtain necessary discovery of information possessed only by her opponent"); Supplemental Wilkerson Decl., Ex. 5, Rule 56(d) Declaration, *passim*.

What is more, the bulk of Defendants' brief, including the 100-plus attachments filed in support, relates to their assertion that they responded reasonably to the risks posed by COVID-19—an issue that is at the heart of this lawsuit. (D.E. 31, Moving Br. at 51 (arguing that even if officials "knew of a substantial risk to inmate health or safety," they may still "be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").) As evidence of their "reasonable response," Defendants attach several declarations from BOP officials, point to several policies, procedures, and email bulletins, and ask the Court to accept all of them at face value without further inquiry. There are several problems with this. For one, the declarations and documents that Defendants rely on tell a markedly different version of facts than the Complaint's well-pled allegations and the declarations Plaintiffs have submitted in support of their class certification motion. (*See* D.E. 27-1-27-10.) A district court may not make credibility determinations on summary judgment. *See, e.g.*, *Morrison v. Nissan Co., Ltd.,* 601 F2d 139, 141 (4th Cir. 1979) ("And when the disposition of a

case turns on a determination of intent, courts must be especially cautious in granting summary judgment, since resolution of that issue depends so much on the credibility of the witnesses, which can be best determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross examination.") Nor can the Court simply accept Defendants' evidence submitted on a motion for summary judgment, where no discovery has taken place, without allowing Plaintiffs to challenge the veracity of Defendants' evidence through cross-examination and otherwise. *See Burns v. Ashraf*, 2019 WL 4169838, at *10 (D. Md. Sept. 3, 2019) (granting the plaintiff's Rule 56(d) motion and denying motion for summary judgment, finding that the plaintiff "must be given the opportunity to challenge the veracity of [a statement made in the defendants' affidavit] through discovery").

Moreover, in this case, the perils of simply accepting Defendants' evidence are highlighted by the January 28, 2021 release of a report by the Department of Justice Office of the Inspector General regarding the pandemic response at FCC Butner. Supplemental Wilkerson Decl., Ex. 6 (Department of Justice Office of the Inspector General, Pandemic Response Report 21-031: Remote Inspection of Federal Correctional Complex Butner ("OIG Report")). The OIG found that:

- "FCC Butner was not complying with some of the BOP's quarantine guidance because of the high volume of COVID-19 cases and a lack of quarantine space." *Id*. at ii.

- "Butner did not quarantine inmates who tested negative for COVID-19, but who, after testing, were likely exposed to known COVID-19 positive inmates, which was inconsistent with BOP and CDC guidance." *Id*.

- "Although Butner's management took steps to reduce staff movements throughout its five facilities, Butner was not able to restrict staff movements to fully mitigate the risk of cross-contamination and spread of COVID-19 at three of its five facilities." *Id*.

- "While Butner had sufficient supplies of personal protective equipment (PPE) during our inspection, we found that staff were not changing N95 respirators when moving between units

37

that had COVID-19 positive inmates and those that had COVID-19 negative inmates, which may have increased the risk of cross-contamination." *Id*.

- "The open, dormitory-style layouts and communal bathrooms of the housing units in the LSCI, FCI I, and the Camp, which as of July 25, 2020, collectively housed nearly half (1,894 of 4,168) of FCC Butner's inmate population, significantly inhibited Butner's ability to socially distance inmates and therefore minimize the spread of COVID-19." *Id*. at 1.

- "As of June, FCI I was medically isolating COVID-19 suspected or confirmed inmates but was not quarantining asymptomatic inmates who had been in close contact with these inmates. According to Butner officials, due to the layout of the facility and the prevalence of COVID-19, nearly all FCI I inmates had been in close contact with suspected or confirmed COVID-19 inmates and there was insufficient space at the facility to quarantine all exposed inmates." *Id*. at 5.

