IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CT-3333-FL

| | | |
|---|---|---|
| CHARLES HALLINAN, JOSEAN KINARD, GEORGE RIDDICK, JORGE LUIS MALDONADO, WILLIAM BROWN, TERRANCE FREEMAN, ANTHONY BUTLER, DARYL WILLIAMS, QUAMAIN JACKSON, and LASALLE WALDRIP, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | ORDER |
| v. | ) ) | |
| WARDEN THOMAS SCARANTINO, Complex Warden Federal Correctional Complex Butner, in his official capacity; MICHAEL CARVAJAL, Federal Bureau of Prisons Director, in his official capacity; JEFFREY ALLEN, Federal Bureau of Prisons Medical Director, in his official capacity; and FEDERAL BUREAU OF PRISONS, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on plaintiffs' motion to certify class (DE 24), and defendants' motion to dismiss or in the alternative for summary judgment (DE 30). The motions have been briefed fully and in this posture the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiffs Charles Hallinan ("Hallinan"), Josean Kinard ("Kinard"), George Riddick ("Riddick"), Jorge Luis Maldonado ("Maldonado"), William Brown ("Brown"), Terrance

Freeman ("Freeman"), Anthony Butler ("Butler"), Daryl Williams ("Williams"), Quamain Jackson ("Jackson"), and Lasalle Waldrip ("Waldrip"), federal inmates represented by counsel, filed October 26, 2020, class action complaint for injunctive and declaratory relief and petition for writ of habeas corpus on behalf of themselves and all others similarly situated. Defendants, sued in their official capacities only, are the Federal Bureau of Prisons ("FBOP"); Thomas Scarantino ("Scarantino"), the warden of the Federal Correctional Complex in Butner, North Carolina ("FCC-Butner"); Michael Carvajal ("Carvajal"), the FBOP director; and Jeffrey Allen ("Allen"), the FBOP medical director.

The complaint alleges defendants failed to implement adequate safeguards to protect plaintiffs from COVID-19, in violation of the Eighth Amendment to the United States Constitution and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. According to plaintiffs, FCC-Butner has not established or implemented: proper requirements for social distancing, adequate medical isolation and quarantine, screening and testing protocols, procedures for wearing masks and other personal protective equipment, restrictions governing movement of inmates and staff among FCC-Butner facilities, and proper sanitation. In addition, defendants allegedly have failed to reduce the FCC-Butner population by transferring eligible inmates to home confinement, denying all requests for compassionate release, and declining to transfer medically vulnerable inmates out of FCC-Butner, which compounds the overcrowding and difficulties implementing proper social distancing.

Plaintiffs assert three claims: 1) discrimination on the basis of disability in violation of the Rehabilitation Act; 2) unconstitutional conditions of confinement in violation of the Eighth Amendment; and 3) a habeas corpus claim pursuant to 28 U.S.C. § 2241, also premised on alleged

violations of the Eighth Amendment. As relief, plaintiffs seek declaratory judgment that defendants violated plaintiffs' rights under the Eighth Amendment or, with respect to the disability subclass described below, section 504 of the Rehabilitation Act. Plaintiffs further seek permanent injunction directing defendants to create and implement a mitigation plan for prevention of COVID-19, provide all necessary and appropriate healthcare at FCC-Butner, and establish a procedure for transferring appropriate inmates to home confinement or safer facilities.

Plaintiffs filed the instant motion to certify class on November 9, 2020, seeking certification of a class of persons currently or in the future incarcerated at FCC-Butner while anyone on the premises is infected with COVID-19. Plaintiffs Hallinan, Riddick, Maldonado, Brown, Freeman, Butler, Williams, and Waldrip also seek certification of a disability subclass consisting of:

> current and future people incarcerated at [FCC-Butner] who are medically vulnerable and at high risk of severe illness or death from COVID-19 due to disabilities protected under Section 504 of the Rehabilitation Act, including those with the following conditions: cancer; chronic kidney disease; chronic obstructive pulmonary disease ("COPD") or moderate or severe asthma; immunocompromised state from solid organ transplant, blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids or other immune weakening medicines; serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; diabetes; cerebrovascular disease; cystic fibrosis; hypertension; neurologic conditions such as dementia; liver disease; pulmonary fibrosis; and thalassemia.

(Compl. (DE 1) ¶ 325).

In support of the certification motion, plaintiffs rely upon memorandum of law, and the following exhibits: 1) declaration of Jeff Wilkerson ("Wilkerson"), counsel for plaintiffs, 2) declarations of the named plaintiffs, 3) declarations of Antonio Ross ("Ross") and Lee Ayers ("Ayers"), federal inmates housed at FCC-Butner; 4) screenshots of the FBOP's COVID-19

website, and 5) declarations of Emily Seawell ("Seawell"), Maria Morris ("Morris"), and Jacqueline Kutnick-Bauder ("Kutnick-Bauder"), counsel for plaintiffs. Defendants responded in opposition to the motion for class certification and plaintiffs replied. Plaintiffs' reply is supported by supplemental declaration of Morris, additional screenshots of the FBOP's COVID-19 website, and FBOP press releases regarding the deaths of FBOP inmates from COVID-19. With leave of court, defendants filed surreply in further opposition to the motion for class certification.

Defendants filed the instant motion to dismiss or in the alternative for summary judgment on December 18, 2020. Defendants argue that plaintiffs' claims should be dismissed based on failure to exhaust administrative remedies, various deficiencies in the pleadings and plaintiffs' legal theories, and where the undisputed factual evidence establishes defendants were not deliberately indifferent to plaintiffs' risk of contracting COVID-19. In support, defendants rely upon a memorandum of law, statement of material facts, and appendix of exhibits thereto, comprising the following: 1) declaration of Phillip Clark ("Clark"), FCC-Butner case management coordinator, with attachments thereto; 2) declaration of Andrew Stock, M.D. ("Stock"), clinical director of the Federal Medical Center at FCC-Butner; 3) declaration of Mary Strassel ("Strassel"), assistant supervisor of education and team leader of the FCC-Butner planning section, with attachments thereto; 4) declaration of Kellie Harden ("Harden"), registered nurse, director of quality management, and supervisory health systems specialist at FCC-Butner; 5) declaration of Luis Martinez ("Martinez"), former acting environmental and safety compliance administrator at FCC-Butner, with attachments thereto; 6) declaration of Christina Kelley ("Kelley"), FBOP senior attorney, with attachments thereto; and 7) declaration of Nihar Vora ("Vora"), FBOP supervisory attorney.