- "[I]n May, the LSCI lacked sufficient space to quarantine all inmates leaving the institution and, therefore, some LSCI inmates sheltered in place in their housing units in the general population before their release rather than being placed in a separate quarantine unit. This outcome was inconsistent with April 7 BOP guidance requiring inmates to be placed in quarantine for 14 days prior to release." *Id*. at 6

- "Following a COVID-19 outbreak and LSCI-wide testing in early June, LSCI inmates were reassigned to housing units based on their test results.… [T]he LSCI did not reassign and begin moving certain inmates until all results of the June 1–2 tests were available on June 9. However, some of the inmates who tested negative likely had close contact with asymptomatic COVID-19 positive inmates during the week between the testing and the unit transfers. Contrary to BOP guidance requiring the quarantine of inmates in close contact with suspected or confirmed COVID-19 cases, the LSCI did not manage the three units housing COVID-19

38

negative inmates as quarantine areas. As a result, inmates in those housing units were not screened twice daily for symptoms, retested at the end of a quarantine period, or provided surgical masks to supplement cloth face coverings, as BOP guidance required." *Id.* at 6-7.

- "Butner was not able to limit correctional staff at the LSCI, FCI I, and the Camp to individual posts, which likely increased the spread of COVID-19 at those facilities. Further, in a written response to our draft report, the BOP told the OIG that restricting every Butner staff member to the same post continuously during the pandemic has been impossible." *Id.* at 7.

- "[A]ccording to FCC Butner officials, COVID-19 related staff absences made it impossible to assign staff to only one facility." *Id.* at 8.

- "Additionally, LSCI correctional staff worked posts at which they were in contact with COVID-19 positive inmates, as well as posts at which they were in contact with COVID-19 negative inmates. The risks associated with these staff rotations were exacerbated by staff continuing to wear N95 respirators after exiting a medical isolation unit." *Id.*

- "[A]t no time between March and December 3, 2020, did BOP policy require institutions to test staff for COVID-19. In June, the BOP Medical Director told us that staff are the primary vulnerability for introduction of COVID-19 into institutions and that testing staff could help mitigate the spread of the disease in institutions." *Id.* at 10.

- "[T]he BOP did not fully leverage its expanded authorities under the CARES Act and the Attorney General's memoranda to promptly transfer FCC Butner inmates to home confinement." *Id.* at 23.

- "According to FCC Butner, 86 inmates from the complex were granted compassionate release between March 13 and June 30. Of those 86 inmates, 1 had his request approved by the BOP prior to being granted release by the court." *Id.* at 24

These findings align with Plaintiffs' allegations and demonstrate the need for discovery.

39

To be sure, the vast difference between Plaintiffs' allegations (confirmed by the OIG Report) and Defendants' filings suggests that discovery is likely to reveal genuine issues of material fact that preclude summary judgment. *See Tyree*, 642 F. App'x at 230 (reversing district court's grant of summary judgment in prisoner case against the Government where district court relied on Government affidavits to establish events, noting that each party's version of events differed and discovery "would potentially have created a genuine issue of material fact sufficient to defeat summary judgment."). Simply having policies and procedures does not absolve Defendants from liability—particularly where, as here, Plaintiffs allege that what is happening on the ground differs markedly from what the procedures provide. And the relatively limited information counsel has been able to gather from Plaintiffs through truncated and often sporadic phone conversations—which is reflected in Plaintiffs' declarations submitted in support of their class certification motion (*see* D.E. 27-1-27-10)—already calls Defendants' claims into question and suggests that Defendants are not actually implementing their own policies and procedures to mitigate the risk of spreading COVID-19 at Butner FCC.

As explained in more detail in the Rule 56(d) Declaration filed with this Response, Plaintiffs need the following discovery to prove their Eighth Amendment claim and respond to Defendants' motion for summary judgment:

- documents, communications, and deposition testimony regarding Plaintiffs' administrative grievance attempts;

- documents, communications, and deposition testimony regarding Defendants' planning for, and response to, multiple, severe COVID-19 outbreaks and the ongoing threat of COVID-19 at FCC Butner, including any evaluations or monitoring that BOP or its contractors have performed;

- documents, communications, and deposition testimony regarding COVID-19 testing, screening, isolation, and quarantine practices at FCC Butner;

- documents, communications, and deposition testimony regarding treatment of incarcerated individuals with COVID-19 at FCC Butner; and

- documents, communications, and deposition testimony regarding access to non-COVID-related medical care at FCC Butner since the onset of the pandemic.