4

In opposition to the motion for summary judgment, plaintiffs rely upon response, responsive statement of facts, and the following exhibits in addition to those already relied upon by defendants: 1) declaration of Wilkerson; 2) supplemental declarations of plaintiffs Hallinan and Riddick; 3) FBOP Administrative Remedy Program Statement; 4) FCC-Butner inmate handbook for the low security correctional institution; 5) FBOP press releases documenting the deaths of two inmates from COVID-19; 6) declaration of Patrick Doerr, plaintiffs' counsel, pursuant to Federal Rule of Civil Procedure 56(d); and 7) DOJ Office of Inspector General's Pandemic Response Report 21-031 regarding remote inspection of FCC-Butner, dated January 2021.

Defendants replied, relying upon reply statement of material facts and the following exhibits in addition to those identified above: 1) declaration of Ian Connors, FBOP inmate appeals administrator, with attachments thereto; and 2) second declaration of Stock, with attachments thereto. With leave of court, plaintiffs filed surreply in further opposition to the motion.

## STATEMENT OF THE FACTS

Except as otherwise noted below, the court recounts the facts in the light most favorable to plaintiffs. COVID-19 is a respiratory disease that can cause severe illness, permanent damage to the lungs and other organs, and death. (Beyrer Decl. (DE 1-30) ¶¶ 7–10). The disease spreads through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects. (Id. ¶¶ 15–16).

The FCC-Butner inmate population includes numerous inmates over 65 years old or who suffer from serious underlying health conditions that place them at risk of severe COVID-19 disease. (See Hallinan Decl. (DE 27-6) ¶ 25; Defs' Stmt. (DE 32) ¶¶ 3–4, 7). And the complex

has experienced one of the worst COVID-19 outbreaks within the FBOP: as of October 26, 2020, the date this action was filed, approximately 900 inmates and 81 staff members at FCC-Butner had tested positive for COVID-19, even without widespread testing. (See Wilkerson Decl. Ex. 20 (DE 27-20)). By October 27, 2020, twenty-six inmates and one FCC-Butner staff member had died from COVID-19. (See id.).

A.    Reducing the Inmate Population

Public health experts have determined that reducing inmate populations is the most effective way to prevent additional spread of COVID-19 in correctional facilities, and to protect inmates who are medically vulnerable. (See Beyrer Decl. (DE 1-30) ¶¶ 33–38, 68). The Department of Justice agrees. On April 3, 2020, following significant outbreaks at several FBOP facilities, Attorney General William Barr directed defendants to "immediately review all inmates who have COVID-19 risk factors, as established by the CDC [at all facilities where] COVID-19 is materially affecting operations [and] for all inmates whom you deem suitable candidates for home confinement . . . immediately process them for transfer and then immediately transfer them following a 14-day quarantine period." (Wilkerson Decl. Ex. 26 (DE 1-27) at 3).[1]

But defendants allegedly have not reduced the FCC-Butner population in sufficient numbers. Despite significant outbreaks at FCC-Butner in 2020, only 123 inmates had been transferred to home confinement as of December 10, 2020, amounting to approximately 3.3 percent of the inmate population. (See Defs' Stmt. (DE 32) ¶¶ 1, 112). In addition, defendants have not moved for compassionate release on behalf of any inmates at FCC-Butner on the basis of

---

[1]    Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

6

their risk of contracting COVID-19. (See id. ¶ 116).

B. Social Distancing

Maintaining social distancing of at least six feet from other people also is a recognized method for preventing COVID-19 transmission. (Wilkerson Decl. Ex. 15 (DE 1-16) at 19). According to plaintiffs, FCC-Butner's housing conditions make it impossible to maintain social distancing in accordance with the CDC guidance. (See, e.g., Freeman Decl. (DE 27-1) ¶ 21; Riddick Decl. (DE 27-2) ¶¶ 14–15; Waldrip Decl. (DE 27-3) ¶¶ 5–8, 10, 14–15, 18–19, 39–40; Williams Decl. (DE 27-4) ¶¶ 6, 20, 30, 33–34). The "dormitory-style" housing units, which comprise a majority of inmate housing, consist of large open rooms housing as many as 160 people. (Hallinan Decl. (DE 27-6) ¶¶ 8–12; Waldrip Decl. (DE 27-3) ¶¶ 5–8; Kinard Decl. (DE 27-8) ¶¶ 5–7, 39–40, 44). The rooms have cubicles with five-foot walls to demarcate the sleeping areas, situated directly next to each other. (Hallinan Decl. (DE 27-6) ¶¶ 8–10; Waldrip Decl. (DE 27-3) ¶¶ 5–7; Kinard Decl. (DE 27-8) ¶ 5). Some cubicles have as many as three inmates assigned to them, each sleeping within a few feet of one another. (Hallinan Decl. (DE 27-6) ¶¶ 8–11; Waldrip Decl. (DE 27-3) ¶¶ 5–8; Kinard Decl. (DE 27-8) ¶¶ 5–6). Inmates in celled housing units typically have between one and three cellmates, and have to sleep within several feet of one another. (Ross Decl. (DE 27-5) ¶ 18; Williams Decl. (DE 27-5) ¶¶ 5–6; Riddick Decl. (DE 27-2) ¶ 17; Ayers Decl. (DE 27-7) ¶¶ 12–13).

The housing unit common areas such as showers, bathrooms, phone areas, and computer rooms also do not allow for social distancing. (Hallinan Decl. (DE 27-6) ¶¶ 12–14, 16, 19–20 ; Kinard Decl. (DE 27-8) ¶¶ 7–10; Riddick Decl. (DE 27-2) ¶¶ 14–15, 20–24). Many inmates line up for meals or medication distribution multiple times a day, coming into close contact with other

inmates both from within and outside their assigned housing units. (Ross Decl. (DE 27-5) ¶¶ 26–27; Hallinan Decl. (DE 27-6) ¶¶ 16–17; Waldrip Decl. (DE 27-3) ¶¶ 14–15, 39; Kinard Decl. (DE 27-8) ¶¶ 11–12; Williams Decl. (DE 27-4) ¶ 17; Jackson Decl. (DE 27-9) ¶ 40).