Finally, Defendants' reliance on Judge Flanagan's opinion and order on Plaintiffs' motion for a temporary restraining order in *Hallinan I* ("*Hallinan I* Order") is misplaced. That Order does not affect Defendants' motion for summary judgment in this case. (D.E. 31 at 54-55.) Judge Flanagan issued that Order in the context of a motion for a temporary restraining order, and she expressly noted in the Order that it was a "preliminary determination" that was "not binding" in future proceedings. *Hallinan I*, D.E 62 at 24 n.3, 26 n.5. What is more, she decided Plaintiffs' TRO motion on a limited record and without a hearing, and ***no*** discovery took place in *Hallinan I.* Finally, the *Hallinan I* Order was issued more than seven months ago (June 2020). Thus, any preliminary findings in that Order are necessarily limited to the pre-June 2020 timeframe and do not extend to the current situation at FCC Butner. In sum, the preliminary determinations in the Hallinan I Order are not binding on this Court. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (holding that findings of fact and conclusions of law made by a court on a preliminary injunction are not binding at a trial on the merits).

The Court should grant Plaintiffs' request for relief under Rule 56(d) and deny Defendants' motion for summary judgment or, in the alternative, continue the motion until Plaintiffs have the opportunity conduct discovery into the essential facts of their Eighth Amendment claim.

**V.     The PLRA Does Not Bar Plaintiffs' Request for Release (Nor Any of Their Other Requested Relief).**

Defendants' argument that the PLRA bars this Court from granting release is wrong. Plaintiffs seek release of medically vulnerable prisoners pursuant to a writ of habeas corpus. (*E.g.*, D.E. 1, Compl. ¶ 369.) That is entirely consistent with this Court's power to order release when persons are "in custody in violation of the Constitution of the laws or treaties of the United States." 28 U.S.C.

41

§ 2241; *Preiser*, 411 U.S. at 484 ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody.").  As discussed above, habeas is an appropriate basis for Plaintiffs to seek release of medically vulnerable class members here because, given the risks at Butner posed by COVID-19, their continued confinement poses a risk too great to be countenanced by the Constitution.  *Martinez-Brooks*, 459 F. Supp. 3d at 428-29 (finding that § 2241 was an appropriate basis to order transfer from BOP facility to home confinement due to spread of COVID-19 in the facility); *see also Coreas*, 451 F. Supp. 3d at 419 ("[A]lthough the grounds on which they seek release relate to their conditions of confinement, Petitioners seek complete release from confinement, which is 'the heart of habeas corpus.'"); *Cordaro v. Finley*, No. 3:10-CR-75, 2020 WL 2084960, at *2 (M.D. Pa. Apr. 30, 2020); *Basank v. Decker*, 449 F. Supp. 3d 205, 212-23 (S.D.N.Y. 2020).

Despite Defendants' suggestion to the contrary, the PLRA's "release order" provisions do not apply in the context of habeas.  Indeed, 18 U.S.C. § 3626(g)(2) definitionally excludes habeas cases challenging the fact of continued confinement.  Several courts have thus rejected the argument that PLRA bars release orders in analogous cases.  *See Martinez-Brooks*, 2020 WL 2405350, at *16; *Wilson v. Williams*, 961 F. 3d 829, 844 (6th Cir. 2020) (claims challenging continued confinement in light of COVID-19 were "properly brought under § 2241," and "[t]he PLRA does not apply in habeas proceedings"); *Baez v. Moniz*, 460 F. Supp. 3d 78, 82-83 (D. Mass. 2020) (where action is "properly viewed, at least in part, as a challenge to the fact or duration of the petitioners' confinement," the PLRA's "provisions governing 'prisoner release orders' [are] inapplicable").

Even if this Court were to hold that § 2241 cannot afford the relief Plaintiffs' request (and it should not so hold), this Court could still grant similar relief under its inherent equitable authority, and it would not be barred from doing so by the PLRA.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing federal courts' inherent equitable authority to order injunctive and declaratory relief to remedy violations of the Constitution by federal actors); *Corr. Servs. Corp. v.*

*Malesko*, 534 U.S. 61, 74 (2001) ("Injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). The PLRA would not bar such an order under the Court's inherent authority because what Plaintiffs seek is discharge of medically vulnerable class members from the physical confines of Butner—via, for example, enlargement of custody to home confinement, community supervision, or furlough—not necessarily complete release from custody. (D.E. 1, Compl. ¶ 20 n.10.) Such relief is not a "prisoner release order" as defined by the PLRA, because those "released" would remain in BOP custody; their confinement would simply be enlarged to meet with Defendants' constitutional obligations. *Wilson v. Williams*, 455 F. Supp. 3d 467, 480-81 (N.D. Ohio 2020) (PLRA does not apply when "inmates will remain in custody, but the conditions of their confinement will be enlarged"), *vacated on other grounds*, 961 F.3d 829.