C.      Testing

Defendants allegedly have not provided adequate testing to determine which inmates have COVID-19 and should be medically isolated. Between September 1 and October 19, 2020, for example, defendants tested only 44 people. (Compare Wilkerson Decl. Ex. 15 (DE 27-15) with id. Ex. 18 (DE 27-18) (showing differential of 44 inmates tested between the foregoing dates)). In the absence of widespread testing, defendants rely on inadequate and sporadic temperature checks and symptom inquiries. (See, e.g., Hallinan Decl. (DE 27-6) ¶¶ 26, 28–31; Freeman Decl. (DE 27-1) ¶¶ 6–7); Williams Decl. (DE 27-) ¶¶ 7–10). FCC-Butner officials also do not test close contacts of known COVID-19 cases. (Williams Decl. (DE 27-4) ¶¶ 10–11; Hallinan Decl. (DE 27-6) ¶ 31).

Plaintiff Terrance Freeman attests that in March 2020 he reported symptoms consistent with COVID-19, including loss of taste and smell, body aches, chills, night sweats, congestion, coughing, and shortness of breath. (Freeman Decl. (DE 27-1) ¶ 6). FBOP medical staff declined to test him and informed him that they could not provide any treatment if did not have a fever. (Id.). During that same period of time, Inmate Antonio Ross developed COVID-19 symptoms and requested a sick call. (Ross Decl. (DE 27-5) ¶¶ 7–10). He was not seen for a week. (Id.). When FBOP medical officials evaluated him, they determined he had the flu and refused to test him for COVID-19. (Id.). He tested positive four days later. (Id.).

8

D.    Quarantine and Isolation Practices

Plaintiffs further challenge FCC-Butner's quarantine and isolation practices.   Defendants place confirmed or suspected COVID-19 cases in the "special housing unit," a form of solitary confinement.   (See Waldrip Decl. (DE 27-3) ¶ 27; Hallinan Decl. (DE 27-6) ¶¶ 29-30; Riddick Decl. (DE 27-2) ¶ 27).   The SHU is not commensurate with medical isolation, which requires close medical supervision, interventions to protect the inmate's psychological and physical health, increased ventilation and air filtration, and access to telephones and other means of connection with the outside world.   (Beyrer Decl. (DE 1-30) ¶¶ 57–61).

Roger Goodwin, a former inmate, reports that he was placed in a "filthy cell" and was not given his medications, toiletries, or even a cup for drinking water for days.   Hallinan v. Scarantino, No. 5:20-HC-2088-FL (E.D.N.C. May 28, 2020) ("Hallinan I"), Goodwin Decl. ¶¶ 26–37 (DE 26-4).   FCC-Butner medical staff checked his vital signs twice daily and directed him to drink fluids, but did not otherwise provide medical treatment.   (Id. ¶ 36).   Plaintiffs also report that numerous inmates hide their COVID-19 symptoms to avoid placement in the SHU.   (Hallinan Decl. (DE 26-4) ¶ 29; Waldrip Decl. (DE 27-3) ¶ 26).

Defendants also delay placing inmates in isolation after learning about symptoms, which increases the risk of further virus spread.   Ross, for example, reported symptoms of COVID-19 in early to mid March, 2020, but he was not placed in isolation until March 28, 2020.   (Ross Decl. (DE 27-5) ¶¶ 7–8).   Several inmates reported symptoms but were left in their housing units for days or weeks at a time before transfer to isolation.   (See Freeman Decl. (DE 27-1) ¶ 9; Hallinan Decl. (DE 27-6) ¶ 37; Waldrip Decl. (DE 27-3) ¶ 27; Williams Decl. (DE 27-4) ¶ 12).

In late May and June 2020, FCC-Butner low[2] experienced a significant COVID-19 outbreak, and defendants ordered testing of all inmates housed at the facility. (Hallinan Decl. (DE 27-6) ¶¶ 34–35; Waldrip Decl. (DE 27-3) ¶¶ 28, 30). On June 6 or 7, 2020, plaintiff Hallinan heard a nurse report that "essentially everyone" on his housing unit was infected. (Hallinan Decl. (DE 27-6) ¶ 38). But defendants did not provide the testing results until June 10, 2020. (Id. ¶ 35). At that time, FCC-Butner low inmates were separated into positive and negative groups. (Id. ¶¶ 35, 39). It took another three or four days before the positive inmates were housed separately from the negative inmates. (Id. ¶ 39). Thus, numerous negative inmates were forced to live in close quarters with positive inmates for at least a week while defendants sorted out the positive and negative housing assignments. (See id.). Defendants did not conduct additional testing prior to the move, and thus could not determine how many of the inmates with negative test results developed COVID-19 during the weeklong delay. (See id.; Beyrer Decl. (DE 1-30) ¶¶ 49–50). Even after the inmates were separated, defendants allegedly did not provide medical care or additional screening for inmates who had tested positive. (Hallinan Decl. (DE 27-6) ¶ 41 ("Throughout June, staff did not take the temperatures of people in Wake A [a positive unit]. They did not take our vital signs. They did not provide us with Tylenol.")).

Plaintiffs also challenge defendants' quarantine practices, which are designed to separate close contacts of COVID-19 positive inmates and new arrivals from other inmates. (Stock Decl. (DE 34-14) ¶¶ 12, 14). Plaintiff Williams, for example, was not quarantined at all after close contact with a confirmed case. (Williams Decl. (DE 27-4) ¶¶ 10–11). Plaintiff Jackson transferred from the medical center to FCC-Butner medium II in July 2020, and he was placed in

---

[2] "FCC-Butner low" refers to the low security institution on the campus. (See Beyrer Decl. (DE 1-18) ¶ 22).

the SHU for quarantine upon arrival at the facility. (Jackson Decl. (DE 27-9) ¶¶ 5–6). During his time in the SHU, numerous additional inmates were placed in the quarantine unit and thereby potentially exposed him to the virus. (Id. ¶¶ 31–32). Defendants also did not implement adequate policies for monitoring quarantined inmates' symptoms, particularly during the large June 2020 outbreak when numerous inmates were exposed. (Waldrip Decl. (DE 27-3) ¶ 34).