The PLRA also does not apply here because its release provisions apply only when the primary cause of the alleged violation is overcrowding at a prison. *Plata v. Brown*, 427 F. Supp. 3d 1211, 1222-24 (N.D. Cal. 2013); *Reaves v. Dep't of Corr.*, 404 F. Supp. 3d 520, 522-24 (D. Mass. 2019). As *Plata* and *Reaves* explain in detail, because the PLRA allows a three-judge panel to order release only when "crowding is the primary cause of the violation of a Federal right," 18 U.S.C. § 3626(a)(3)(E)(i), the PLRA's definition of "prisoner release order" must be interpreted to include only requests for release based on overcrowding. *Plata*, 427 F. Supp. 3d at 1222-24; *Reaves*, 404 F. Supp. 3d at 522-24 ("Reading the statute as a whole entails harmonizing the definition of 'prisoner release order' with the requirements for entering one."). Reading the statute otherwise would mean that neither a single judge *nor* a three-judge panel would have the power to order release in the "easy to imagine circumstances"— like those in this case—in which a violation of incarcerated people's rights was ongoing but was not primarily caused by crowding. *Plata*, 427 F. Supp. 3d at 1223. And such an expansive reading of the PLRA would "prevent vindication of the inmates' constitutional rights and would therefore be impermissible." *Id.* at 1224; *see also Jones v. United States*, 529 U.S. 848, 857 (2000) ("[W]here a

43

statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.").[21]

### VI.    The Court Should Decide Class Certification Issues in the Context of Plaintiffs' Pending Motion for Class Certification.

In the introduction to their motion, Defendants ask this Court to "strike Plaintiff's class allegations." (D.E. 31, Mov. Br. at 7.)  But in the body of their argument, Defendants ask the Court to consider class certification in the context of Plaintiffs' motion for class certification, stating that they will "file a response in opposition" to the motion and that the Court should consider whether to grant or deny class certification in that context. (*Id*. at 69.)  The latter is the correct approach.  Class certification is fully briefed in Plaintiffs' motion, and that is the correct context in which to consider those issues. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (motions to strike are "generally viewed with disfavor").

<u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' Motion should be denied.

Respectfully submitted this 29th day of January, 2021.

---

[21] Even if this Court holds that the PLRA applies here and bars a release order (and it should not), that would not warrant dismissal of this case.  Release is not the only remedy Plaintiffs seek. (D.E. 1, Compl. at Prayer for Relief.)

44

/s/ Jeff Wilkerson

Jeff Wilkerson [N.C. State Bar No. 51209]
Gretchen Scavo [N.C. State Bar No. 48589]
Elizabeth Ireland [N.C. State Bar No. 47059]
Patrick Doerr [N.C. State Bar No. 50673]
WINSTON & STRAWN LLP
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
jwilkerson@winston.com
gscavo@winston.com
eireland@winston.com
pdoerr@winston.com

Maria V. Morris
[D.C. Bar No. 1697904]
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, DC 20005
Tel.: (202) 548-6607
mmorris@aclu.org

Sarah Hinger[†]
[N.Y. State Bar No. 4823878][†]
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
New York, NY 10004
Tel.: (212) 519-7882
shinger@aclu.org

Jacqueline Kutnik-Bauder [Mo. Bar No. 45014] [†]
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS & URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 319-1000
Fax: (202) 319-1010
jacqueline_kutnik-bauder@washlaw.org.

Emily E. Seawell [N.C. Bar No. 50207]
Jaclyn Maffetore [N.C. Bar No. 50849]
AMERICAN CIVIL LIBERTIES UNION
OF NORTH CAROLINA
LEGAL FOUNDATION
Post Office Box 28004
Raleigh, NC 27611
Tel.: (919) 834-3466
Fax: (866) 511-1344
eseawell@acluofnc.org
jmaffetore@acluofnc.org

[†] Special Appearance Forthcoming

*Counsel for Plaintiffs/Petitioners*

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 29th day of January, 2021, served a copy of the foregoing upon counsel of record for Respondents/Defendants' counsel of record by electronically filing the same with the Court using the CM/ECF system.

/s/ Jeff Wilkerson
Jeff Wilkerson [N.C. State Bar No. 51209]
WINSTON & STRAWN LLP
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
jwilkerson@winston.com