E.     Sanitation and Masking

Finally, defendants allegedly have not enforced a plan for cleaning and disinfecting living areas and other high-touch surfaces, or the masking policy. Living spaces, bathrooms, and shared equipment such as telephones, computers, and tablets are not cleaned with sufficient frequency or using procedures that destroy the virus. (Hallinan Decl. (DE 27-6) ¶¶ 20–24; Williams Decl. (DE 27-4) ¶¶ 22–32; Jackson Decl. (DE 27-9) ¶¶ 19–22, 39–45; Ross Decl. (DE 27-5) ¶¶ 24, 28–32; Riddick Decl. (DE 27-2) ¶¶ 20–24; Waldrip Decl. (DE 27-3) ¶¶ 12, 16–24). Defendants also failed to clean housing units after inmates tested positive, and did not allow the disinfectant they used to remain on surfaces for 10 minutes prior to wiping down, as required to destroy the virus and prevent surface transmission. (Waldrip Decl. (DE 27-3) ¶¶ 34–35; Hallinan Decl. (DE 27-6) ¶ 14; Jackson Decl. (DE 27-9) ¶ 21; Ross Decl. (DE 27-5) ¶ 30; Beyrer Decl. (DE 1-30) ¶ 43).

FCC-Butner also allegedly did not enforce policies requiring masking. The policy "strongly encourages" the use of face masks as opposed to requiring them. Hallinan I, Defs' Stmt. ¶ 11 (DE 36). And even if the policy now requires use of face masks, many inmates refuse to abide by it and corrections staff inconsistently enforce the policy. (Williams Decl. (DE 27-4)

¶ 34; Kinard Decl. (DE 27-8) ¶ 37).

## DISCUSSION

A.     Standard of Review

Where the parties rely on matters outside the pleadings with respect to the dispositive issue of exhaustion of administrative remedies, the court construes defendant's motion as one for summary judgment. See Fed. R. Civ. P. 12(d). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

12

[non-movant's] favor." <u>Id.</u> at 255; <u>see</u> <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." <u>Lovelace v. Sherwin–Williams Co.</u>, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." <u>Myrick v. Prime Ins. Syndicate, Inc.</u>, 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. <u>Id.</u> at 489-90.

B.     Analysis

1.     Exhaustion of Administrative Remedies – Legal Standard

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); <u>see</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 84 (2006). Exhaustion is mandatory. <u>Woodford</u>, 548 U.S. at 84; <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory."). A prisoner must exhaust his administrative remedies even if the relief requested is not available under the

Case 5:20-ct-03333-FL   Document 83   Filed 03/29/22   Page 13 of 30

administrative process. <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001). Administrative grievances must contain sufficient detail to "alert[] the prison to the nature of the wrong for which redress is sought" and "give prison officials a fair opportunity to address the alleged [mistreatment]." <u>Wilcox v. Brown</u>, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (quoting <u>Strong v. David</u>, 297 F.3d 646, 650 (7th Cir. 2002)); <u>Moore v. Bennette</u>, 517 F.3d 717, 729 (4th Cir. 2008).

Administrative exhaustion is "defined not by the PLRA, but by the prison grievance process itself." <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007). And the PLRA mandates "proper exhaustion" meaning "untimely or otherwise procedurally defective administrative grievance[s] or appeal[s,]" as determined by the correctional institution's procedural rules, do not satisfy the PLRA's exhaustion requirement. <u>Woodford</u>, 548 U.S. at 83, 90. Thus, an inmate has not properly exhausted administrative remedies unless he receives a decision "on the merits" of his grievance and complies with all procedural requirements for appealing the result. <u>See id.</u> at 90.

The FBOP provides a four-step administrative remedy procedure. The first step in the process requires an inmate to present his issue to staff in an attempt at informal resolution. <u>See</u> 28 C.F.R. § 542.13. If informal resolution is unsuccessful, an inmate may submit a formal written administrative remedy request to the warden using a BP-9 form within 20 calendar days from the date on which the incident occurred. <u>See</u> 28 C.F.R. § 542.14.

If an inmate is dissatisfied with the warden's response, he may appeal to an FBOP regional director within 20 calendar days of the date the warden signed the response, using a BP-10 form. 28 C.F.R. § 542.15(a). The regional director has 30 days to respond to the BP-10, although the response time can be extended for an additional 30 days at the director's discretion. 28 C.F.R. § 542.18. The final administrative appeal is made to the FBOP's general counsel, using a BP-11

14

form, within 30 days of the date the regional director signed the response. See 28 C.F.R. § 542.15(a). The general counsel's office has 40 days to respond and has discretion to extend the response time for an additional 20 days. 28 C.F.R. § 542.18. In the event the inmate does not receive a response within the foregoing deadlines, including any extension, he may treat the absence of a response as a denial at that level. Id.

  2. Plaintiffs' Rule 56(d) Affidavit

  The court first addresses plaintiffs' request that the court deny or defer ruling on the motion for summary judgment until plaintiffs have had an opportunity to conduct discovery. "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: defer considering the motion or deny it." Fed. R. Civ. P. 56(d)(1). "Rule 56(d) mandates that summary judgment be denied when the nonmovant has not had the opportunity to discover information that is essential to his opposition." Pisano v. Strach, 743 F.3d 927, 931 (4th Cir. 2014) (quotations omitted).

  Relief under Rule 56(d) is "broadly favored and should be liberally granted in order to protect non-moving parties from premature summary judgment motions." McCray v. Maryland Dep't of Transp., Maryland Transit Admin., 741 F.3d 480, 484 (4th Cir. 2014) (quotations omitted). However, "a court need not allow discovery unless [the nonmovant] identifies material, disputed facts." McClure v. Ports, 914 F.3d 866, 875 (4th Cir. 2019); Hodgin v. UTC Fire & Sec. Americas Corp., 885 F.3d 243, 250 (4th Cir. 2018).

  Pursuant to Rule 56(d), defendants rely on declaration of counsel asserting that discovery is necessary on, among other things, whether plaintiffs and the putative class and subclass have exhausted administrative remedies. (Doerr Aff. (DE 46-5) ¶ 7). And plaintiffs broadly request

15

that the court deny the pending motion for summary judgment as premature because the parties have not exchanged discovery. (Defs' Resp. (DE 45) at 3).

As to the dispositive issue of exhaustion of administrative remedies, plaintiffs have not met their burden of establishing discovery is necessary. See McClure, 914 F.3d at 875. Plaintiffs do not contest that the grievance records submitted by defendants are the complete records of their attempts to exhaust administrative remedies.[3] (See Surreply (DE 80) at 3–6; Hallinan Suppl. Decl. (DE 46-1)). In other words, while plaintiffs argue that defendants' records establish that plaintiffs Hallinan and Williams exhausted administrative remedies, or in the alternative that the FBOP's administrative remedy procedure was unavailable, they do not suggest that defendants have failed to provide the administrative documents or information necessary to resolve the defense. (See Resp. (DE 45) at 8–17; Surreply (DE 80) at 3–11). In these circumstances, plaintiffs have not established that they were denied the "opportunity to discover information that is essential to [their] opposition." Pisano, 743 F.3d at 931.

Moreover, plaintiffs have direct knowledge of their individual grievances, the subject matter thereof, and whether they pursued all administrative appeals. Discovery is not necessary for plaintiffs to offer evidence that is within their direct personal knowledge. See Fed. R. Civ. P. 56(c)(4). Plaintiffs were afforded the opportunity to provide such evidence in the form of personal declarations or affidavits from any of the named plaintiffs attesting that they filed and exhausted grievances related to the subject matter of this action. They do not need the precise grievance records to establish a genuine issue of material fact with respect to the exhaustion defense. See McClure, 914 F.3d at 875 (affirming denial of relief where "plaintiffs' Rule 56(d)

_____

[3] Indeed, plaintiffs do not argue discovery is necessary to resolve the exhaustion defense at any point in their substantive briefing on the issue. (See Resp. (DE 45) at 8–17; Surreply (DE 80) at 3–11).

16

motion did not identify any factual issues that were essential to their opposition").   Accordingly, the court denies plaintiff's request to deny or defer ruling on the motion for summary judgment pending completion of discovery.

      3.      Merits of the Administrative Exhaustion Defense

The court now turns to the merits of the exhaustion issue.   Plaintiffs acknowledge that Hallinan and Williams are the only named plaintiffs that arguably could have exhausted administrative remedies.   (See Surreply (DE 80) at 3–11 & n.1).   The court begins by analyzing plaintiff's Hallinan's administrative remedy records.

Plaintiff Hallinan began the administrative grievance process by attempting informal resolution under 28 C.F.R. § 542.13 in March or April 2020.   (Hallinan Suppl. Decl. (DE 46-1) ¶ 2).   Although no formal documentation of this step is in the record, plaintiff Hallinan attests that he asked the FBOP "to take steps to protect me from COVID-19.   I explained that I was, at that time, 79 years old, and that I had several medical conditions that place me at high risk from COVID-19."   (Id.).   Plaintiff Hallinan does not recall receiving a response to his informal request.   (Id. ¶ 2).

On June 2, 2020, plaintiff Hallinan filed BP-9 with the FCC-Butner warden, the second step in the FBOP's grievance procedure.   28 C.F.R. § 542.14.   The BP-9 provides:

> Please reverse your decision denying my request for compassionate release or transfer to home confinement under the CARES Act.   Based on instructions issued by officers early in the COVID-19 lockdown, I tendered a compassionate release application noting my risk for serious complications upon infection and providing a verifiable release plan.   I am 79 years of age and present with several CDC-listed risk factors.   My risk factors, non-violent offense characteristics, and minimum PATTERN recidivism risk rating all match with criteria in memoranda issued by the Correctional Programs Division and ReEntry Services Division, most recently, on May 8, 2020.   I have an easily verifiable release plan on file with [my] Unit Team and the Philadelphia Office of the United States Probation /Pretrial Services

17

Office. I understand that I was not even placed on the consideration list for home confinement placement in the past. With numerous non-"priority" prisoners being transferred to home confinement nationally, I request that you exercise your discretion to transfer me to safety after you conduct an individualized assessment, or grant me compassionate release.

(Connors Decl. (DE 57-1) ¶ 22). On June 17, 2020, the FCC-Butner low warden denied the BP-9.

On June 26, 2020, plaintiff Hallinan appealed the warden's decision by filing his BP-10 with the FBOP's Mid-Atlantic Regional Office. (Hallinan Suppl. Decl. (DE 46-1) ¶ 6). The BP-10 appeal provides:

The warden has declined to conduct an individualized assessment of my condition, risk factors, and recidivism risk as required under CARES Act home confinement memoranda. As I qualify under each element except the percentage of sentence served, and that factor is only used to determine "priority" in placement on home confinement rather than eligibility, an individualized assessment supports my placement on home confinement because I am 79 years old and present with a series of CDC-listed risk factors. My home confinement plan is on file, verifiable, and safe. Alternatively, under the risk of COVID-19 complications that have already claimed the lives of 21 other prisoners with pre-existing conditions similar to my own, a candid review of my medical file supports a conclusion that I should be recommended for [a reduction in sentence] under either the terminal or debilitated condition standards. Warden Lyn did not arrange for my evaluation at health services prior to denying my request. She should be reversed.

(Connors Decl. (DE 57-1) ¶ 24). Plaintiff Hallinan did not receive a response from the regional director within 30 days. (Hallinan Suppl. Decl. (DE 46-1) ¶ 7).

On July 31, 2020, plaintiff Hallinan filed his BP-11 appeal to the FBOP general counsel's office. The BP-11 provides in relevant part as follows:

I respectfully appeal the denial of my request for a referral to home confinement under Attorney General Barr's Emergency Declaration and Order entered April 3, 2020. I am held at [FCC-Butner low], the prison with the most severe COVID-19 outbreak nationally (16 Deaths). I suffer from several CDC risk factors for serious complications, including age (79)[,] cancer history, and coronary [disease]. I am serving a sentence for a first-time, non-violent offense. I have no detainer, an R-

18

MIN Pattern score, and an easily verifiable home confinement plan with my wife . . . While I have not served 51% of my sentence, A.G. Barr imposed no requirement and [the FBOP] should waive [any such requirement] because of risk.

(Connors Decl. (DE 57-1) ¶ 25). According to plaintiff Hallinan, the general counsel denied his BP-11 appeal on September 16, 2020. (Hallinan Suppl. Decl. (DE 46-1) ¶ 9).[4]

Plaintiff Hallinan's grievances are insufficient to "alert[] the prison to the nature of the wrong for which redress is sought" and "give prison officials a fair opportunity to address the alleged [mistreatment]." Wilcox, 877 F.3d at 167 n.4 (quotation omitted); Moore, 517 F.3d at 729. The grievances request, in essence, reconsideration of the decision denying his individual request for home confinement. (See Connors Decl. (DE 57-1) ¶¶ 22, 24). Plaintiff Hallinan did not allege that social distancing was effectively impossible at FCC-Butner, that the isolation and quarantine practices were deficient, that FCC-Butner had not transferred inmates to home confinement or granted requests for compassionate release in sufficient numbers to prevent further spread of COVID-19, or that the sanitation, masking, or testing practices were deficient. (See id.). He does not even allege in the most general terms that FCC-Butner's COVID-19 policies, or the implementation thereof, increased his risk of contracting COVID-19. (See id.). And finally, with respect to plaintiffs' claim under the Rehabilitation Act, the foregoing grievances do not remotely allege defendants discriminated against plaintiff on the basis of a disability by failing

---

[4]     Defendants argue that plaintiff Hallinan's July 31 BP-11 was prematurely filed because he did not give the regional director sufficient time to respond, and that it was denied on that basis, along with other procedural deficiencies, on August 18, 2020. (Reply (DE 54) at 7–8; Connors Decl. (DE 57-1) ¶ 26). According to defendants, plaintiff Hallinan then resubmitted his BP-11 appeal on October 2, 2020, and the general counsel did not issue a merits decision until November 18, 2020, after plaintiffs filed this action. (Reply (DE 54) at 8–9; Connors Decl. (DE 57-1) ¶¶ 26–29). The court, however, must adopt plaintiffs' version of the facts for purposes of ruling on the motion for summary judgment. See Scott v. Harris, 550 U.S. 372, 378 (2007). And plaintiff Hallinan attests that the general counsel denied his BP-11, on the merits, on September 16, 2020. (See Hallinan Suppl. Decl. (DE 46-1) ¶¶ 9, 11). Adopting this version of the facts, plaintiff Hallinan completed the procedural steps for exhausting administrative remedies before this action was filed. See 28 C.F.R. § 542.13–.15.

19

to protect him from COVID-19. (See id.). It is true that plaintiff Hallinan requested home confinement or compassionate release in order to protect himself against COVID-19, and made passing reference to 21 other prisoners who had died at FCC-Butner. (See id.). These comments, however, could not place FCC-Butner on notice of the relevant allegations in this action. See Moore, 517 F.3d at 729 (requiring that grievances "give prison officials a fair opportunity to address the alleged [mistreatment]").

Plaintiffs respond to this straightforward analysis with several arguments. First, they suggest that defendants raised the issue of whether the grievances provided sufficient notice for the first time in their reply brief. The court does not typically consider arguments raised for the first time on reply. See Local Civil Rule 7.1(g) (permitting replies directed to "matters initially raised in a response to a motion"); United States v. Williams, 445 F.3d 724, 736 n.6 (4th Cir. 2006).

But here defendants argued in their opening brief that "not a single plaintiff has filed any administrative remedy request related to unconstitutional conditions of confinement, or the purported deliberate indifference of FCC Butner staff in response to COVID-19." (DE 31 at 38 (citing Kelley Decl. (DE 39-7) ¶¶ 9–16)). Defendants further asserted that "not one plaintiff has filed an administrative remedy at the institutional level, let alone all required levels, asserting that the conditions of confinement at any institution within the federal correctional complex in Butner are unconstitutional." (Id. at 50 (citing Kelley Decl. (DE 39-7) ¶¶ 9–16)). And finally, defendants argued that "not one [plaintiff] filed a request for administrative remedy citing discrimination on the basis of a disability in violation of the Rehabilitation Act of 1973." (Id. at 24 (citing Kelley Decl. (DE 39-7) ¶¶ 9–16)). The Kelley declaration offered in support of these

20

arguments explained that plaintiffs Hallinan and Williams appealed decisions denying their individual requests for home confinement or compassionate release. (See DE 39-7 ¶¶ 12, 16). Taken together, defendants' opening brief and the Kelley declaration argued that plaintiffs' grievances did not notify defendants of the "wrong[s] for which redress is sought." Wilcox, 877 F.3d at 167 n.4.

Because defendants raised this issue in their opening brief, the burden shifted to plaintiffs to offer evidence establishing genuine issues of material fact on the notice issue. See Matsushita, 475 U.S. at 586–87; Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) ("Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact. Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist"). The only evidence offered in response is plaintiff Hallinan's supplemental declaration stating that he "submitted a BP-8 asking the [FBOP] to take steps to protect me from COVID-19." (Hallinan Suppl. Decl. (DE 46-1) ¶ 2). This declaration does not create a genuine issue of material fact on the notice issue for the reasons explained above.

It is true that defendants produced the specific grievance records of the named plaintiffs for the first time on reply, and thus plaintiffs, without having the benefit of discovery, could not examine those grievances until the reply brief and appendix were filed. (See Defs' Reply Appendix (DE 56)). As discussed above, however, the plaintiffs have direct personal knowledge the grievances they filed, including the subject matter thereof. Plaintiffs could have filed declarations or affidavits in response to the motion for summary judgment – as they attempted to

21

do in the case of plaintiff Hallinan (DE 46-1) – attesting that they exhausted administrative remedies in a manner that alerted FCC-Butner officials to the nature of the claims in this action. And, in any event, the court permitted plaintiffs to file surreply addressing the argument that plaintiffs' grievances did not provide sufficient notice of the claims. (May 7, 2021, order, (DE 78)); <u>see also</u> <u>United States v. Head</u>, 340 F.3d 628, 630 n.4 (4th Cir. 2003) (explaining rule that arguments raised for the first time on reply should not be considered is discretionary and may be excused if the prejudiced party is given an opportunity to respond).

Plaintiffs next argue that "the level of detail required is determined by the grievance process in the particular correctional system, not by the PLRA" and that defendants fail to provide an FBOP policy delineating the level of detail required for administrative grievances. (Surreply (DE 80) at 10). The Supreme Court has indeed held that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." <u>Jones</u>, 549 U.S. at 219.

Here, the administrative remedy regulations allow inmates to "seek formal review of an issue relating to any aspect of his/her own confinement" and that the inmate must present "an issue of concern" to staff to initiate the process. 28 C.F.R. §§ 542.10(a) 542.13(a). To initiate a BP-9 request to the warden, the inmate "shall place a single complaint or a reasonable number of closely related issues on the form." 28 C.F.R. § 542.14(c)(2); (<u>see also</u> FBOP Program Statement 1330.18 – Administrative Remedy Program (DE 57-2) (setting forth these same requirements in formal FBOP policy)). FBOP inmates therefore must identify the subject matter of their complaints in order to exhaust administrative remedies. Regardless of the precise level of detail

22

required in an administrative grievance, the policy requires, at a minimum, that the grievance "alert[] the prison to the nature of the wrong for which redress is sought."   See Wilcox, 877 F.3d at 167 n.4 (quotation omitted).   Plaintiff Hallinan did not satisfy this requirement for the reasons explained above.

Plaintiffs further point out that the PLRA does not require that they cite to specific legal doctrines or statutes, such as deliberate indifference or the Rehabilitation Act, to exhaust administrative remedies.   (Surreply (DE 80) at 10–11).   While that is true, they must provide notice of the nature of the wrongs and "give prison officials a fair opportunity to address the alleged [mistreatment]."   Wilcox, 877 F.3d at 167 n.4; Moore, 517 F.3d at 729.

Finally, plaintiffs argue that the administrative remedy procedure does not allow individual inmates to file grievances on behalf of other inmates.   (Surreply (DE 80) at 11).   But plaintiff Hallinan did not need to file a grievance complaining about the conditions faced by other inmates. Plaintiff Hallinan alleges that the conduct complained of affects him personally.   He alleges he suffers from a disability, that FCC-Butner's response to COVID-19 discriminated against him on the basis of that disability, and that defendants were deliberately indifferent to his individual risk of contracting COVID-19.   (See Compl. (DE 1) ¶¶ 28, 104).   The administrative remedy policy did not prevent plaintiff Hallinan from filing a grievance alleging the FBOP's response to COVID-19 was deficient and increased his chances of infection.   See 28 C.F.R. § 542.10 (providing the purpose of the program is "to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement"); (see also FBOP Program Statement 1330.18 – Administrative Remedy Program (DE 57-2) at 1)).

In sum, plaintiff Hallinan's grievances did not alert prison officials to the issues raised in

23

the complaint.   He therefore did not exhaust administrative remedies.

The court next turns to plaintiff Williams's administrative grievance records.   The record is unclear as to whether plaintiff Williams filed one or two administrative grievances related to COVID-19.   (<u>Compare</u> Kelley Decl. (DE 39-7) ¶ 16 <u>with</u> Connors Decl. (DE 57-1) ¶¶ 37–39). In any event, the parties agree that plaintiff Williams filed the pertinent BP-10(s) in either July or August 2020, and that he did not receive a response to the grievance(s) within the permitted response deadline.   (<u>See</u> Connor Decl. (DE 57-1) ¶¶ 37–39; Kelley Decl. (DE 39-7) ¶ 16; <u>see also</u> Pls' Surreply (DE 80) at 5–6).   Plaintiff Williams, however, admits he did not treat the absence of a response at the BP-10 level as a denial and file a BP-11 appeal with the general counsel for any grievance.   (<u>See</u> Pls' Resp. (DE 45) at 14).   He therefore did not exhaust administrative remedies prior to filing this action.

Plaintiff Williams argues the administrative remedy program was unavailable to him.   The PLRA does provide a statutory exception to the exhaustion requirement: the inmate must exhaust only "available" administrative remedies.   <u>See</u> 42 U.S.C. § 1997e(a); <u>Ross v. Blake</u>, 578 U.S. 632, 642–44 (2016).   An administrative remedy procedure is unavailable if: 1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; 2) when it is "so opaque that it becomes, practically speaking, incapable of use"; and 3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."   <u>Ross</u>, 578 U.S. at 642–44.

Here, plaintiff Williams did not pursue his BP-11 appeal because he assumed the general counsel would reject his filing if he could not attach the BP-10 decision.   The FCC-Butner Inmate Handbook provides that any BP-11 appeal "must [include] copies of the [BP-9 and BP-10] forms

24

with responses." (DE 46-3 at 41); <u>see also</u> 28 C.F.R. § 542.15(b)(1) (requiring that the inmate attach the BP-10 response to any BP-11 appeal). The pertinent regulation and the administrative remedy program statement, however, expressly provide that "[i]f the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18; (FBOP Program Statement 1330.18 (DE 57-2) ¶ 12). As plaintiffs argue, the handbook and the policy statement/regulation are inconsistent where the handbook requires the inmate to attach the BP-10 response to the BP-11 appeal, but the program statement and the regulation allow the inmate to file the BP-11 appeal in the event the regional director does not respond within the pertinent deadline.

This inconsistency, however, does not render the administrative remedy program unavailable to plaintiffs. Plaintiff Williams did not even attempt to file a BP-11 appeal and explain that he could not attach the BP-10 response because the regional director failed to respond. (<u>See</u> Surreply (DE 80) at 5–6; Connors Decl. (DE 57-1) ¶¶ 37–40). As discussed above, the publicly available regulations and program statement expressly contemplate this procedure. 28 C.F.R. § 542.18; (FBOP Program Statement 1330.18 (DE 57-2) ¶ 12). If he had done so, the general counsel would not have rejected the appeal so long as plaintiff Williams provided a receipt showing that he filed the BP-10 appeal and waited until the deadline expired before appealing to the general counsel. (Connors Decl. (DE 57-1) ¶¶ 16 n.2, 26). Nor does plaintiff Williams provide a declaration explaining why he unilaterally determined the administrative remedy process was unavailable without even attempting to file the BP-11 appeal or seek guidance from other staff members about how to proceed with a BP-11 appeal when did not receive a response at the BP-10 level. <u>See</u> <u>Ross</u>, 578 U.S. at 643–49 (suggesting inmate bears the burden of showing

25

administrative remedies are unavailable); see also Graham v. Gentry, 413 F. App'x 660, 663 (4th Cir. 2011) ("[I]n order to show that a grievance procedure was not available, a prisoner must adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure."). This is not a situation, in other words, where "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it"; nor is it a program designed "to trip up all but the most skillful prisoners." Ross, 578 U.S. at 644 (quotation omitted).

Plaintiffs' reliance on Risher v. Lappin, 639 F.3d 236 (6th Cir. 2011), is therefore misplaced. In Risher, the plaintiff did not receive a response to his BP-10 within the relevant deadline, and he treated the absence of a response as a denial at that level and filed a BP-11 appeal. 639 F.3d at 239. The general counsel's office rejected the BP-11 because the plaintiff did not provide the regional director's response, even though he explained to the general counsel he did not have a response to provide. Id. In these circumstances, the United States Court of Appeals for the Sixth Circuit held the plaintiff exhausted available administrative remedies where he "attempted to follow the [FBOP's] regulations by treating the Regional Director's failure to respond to his appeal as a denial, as he was instructed he could do by 28 C.F.R. § 542.18, and appealing that denial to the Central Office." Id. at 240. As set forth above, plaintiff Williams did not attempt to file his BP-11 central office appeal after the regional director failed to respond. As a result, plaintiff Williams, unlike the plaintiff in Risher, cannot refute defendants' evidence showing they would not have rejected the BP-11 appeal if he provided evidence that he did not receive the BP-10 response. (Connors Decl. (DE 57-1) ¶¶ 16 n.2, 26).

Plaintiffs further assert that the requirement that they attach a receipt showing they filed at the BP-10 level and did not receive a response is not directly explained in the administrative

remedy policy. (Surreply (DE 80) at 8–6). They argue the BP-11 procedure was unavailable to plaintiff Williams because he did not know he could file the BP-11 with the receipt showing he did not receive a BP-10 response. (Id.). As explained above, the pertinent regulations and program statement expressly allow the inmate to treat the absence of a response as a denial and proceed to the next appeal level. 28 C.F.R. § 542.18; (FBOP Program Statement 1330.18 (DE 57-2) ¶ 12). And, according to defendants, if plaintiff Williams filed the BP-11 without the receipt, the general counsel would have dismissed the filing without prejudice to refiling after explaining the receipt was required to establish the regional director did not respond. (See Connors Decl. (DE 57-2) ¶ 26). Because plaintiff Williams did not attempt to file his BP-11 appeal, he cannot refute this evidence. Plaintiffs also offer no evidence suggesting the receipt is not provided to them or is otherwise difficult to obtain. Under these facts, defendants' failure to explain the requirement for filing a receipt showing a lack of response at the BP-10 level along with the BP-11 appeal did not render the BP-11 appeal unavailable to plaintiff Williams. See Ross, 578 U.S. at 642–44.

Plaintiff Williams therefore did not exhaust administrative remedies, and he has failed to carry his burden of showing the FBOP's administrative remedy procedure is unavailable.

Plaintiffs' final argument is that the doctrine of vicarious exhaustion precludes dismissal on exhaustion grounds at this pre-discovery stage of the litigation. (Resp. (DE 45) at 15). The argument may be summarized as follows: 1) under the vicarious exhaustion doctrine, the PLRA's exhaustion provision is satisfied if any one member of the class exhausted administrative remedies; 2) even if the named plaintiffs in this case did not exhaust, the possibility exists that some unidentified member of the proposed class could have done so; and 3) thus, summary judgment on

exhaustion grounds is premature unless the parties are given an opportunity for class-wide discovery to identify whether any member of the proposed class exhausted administrative remedies. (Id.).

Although the United States Court of Appeals for the Fourth Circuit has not addressed vicarious exhaustion in the context of the PLRA, courts have recognized the principle that where an inmate class is certified and the plaintiffs establish at least one member of class exhausted administrative remedies, that exhaustion applies vicariously to all members of the class. See Chandler v. Crosby, 379 F.3d 1278, 1287 (11th Cir. 2004); Gates v. Cook, 376 F.3d 323, 329–30 (5th Cir. 2004); Jackson v. District of Columbia, 254 F.3d 262, 268–69 (D.C. Cir. 2001); Scott v. Clarke, 64 F. Supp. 3d 813, 832 n.10 (W.D. Va. 2014). These cases, however, involved class actions that had been certified under Federal Rule of Civil Procedure 23 and where at least one of the named plaintiffs had exhausted administrative remedies. See Chandler, 379 F.3d at 1287–88; Gates, 376 F.3d at 329–30; Jackson, 254 F.3d at 268–69; Scott, 64 F. Supp. 3d at 815 n.1, 832–33 & n.10.

Plaintiffs cite no authority, and the court has found none, holding that vicarious exhaustion precludes dismissal of putative class action where the class has not been certified and the named plaintiffs have not exhausted administrative remedies. The Fourth Circuit has suggested that the named plaintiff must exhaust administrative remedies before the court applies vicarious exhaustion to members of the class. See Chisholm v. U.S. Postal Serv., 665 F.2d 482, 490 (4th Cir. 1981) (addressing vicarious exhaustion in the context of class action alleging employment discrimination); cf. Gibson v. Chrysler Corp., 261 F.3d 927, 940 (9th Cir. 2001) ("[A] class action, when filed, includes only the claims of the named plaintiff or plaintiffs. The claims of unnamed

28

class members are added to the action later, when the action is certified as a class under Rule 23.").

Plaintiffs also cannot achieve class certification in the absence of viable claims for relief. See Fed. R. Civ. P. 23(a)(3) (requiring class representatives have "claims or defenses" that are "typical of the claims or defenses of the class"); East Texas Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (holding that court of appeals erred in certifying a class where it was "inescapably clear" that the named plaintiffs were "not proper class representatives" because their individual claims were without merit); Board of School Comm'rs v. Jacobs, 420 U.S. 128, 128–30 (1975) (per curiam) (concluding that where claims of the named plaintiffs were moot and case was not properly certified as a class action, the action must be dismissed). In the absence of class representatives, the motion for class certification must be denied and plaintiffs cannot rely on vicarious exhaustion to save their unexhausted claims.

In sum, plaintiffs did not exhaust available administrative remedies prior to filing this action. As a result, the Eighth Amendment and Rehabilitation Act claims must be dismissed without prejudice.

4. Habeas Corpus Claim

Plaintiffs also bring this action as a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Although § 2241 does not require administrative exhaustion and the PLRA's exhaustion provisions do not apply to habeas actions, courts require inmates challenging the execution of their sentences to exhaust administrative remedies before seeking review in federal court pursuant to § 2241. See Timms v. Johns, 627 F.3d 525, 530–31 (4th Cir. 2010); United States v. Vance, 563 F. App'x 277, 278 (4th Cir. 2014); McClung v. Shearin, 90 F. App'x 444, 445 (4th Cir. 2004). Plaintiffs acknowledge that if they have not exhausted administrative remedies with respect to

29

their Eighth Amendment or Rehabilitation Act claims, they also have not exhausted alternative remedies for their § 2241 claim. (See Resp. (DE 45) at 8 n.3). Plaintiffs also have not established grounds for excusing their failure to exhaust. See McClung, 90 F. App'x at 445. Accordingly, the habeas corpus claim is dismissed without prejudice.

C.      Motion for Class Certification

As discussed above, plaintiffs cannot represent the class because they do not have viable legal claims. In the absence of class representatives with valid claims, the court cannot certify a class. See Fed. R. Civ. P. 23(a)(3); Rodriguez, 431 U.S. at 403. Accordingly, the motion for class certification is denied.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 30) is GRANTED, and plaintiffs' motion for class certification (DE 24) is DENIED. Plaintiffs' claims are dismissed without prejudice to refiling after exhausting administrative remedies or finding alternative class representatives. The clerk is DIRECTED to close this case.

SO ORDERED, this the 29th day of March, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge

30